## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| ORBIT SPORTS LLC,<br><br>                    Plaintiff,<br><br>vs.<br><br>GLEN TAYLOR, TAYLOR CORPORATION,<br>and TAYLOR SPORTS GROUP, INC.,<br><br>                    Defendants. | Civil Action No.: _____<br><br><br>**COMPLAINT** |

Plaintiff Orbit Sports LLC ("Orbit"), by and through its attorneys, Greenberg Traurig, LLP, states as follows by way of Complaint against defendants Glen Taylor ("Taylor"), Taylor Corporation ("Taylor Corporation") and Taylor Sports Group, Inc. ("Taylor Sports Group") (each, a "Taylor Party" and collectively, the "Taylor Parties"), upon knowledge with respect to Orbit's own acts and upon information and belief with respect to all other matters:

## <u>INTRODUCTION</u>

1.      The Taylor Parties are, collectively, the majority owner and General Partner of the NBA's Minnesota Timberwolves (the "Timberwolves") and the WNBA's Minnesota Lynx (the "Lynx"). The Taylor Parties, however, are not the only owner. Over the years, the Taylor Parties have raised substantial sums of money by selling portions of their interests in the teams to various limited partners.

2.      Among those limited partners is Orbit, which currently owns more than 17% of the Timberwolves and Lynx. Orbit not only owns the second largest ownership interest in the teams, but its stake also is greater than those of all other (non-Taylor Parties) limited partners combined.

3.      Orbit first invested in the Timberwolves and Lynx in 2016, when the Taylor Parties sold a portion of their interests to raise desperately-needed cash.  At that time, Orbit was unwilling to invest in a minority interest in the Timberwolves and Lynx unless it received a guarantee that it would be able to sell its interest in the event that Taylor agreed to transfer control of the teams.

4.      For this reason, in 2016, the Partnership Agreement was amended to provide that in the event of such a "Control Sale," Orbit (and the other limited partners) had the right to sell its entire interest to the buyer.  These rights are referred to as the "Tag-Along Rights."

5.      A "tag-along-right" is a provision commonly found in partnership agreements to protect minority investors if the controlling partner proposes to sell the ownership of the company without the consent or approval of the minority investors.  A "tag-along right" entitles minority investors to sell their interests if controlling partnership interests are proposed to be transferred.

6.      The Tag-Along Rights in the Partnership Agreement were a material precondition to Orbit's decision to invest in the Timberwolves and Lynx.  Without them, Orbit would not have made its investment in the first place.

7.      Taylor has publicly announced that he has agreed to sell his interests in the Timberwolves and Lynx to Alex Rodriguez ("Rodriguez") and Marc Lore ("Lore").  That sale has been described as "beginning *the transition of ownership* and *a new chapter* of Minnesota Timberwolves and Lynx basketball." (*See, e.g.,* https://www.nba.com/timberwolves/statement-on-ownership) (emphasis added).

8.      As reported in the *Star Tribune* (which Taylor also owns), "Taylor, 80, has an agreement for *the $1.5 billion sale* of the Wolves and Lynx to former baseball star Alex Rodriguez and tech entrepreneur Marc Lore."  (Emphasis added).

2

9.      Taylor's agreement to transfer control of the Timberwolves and Lynx to Rodriguez and Lore triggered Orbit's Tag-Along Rights under the Partnership Agreement.  Nonetheless, when Orbit attempted to exercise its Tag-Along Rights, Taylor not only ignored Orbit but also privately stated – directly contrary to his public statements – that he is *not* proposing to enter into a "control sale" with Rodriguez and Lore at this time.  Instead, Taylor is claiming that any "control sale" will be years in the future, and therefore Orbit currently does not have any Tag-Along Rights.

10.     Taylor is wrong. Although the deal with Rodriguez and Lore was structured as a clumsy attempt to circumvent Orbit's Tag-Along Rights, it does not deprive Orbit of its Tag-Along Rights.

11.     As a threshold matter, the Tag Along Rights are triggered regardless of whether control is transferred "in a single transaction or *in a series of related transactions*." (Partnership Agreement § 1.9C) (emphasis added.)   Here, Taylor is proposing to enter into a series of related transactions through which the Taylor Parties will transfer their controlling interests to Rodriguez and Lore over time – which is just as much of a "Control Sale" under the Partnership Agreement as would be a sale of the Taylor Parties' entire interests in one fell swoop.

12.     Orbit's Tag-Along Rights were triggered immediately when the Taylor Parties "*proposed*" to enter into a "Control Sale" – regardless of when the transaction closes or when a change of control actually occurs.  Put another way, the Taylor Parties' Tag-Along obligations under the Partnership Agreement are triggered immediately upon their "*proposal*" to enter into a Control Sale – whether or not control transfers in two days, two months or even two years later. Having already signed a detailed agreement regarding a transition of ownership and having publicly announced that agreement, Taylor clearly has "proposed" to enter into a "Control Sale" with Rodriguez and Lore.

13.     Under the Partnership Agreement, if the prospective purchaser does not agree to purchase Orbit's interests, Taylor himself must acquire them. Moreover, the Partnership Agreement provides that Taylor may not transfer *any* Partnership Interests – including his own – unless and until he has honored all Tag-Along Rights.

14.     Taylor has refused to take any of the steps required under the Partnership Agreement to honor these Tag-Along Rights. He has refused to recognize, much less act upon, Orbit's "Tag-Along Notices" through which Orbit elected to exercise its Tag-Along Rights to participate in the proposed sale to Rodriguez and Lore.

15.     Under his agreement with Rodriguez and Lore, Taylor's sale of an initial 20% of the teams is scheduled to close in 2021. Under the same agreement, Taylor is also issuing "options" for Rodriguez and Lore to acquire all of Taylor's remaining interests on or before various specified outside dates up to the end of 2024. Nothing in this convoluted structure diminishes Orbit's ability to exercise its Tag-Along Rights now.

16.     Under the Partnership Agreement, a "Control Sale" encompasses an "exchange or other disposition" of the Taylor Parties' interests through a "series of related transactions" – even if one or more or those "related transactions" may not be deemed a "sale" and even if those transactions do not all occur at once. Therefore, a "Control Sale" will have occurred immediately upon closing of the proposed transaction with Rodriguez and Lore, which admittedly involves a "transition of ownership" – and not merely when they might exercise various carefully-specified "options" down the road.

17.     There are two ways in which the Taylor Parties can transfer their controlling interests in the Timberwolves and Lynx to a third party: (i) through a single transaction involving the Taylor Parties' entire interests all at once; or (ii) through a series of related transactions through

4

which the Taylor Parties transfer their controlling interests to a third party over time.  Under the Partnership Agreement, *both* of those scenarios constitute a "Control Sale."  Here, Taylor is proposing to enter into a series of related transactions through which the Taylor Parties transfer their controlling interests to Rodriguez and Lore over time – which is just as much of a "Control Sale" under the Partnership Agreement as would be a sale of the Taylor Parties' entire interests in one fell swoop.

18.    If any more evidence were needed about whether Taylor's agreement with Rodriguez and Lore is an agreement to transfer control in a "series of related transactions," Taylor confirmed to Darren Wolfson of KSTP News that "*it's obvious . . . where the ownership is going,*" and predicted that "the transition will be relatively easy." (https://kstp.com/minnesota-sports/glen-taylor-interview-selling-timberwolves-lynx-rodriguez-lore/6111053/) ("Q&A: Glen Taylor on selling Wolves and Lynx to Alex Rodriguez and Marc Lore") (emphasis added).

19.    Under the agreement that Taylor signed, Rodriguez and Lore are entitled to exercise their "options" *at any time* following the closing date and prior to the dates set forth in the agreement.  In other words, although a number of their rights under the agreement are called "options," the truth is that Rodriguez and Lore may assume control of the Timberwolves and Lynx long before December 31, 2023 – and they are entitled to do so, at their sole option, "at any time" before then if they so wish.  As a result, Rodriguez and Lore have a clear path to control.

20.    There are other aspects of the sale to Rodriguez and Lore about which Taylor is saying one thing publicly while actually doing something different entirely. The *Associated Press* reported that "[t]hroughout the sale process, [Taylor] told interested parties that keeping the franchises in town was a prerequisite for purchase, and quoted Taylor as saying that "[t]here was no use talking to them if they didn't agree to that."  Similarly, Taylor's *Star Tribune* reported that

"Timberwolves and Lynx owner Glen Taylor appeared on WCCO-AM 830 on Tuesday to reiterate that there is language in the agreement he made with prospective new owners Alex Rodriguez and Marc Lore to keep the Wolves in Minnesota," and quoted Taylor as saying: "*We have it in the contract, they have signed the contract to do that.*"  (emphasis added).

21.     Yet the truth is that Taylor's agreement with Rodriguez and Lore does *not*, in fact, require them to keep the Timberwolves in Minnesota.

22.     Taylor must not be permitted to avoid his contractual obligation to Orbit, which invested in the Timberwolves and Lynx only because of the assurance it obtained that it could sell its interest in the teams without delay in the event of any agreement by Taylor to transfer control.

23.     Orbit has repeatedly brought these matters to Taylor's attention.  Before Taylor finalized his agreement with Rodriguez and Lore, Orbit reminded Taylor of its Tag-Along Rights and advised Taylor that Orbit intended to exercise them if Taylor did go forward with an agreement with Rodriguez and Lore.   Taylor nevertheless went ahead and signed his agreement with Rodriguez and Lore, while ignoring Orbit's reminder of its Tag-Along Rights.

24.     After Taylor signed his agreement with Rodriguez and Lore, Orbit sent multiple additional letters to Taylor citing the provisions of the Partnership Agreement in detail and explaining that Orbit's Tag-Along Rights had been triggered.

25.      Unfortunately, Orbit's good faith efforts have been met with silence and stonewalling.  Instead of recognizing that he cannot vitiate Orbit's Tag-Along Rights under the Partnership Agreement, Taylor has repeatedly denied that those rights have been triggered at all.

26.     Having exhausted its pre-litigation efforts to obtain Taylor's recognition of its bargained-for rights, Orbit brings this action for monetary, declaratory and injunctive relief to protect and preserve those rights.

27.    Orbit brings these claims for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory judgment, and injunctive relief enjoining Taylor and his entities from proceeding with the transaction without first honoring his partners' Tag-Along Rights to fully participate in the sale from the outset.

28.    Taylor cannot erase the bargained-for rights that he granted to Orbit years ago, and that were triggered as soon as Taylor proposed to enter into a deal like the one to which Taylor already has agreed with Rodriguez and Lore.  Taylor should not be permitted to leap ahead of his partners and pocket substantial proceeds from his deal with Rodriguez and Lore while his partners are made to wait for up to several years to be paid for their interests.

## THE PARTIES

29.    Taylor is a natural person who is domiciled in the State of Minnesota and is a citizen of the State of Minnesota.

30.    Taylor Sports Group is a Minnesota corporation with its principal place of business located at 1725 Roe Crest Drive, North Mankato, Minnesota 56002.  Taylor Sports Group is a citizen of the State of Minnesota.

31.    Taylor Corporation is a Minnesota corporation with its principal place of business located at 1725 Roe Crest Drive, North Mankato, Minnesota 56002.  Taylor Corporation is a citizen of the State of Minnesota.

32.    Orbit is a New Jersey limited liability company with its principal place of business located at 980 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  Orbit's members are all citizens of the State of New Jersey.  No member of Orbit is a citizen of the State of Minnesota.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because this action is between citizens of different States and the amount in controversy exceeds $75,000.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

## STATEMENT OF FACTS

**A.     Orbit is By Far the Largest Non-Taylor Party Limited Partner in the Timberwolves and Lynx.**

35.     Taylor Sports Group is the General Partner of the Minnesota Timberwolves Limited Partnership (the "Partnership") pursuant to a Limited Partnership Agreement effective September 29, 1994, as amended (the "Partnership Agreement"), which is attached as **Exhibit A**. Taylor Sports Group owns all General Partnership Interests in the Partnership.

36.     The purpose of the Partnership, among other things, is to own and operate the Timberwolves and the Lynx, both located in Minneapolis, Minnesota.

37.     As General Partner, Taylor Sports Group has the "exclusive management and control of the business of the Partnership, and all decisions regarding the management and affairs of the Partnership shall be made by the General Partner." (Partnership Agreement § 7.1.)

38.     Taylor Corporation and Taylor are Limited Partners under the Partnership Agreement and collectively own a substantial majority of the Limited Partnership Interests.

39.     Taylor owns and controls both Taylor Sports Group and Taylor Corporation.

40.     Except only for the Taylor Parties, Orbit is the largest Limited Partner of the Partnership, holding more than 17% of the Partnership Interests. Orbit's stake in the Partnership is greater than the interests of all other non-Taylor Party Limited Partners combined.

**B.**      **Orbit's Tag-Along Rights Are Triggered Immediately When a Taylor Party Proposes to Enter into a Control Sale.**

      **1.**      **Orbit's Tag-Along Rights Guarantee Its Ability to Exit in Full and at the Outset of Any "Series of Related Transactions," Whether by "Sale, Exchange or Other Disposition," Involving the Transfer of the Taylor Parties' Partnership Interests.**

41.      Orbit's significant stake in the Timberwolves and Lynx is no accident:  Taylor solicited Orbit's investment at a time when he sorely required a capital infusion.  Before acquiring its initial Limited Partnership Interests in 2016, Orbit required that the Partnership Agreement be amended to guarantee all Limited Partners certain rights, known as "Tag-Along Rights," in the event of a "Control Sale."

42.      The Tag-Along Rights were a precondition to Orbit's decision to become a Limited Partner.  Put another way, the Tag-Along Rights were a significant factor in Orbit's decision to invest in the Timberwolves and Lynx.  Without them, Orbit would not have invested in the first place.

43.      Under Section 10.7 of the Partnership Agreement, if and when the Taylor Parties propose to enter into a Control Sale, all Limited Partners – including Orbit – have the right to participate and sell their own interests in the Partnership at the same price as proposed through the Control Sale.  (*See* Partnership Agreement § 10.7(a) ("[I]n the event that one or more members of the Taylor Group . . . *proposes* to enter into a Control Sale. . ., *then* each Limited Partner (the 'Tag-Along Partners') shall have the right (the 'Tag-Along Right'), to elect to participate in such Tag-Along Sale . . .") (emphasis added).)

44.      Once those Tag-Along Rights are triggered, the Selling Partner – *i.e.*, the Taylor Parties in connection with the proposed transaction – is required to take various actions for the benefit of other partners, including Orbit.  Among other things, the Taylor Parties (a) must give notice of any proposed Control Sale to all Limited Partners; (b) must use commercially reasonable

efforts to obtain the agreement of the Prospective Purchaser to allow the participation of Limited Partners who wish to participate; (c) must purchase, at the negotiated price, the interests of any Limited Partner whose Limited Partnership Interests are not purchased by the Prospective Purchaser; and (d) may not proceed with the proposed Control Sale if all Limited Partners who wish to participate are not allowed to participate at the negotiated price. (Partnership Agreement §§ 10.7(b)-(d).)

45.     In defining the term "Control Sale," the parties agreed that it would include any "sale, exchange or other disposition . . . of Partnership Interests which includes majority of all the General Partnership Interests," whether "in a single transaction or *in a series of related transactions*." (Partnership Agreement § 1.9C (emphasis added).)  This definition, which Orbit specifically bargained for with the Taylor Parties, protects against a deal structure that might impair the value of the Limited Partnership Interests over time or subject the Limited Partners to indeterminate credit risk, whether due to the passage of time, the impact of purchase price adjustments, the incurrence of additional debt obligations by the Partnership, changes in tax law, or otherwise.  The definition of "Control Sale" ensures that Limited Partners can exit in full at the outset, instead of being forced to assume such risks if the Control Sale spans a series of related transactions over time.

46.     The parties agreed that the vesting of Tag-Along Rights would not be delayed until the actual transfer of a majority of General Partnership Interests.  Instead, Tag-Along Rights are triggered *immediately* once a member of the Taylor Group "*proposes* to enter into a Control Sale." (Partnership Agreement § 10.7(a) (emphasis added).)

47.     As noted, under Section 1.9C of the Partnership Agreement, a Control Sale includes "*a sale, exchange or other disposition* (for cash or property with a discernible cash value) by one

or more members of the Taylor Group, in a single transaction or series of related transactions, to any Person who is not a member of the Taylor Group, of Partnership Interests which includes a majority of all the General Partnership Interests."  (Partnership Agreement § 1.9C) (emphasis added).   In other words, under Section 1.9C, a "Control Sale" need not necessarily involve a "sale"; an "exchange or other disposition" qualifies, too.  (*Id*.)

48.    An agreement to transfer the Taylor Parties' Partnership Interests constitutes a "Control Sale" even if it is structured so that the General Partnership Interests are sold or otherwise disposed together at the end, following other transactions involving other Partnership Interests held by the Taylor Parties.  Such an agreement constitutes a sale, exchange or other disposition "*in a series of related transactions . . . of Partnership Interests which includes a majority of all the General Partnership Interests*."  (*Id*.)  (Emphasis added).

49.    Once a Control Sale is "proposed," the Tag Along Rights under the Partnership Agreement are immediately triggered.  (Partnership Agreement § 10.7(a)).  Indeed, the Partnership Agreement provides that when a Control Sale is proposed, "*then"* – not at some future date – "each Limited Partner (the 'Tag-Along Partners') *shall have the right (the 'Tag-Along Right'), to elect to participate in such Tag-Along Sale . . . .*"  (*Id*.) (emphasis added).

50.    In light of the above, the Taylor Parties' Tag-Along obligations under Section 10.7 of the Partnership Agreement are triggered immediately upon any "*proposal*" by them to enter into a Control Sale, whether or not closing of such a Control Sale is scheduled to occur – and whether or not "control" might actually vest – two days, two months or even two years later.  The triggering event under Section 10.7 is when the Taylor Parties "propose" to enter into a Control Sale – not when the Taylor Parties might elect to close or actually transfer "control."

51.     Once the Tag-Along Rights are triggered, the Taylor Parties must honor them before proceeding with a transaction that benefits only them, as the Taylor Parties now seek to do.

52.     The Partnership Agreement expressly prohibits the Taylor Parties from transferring any of their Partnership Interests as part of a Control Sale without first honoring the Limited Partners' Tag-Along Rights.:  the Selling Partner "shall not (directly or indirectly) Transfer *any* of its Partnership Interests" until after every Limited Partner has fully exercised its Tag-Along Rights, if it chooses to do so.  (Partnership Agreement § 10.7(d)(iii)) (emphasis added).

53.     Therefore, the Taylor Parties may not proceed with a Control Sale – *i.e.*, a Transfer of their own Partnership Interests to a third party – unless and until they have complied with Section 10.7 of the Partnership Agreement by honoring and implementing the Tag-Along Rights of Orbit and all other Limited Partners.

**2.     The Partnership Agreement Provisions Assure Orbit's Tag-Along Rights.**

54.     The Limited Partners' Tag-Along Rights are governed by Section 10.7 of the Partnership Agreement.  Specifically, Section 10.7(a) provides, in full, as follows:

> Participation Right. Subject to Section 10.1, in the event that one or members of the Taylor Group (which includes one or more persons that collectively own, directly or indirectly, a majority of the General Partnership Interests) proposes to enter into a Control Sale (such participating members of the Taylor Group, collectively the "***Selling Partner***"), and the Selling Partner does not exercise the Drag-Along Right (defined below) with respect to such sale (the "***Tag-Along Sale***"), then each Limited Partner (the "***Tag-Along Partners***") shall have the right (the "***Tag-Along Right***") to elect to participate in such Tag-Along Sale on and pursuant to the terms and conditions set forth in this Section 10.7 at the same price and on the same other terms and conditions applicable to the Selling Partner (other than the non-purchase price terms applicable to the General Partnership Interests (for the avoidance of doubt, the Limited Partnership Interests will receive the same purchase price, on a per-Percentage Interest basis, as is applicable to the General Partnership Interests)).

(Partnership Agreement § 10.7(a).)

55.     "Control Sale" is defined in Section 1.9C of the Partnership Agreement as follows:

[A] sale, exchange or other disposition (for cash or property with a discernible cash value) by one or more members of the Taylor Group, in a single transaction or series of related transactions, to any Person who is not a member of the Taylor Group, of Partnership Interests which includes a majority of all the General Partnership Interests (including the indirect sale, exchange or other disposition of such Partnership Interests through the sale, exchange or other disposition (for cash or property with a discernible cash value) of interests in any entity that owns, directly or indirectly, such Partnership Interests).

(*Id.* § 1.9C.)

56.    Pursuant to Section 10.7(b) of the Partnership Agreement, if the Selling Partner "proposes to enter into a Control Sale," it must provide all Limited Partners (*i.e.*, the Tag-Along Partners) with a "Sale Notice" within ten days of executing a definitive agreement.  (*Id.* § 10.7(b).) Section 10.7(b) provides in full:

> Sale Notice. The Selling Partner shall provide each of the Tag-Along Partners with written notice of the proposed Tag-Along Sale (the "***Sale Notice***") within ten (10) days following execution of any definitive agreement (by all the parties thereto) entered into with respect to the Tag-Along Sale. The Sale Notice shall describe in reasonable detail (i) the Partnership Interests to be sold (directly or indirectly) by the Selling Partner; (ii) the name of the proposed buyer (the "***Prospective Purchaser***"); (iii) the purchase price and the other material terms and conditions of the sale; (iv) the proposed date, time and location of the closing of the sale; and (v) copy of the definitive agreement so entered into or if not yet executed any form of agreement proposed to be executed in connection therewith.

(*Id.*)

57.    Pursuant to Section 10.7(c) of the Partnership Agreement, upon receipt of the Sale Notice, each Tag-Along Partner has fifteen days to exercise its Tag-Along Rights by issuing a "Tag-Along Notice" to the Selling Partner that specifies the Partnership Interests it proposes to sell.  (*Id.* § 10.7(c).)  Each Tag-Along Partner is "entitled to sell in the contemplated Tag-Along Sale up to all of the Partnership Interest owned by such Tag-Along Partner."  (*Id.*)  Section 10.7(c) provides in full as follows:

> (i)    To exercise the Tag-Along Right, the Tag-Along Partner shall give written notice (the "***Tag-Along Notice***") to the Selling Partner of such election and

13

specifying the Partnership Interests it proposes to sell within fifteen (15) days after receiving the Sale Notice from the Selling Partner. The offer of each Tag-Along Partner set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Partner shall be bound and obligated to sell in the proposed Tag-Along Sale on the terms and conditions set forth in this Section 10.7. Subject to Section 10.7(d), each Tag-Along Partner shall be entitled to sell in the contemplated Tag-Along Sale up to all of the Partnership Interest owned by such Tag-Along Partner.

(ii)    Each Tag-Along Partner that timely and properly delivers a Tag-Along Notice (electing to exercise the Tag-Along Right) in accordance with this Section 10.7(b) is referred to as an "***Electing Partner***". Each Tag-Along Partner who does not timely and properly deliver a Tag-Along Notice in compliance with this Section 10.7(b) shall be deemed to have waived all of such Tag-Along Partner's rights to participate in such Tag-Along Sale.

(*Id.*)

58.    Once a Limited Partner delivers a Tag-Along Notice, the Selling Partner must "use commercially reasonable efforts to obtain the agreement of the Prospective Purchaser to the participation of each Electing Partner in such contemplated Tag-Along Sale . . . ." (*Id.* § 10.7(d)(i).)

59.    Additionally, under Section 10.7(d)(iii) of the Partnership Agreement,

[t]he Selling Partner shall not (directly or indirectly) Transfer any of its Partnership Interests to any Prospective Purchaser pursuant to such Tag-Along Sale if either (x) such Prospective Purchaser declines to allow the participation of any Electing Partner in accordance with the terms hereof or (y) each Electing Partner that desires to sell all of its Partnership Interests in such sale is not able to do so because of the Maximum Tag Amount, unless in connection with such Tag-Along Sale, the Selling Partner purchases the Partnership Interest from such Electing Partner which such Electing Partner would have been entitled (and elected) to sell pursuant to this Section 10.7, in each case at the same price and on the same terms and conditions on which such Partnership Interests were sold to the Prospective Purchaser.

(*Id.* § 10.7(d)(iii).)

60.     Section 10.1 of the Partnership Agreement further provides that "[a] Partner may not Transfer or assign all or any part of such Partner's Partnership Interest except in accordance with this Agreement." (*Id.* § 10.1.)

**C.      The Taylor Parties Propose to Enter into a Control Sale, Thus Immediately Triggering Orbit's Tag-Along Rights.**

61.     On May 13, 2021, the Taylor Parties and the Partnership entered into an Equity Interest Purchase Agreement (the "EIPA") with Purple Buyer Holdings, LLC (the "Buyer"), pursuant to which the Buyer will acquire 100% of the Taylor Parties' Partnership Interests, including all of Taylor Sports Group's General Partnership Interests (the "Proposed Transaction"). (A copy of the EIPA, excluding the exhibits thereto, is attached hereto as **Exhibit B**).  The Buyer is owned and controlled by Rodriguez, Lore, and/or entities controlled by them.

62.     The Proposed Transaction constitutes a proposal to enter into a Control Sale, thereby triggering the Limited Partners' Tag-Along Rights under Section 10.7 of the Partnership Agreement.

63.     The Taylor Parties, however, have refused to acknowledge the Limited Partners' Tag-Along Rights, as required by the Partnership Agreement.  Instead, the Taylor Parties have wrongly asserted that Orbit and the other Limited Partners do not currently have any Tag-Along rights, because there supposedly is no Control Sale until the Buyer exercises one or more "options" under the EIPA to acquire the Taylor Parties' General Partnership Interests, which may not occur until December 2023 (although, as noted, Rodriguez and Lore are entitled to exercise the options "at any time" sooner than that).

64.     In a blatant attempt to circumvent their Tag-Along obligations, the Taylor Parties have structured the Proposed Transaction in tranches, whereby the Buyer will acquire the Taylor Parties' Partnership Interests over time by exercising a series of "options."  Specifically,  under Section 6.1(b) of EIPA, the Buyers will acquire 20% of the Partnership Interests at the initial "Closing" (as defined in the EIPA) scheduled for 2021.  Thereafter, the Buyer will have "Call Options" to acquire (a) an additional 20% of the Partnership Interests on or before December 31, 2022 (the "First Tranche"); (b) all of the Taylor Parties' General Partnership Interests and, from Taylor Corporation, an additional 4.939458% of Partnership Interests in the form of Limited Partnership Interests on or before December 31, 2023 (the "Second Tranche"); and (c) all of the Taylor Parties' remaining Limited Partnership Interests on or before December 31, 2024.  (*See* EIPA, § 6.1(a)).  Under Section 6.1(a) of the EIPA, moreover, "[e]ach Call Option may be exercised by the Buyer *at any time following the Closing Date* prior to the respective dates specified for the respective portion of the Call Option Units . . . ." (*Id.*) (emphasis added).

65.     Before the May 14, 2021 date on which Taylor stated that the Taylor Parties finalized their agreement with Rodriguez and Lore, Orbit reminded the Taylor Parties of its Tag-Along Rights and advised the Taylor Parties that Orbit intended to exercise them if the Taylor Parties went forward with an agreement with Rodriguez and Lore.  (**Exhibit C** hereto).

66.     After the Taylor Parties executed the EIPA, Orbit sent multiple follow-up letters to the Taylor Parties citing the provisions of the Partnership Agreement in detail and explaining that Orbit's Tag-Along Rights had been triggered as a result of the Proposed Transaction set forth in the EIPA.  Attached hereto as **Exhibits D, E and F** are copies of letters sent by Orbit to the Taylor Parties dated May 14, 2021, May 17, 2021 and May 18, 2021, respectively.

67.     Unfortunately, Orbit's good faith efforts have been unavailing.  Instead of recognizing that they cannot vitiate Orbit's Tag-Along Rights under the Partnership Agreement, the Taylor Parties have falsely contended that the Control Sale will not occur until the Buyer exercises its Second Tranche option and acquires the General Partnership Interests.  Attached hereto as **Exhibit G** is a copy of Taylor's letter to Orbit dated May 17, 2021.

68.     The Taylor Parties, however, cannot erase Orbit's Tag-Along Rights by structuring the disposition of Partnership Interests in tranches or scheduling the transfer of General Partnership Interests for a later date.

69.     Under the Partnership Agreement, Tag-Along Rights do not arise only when the Taylor Parties transfer a majority of the General Partnership Interests to the Buyer.  Instead, Orbit's Tag-Along Rights arise when the Taylor Parties "*propose[]*" to sell, exchange, or otherwise dispose of *any* of their Partnership Interests "in a series of related transactions," as long as the proposed disposition "includes a majority of all the General Partnership Interests."  (Partnership Agreement §§ 1.9C, 10.7(a) (emphasis added).)  That is precisely what has occurred here.

70.     The Proposed Transaction consists of the sale, exchange or other disposition of certain Limited Partnership Interests, coupled with the sale, exchange or other disposition over time of the Taylor Parties' remaining interests, including all the General Partnership Interests, through a series of transactions, including "options" that Rodriguez and Lore are entitled to exercise at various points in time.  The Taylor Parties thus have proposed to enter into a "sale, exchange or other disposition," through a "series of related transactions," of their Partnership Interests, which includes a majority of the General Partnership Interests.  No more is required to trigger Orbit's Tag-Along Rights.

71.     In short, under Section 10.7 of the Partnership Agreement, the triggering event regarding Orbit's Tag-Along Rights is when the Taylor Parties "*propose*" to sell, exchange or otherwise dispose of their Partnership Interests, including a majority of their General Partnership Interests, through a series of related transactions.  The triggering event is *not* when the Taylor Parties might elect to close on the "Control Sale", when the Buyer exercises the Second Tranche option, or when Taylor Parties actually transfer their General Partnership Interests to the Buyer.

72.     The Partnership Agreement provides that when a Control Sale is proposed, "*then*" – not at some future date – "each Limited Partner (the 'Tag-Along Partners') *shall have the right (the 'Tag-Along Right'), to elect to participate in such Tag-Along Sale . . . .*"  (*Id.*) (emphasis added).  By executing the EIPA, the Taylor Parties are "proposing" to enter into a "Control Sale." Therefore, the Taylor Parties' Tag-Along obligations have been triggered already.

1.     **The Taylor Parties' Own Statements Demonstrate That They Have Proposed to Enter into a Control Sale.**

73.     The Taylor Parties' own statements confirm that they have proposed to enter into a Control Sale.  In an April 12, 2021 email to the Limited Partners (a copy of which is attached hereto as **Exhibit H**), Taylor disclosed his intention to relinquish control of the Partnership to the Buyer.  Specifically, Taylor advised as follows:

> I am sure by now you have seen the news regarding the exclusive letter of intent I signed over the weekend with Alex Rodriguez and Marc Lore *to purchase the Timberwolves and Lynx franchises*.  As the reports indicate, this agreement is for a 30 day window to negotiate and come to terms on final details.  This agreement is *structured* for me to continue as the controlling partner for 2.5 years, *after which Alex and Marc will take full ownership*.

(Exhibit H)(Emphasis added.)

74.     When he publicly discussed his deal with Rodriguez and Lore, Taylor hastened to add that he took measures to ensure that the Timberwolves would remain in Minnesota.  The

*Associated Press* reported that "[t]hroughout the sale process, [Taylor] told interested parties that keeping the franchises in town was a prerequisite for purchase, and quoted Taylor as saying that "[t]here was no use talking to them if they didn't agree to that." (**Exhibit I**).

75.     Similarly, Taylor's *Star Tribune* reported that "Timberwolves and Lynx owner Glen Taylor appeared on WCCO-AM 830 on Tuesday to reiterate that there is language in the agreement he made with prospective new owners Alex Rodriguez and Marc Lore to keep the Wolves in Minnesota," and then specifically quoted Taylor as saying: "*We have it in the contract, they have signed the contract to do that*." (**Exhibit J**) (Emphasis added).

76.     On May 14, 2021, after they executed the EIPA, the Taylor Parties issued a public statement that was issued on the Timberwolves' website and posted on social media. (A copy of the aforesaid public statement is attached hereto as **Exhibit K**). The statement provided, in relevant part:

> Glen Taylor *has reached an agreement* with Marc Lore and Alex Rodriguez regarding *the sale and future ownership* of the Timberwolves and Lynx. *The transaction will close following league approval*, beginning *the transition of ownership* and a new chapter of Minnesota Timberwolves and Lynx basketball.

(Exhibit K) (Emphasis added).

77.     In an interview with Darren Wolfson of KSTP News, Taylor again described the transfer of control to the Buyer as a done deal, subject only to formalities:

> In the long run *I think it's obvious that we now know, you know, where the ownership is going in the future* and I think it's good for our employees to be able to work with [the Buyer] for the next couple of years and to everyone to get to know each other and *I think the transition will be relatively easy*.

(https://kstp.com/minnesota-sports/glen-taylor-interview-selling-timberwolves-lynx  rodriguez-lore/6111053/) ("Q&A: Glen Taylor on selling Wolves and Lynx to Alex Rodriguez and Marc Lore") (Emphasis added).

78.     These and many other statements demonstrate that the intention of both parties to the Proposed Transaction is to transfer control of the Timberwolves and Lynx, together with their related assets, through the consummation of the Proposed Transaction.

**2.     The EIPA's Provisions Further Demonstrate that the Taylor Parties Have Proposed to Enter into a Control Sale.**

79.     The provisions of the EIPA further demonstrate that the Proposed Transaction is a Control Sale.  Section 2.1 of the EIPA, for instance, demonstrates that the acquisition of the "Closing Units" is one of a series of related transactions – all set forth in painstaking detail in a single document – that will result in a transfer of control to the Buyer.

80.     The "Call Options" set forth in Section 2.1(b) all will be "*[e]ffective as of the Closing and after giving effect to the purchase of the Closing Units by the Buyer*." (EIPA, § 2.1(b)) (emphasis added).  Specifically, at Closing, "each of the Seller Parties will grant to the Buyer *a series of Call Options (as defined in Article VI) to acquire all of the remaining Taylor Units held by the Seller Parties on the terms and conditions set forth [t]herein*." *Id.* (emphasis added).

81.     In other words, the EIPA sets forth a "series of related transactions to [Buyer], of Partnership Interests which includes a majority of all the General Partnership Interests (including the indirect sale, exchange or other disposition of such Partnership Interests through the sale, exchange or other disposition (for cash or property with a discernible cash value) of interests in any entity that owns, directly or indirectly, such Partnership Interests)." (*See* Partnership Agreement § 1.9C.)  That "series of related transactions" will be "effective" as of *day one*. (*See* EIPA § 2.1(b).)

82.     By virtue of the granting of the Call Options, the Taylor Parties have provided the Buyer with a clear path to control and, under the EIPA, the Taylor Parties have no means to prevent or otherwise avoid the sale of all of their General Partnership Interests to the Buyer.  The EIPA's

20

defined term "Contemplated Transactions" expressly includes the various tranches in addition to the sale at the initial Closing.

83.     Under the EIPA, the Taylor Parties and the Buyer contemplate more than a single transfer of Limited Partnership Interests.  In fact, the initial sale and subsequent tranches are set forth in a single, integrated agreement that includes direct and specific ties between transaction steps.  These transactions are related and, when taken together, the tranches constitute a "series of related transactions" within the meaning of the Partnership Agreement.

84.     Furthermore, Section 9.7 and Exhibit I to the EIPA – artfully titled "Certain Operating and Governance Matters" – set forth the details of the change of control from the Taylor Parties to Rodriguez and Lore.  (A copy of Exhibit I to the EIPA is attached hereto as **Exhibit L**).  These sort of "governance matters" were never contemplated – much less, granted – when any prior non-Taylor investment (including Orbit's substantial investment) was made in the Timberwolves and Lynx.

85.     For instance, the EIPA names Lore and Rodriguez as Alternate Governors, a first for Limited Partners. (*See* EIPA, § 9.7 and Exhibit I thereto ("With respect to the period between the Closing Date and the Transition Date, the General Partner will appoint Alex Rodriguez and Marc Lore as Alternate Governors").)  The designation of "Governor" has significant meaning with the National Basketball Association.  The EIPA also proposes to restrict amendments to the Drag- or Tag-Along rights in a manner that would be adverse to the ability of Lore and Rodriguez to obtain control and includes the list of perquisites and other rights that the Taylor Parties will have once Lore and Rodriguez assume control of the Timberwolves and Lynx.  (*Id.*)

86.     In yet another "first" for the Timberwolves and Lynx, the EIPA provides that "[t]he Company will establish an advisory board (the 'Advisory Board') selected by the limited partners

of the Company" – but that *each of the Taylor Parties "agrees to vote their respective limited partnership interests in favor of two (2) representatives designated by [Rodriguez and Lore]."* (*See* EIPA, § 9.7 and Exhibit I thereto (emphasis added).)

87.     The EIPA further provides that "[b]etween the Closing Date *and the Transition Date*, the General Partner will present to the Advisory Board for discussion *before causing the Company or any of its subsidiaries to take any of the [various enumerated] actions with respect to the Company or the Team."* (*Id.)* (emphasis added).  In other words, immediately upon the Closing, the Rodriguez and Lore will become part of an "Advisory Board" and the General Partner will not cause the Company to take a series of actions without first presenting such actions to the "Advisory Board." (*Id.*)

88.     Furthermore, the EIPA sets forth a procedure by which "*the Buyer, or its Affiliate, becomes the General Partner*." (*See* EIPA, § 9.7 and Exhibit I thereto (emphasis added).)  The EIPA defines "*Controlling Owner*" as "the individual designated by the General Partner of the Company in accordance with NBA Rules consisting of: (a) Glen A. Taylor (or any successor designee by Taylor Sports Group, Inc.); or (b) *Marc Lore or Alex Rodriguez as designated by Buyer.  (Id.*) (emphasis added).  "*General Partner*," in turn, is defined to include "*Buyer* with respect to any period between the Call Option Closing of the Second Tranche and the date on which the last of Taylor Sports Group, Inc., Taylor Corporation and Glen A. Taylor (Taylor') own Units of Company ('*Exit Date*')")".  (*Id.*) (emphasis added).

89.     In such manner, the EIPA provides for an "Exit Date" for the Taylor Parties, following which they will cede any remaining control to the Buyer.  At that point, the Buyer, as "Controlling Owner," "will have *exclusive power and authority to act for and bind the Company . . . with respect to all matters relating to the NBA and the basketball and business operations of*

*the Company and its subsidiaries* (including with respect to Core NBA Matters, as defined in the NBA Ownership Transfer Policies)." (*Id.*) (emphasis added).

90.     In these and other ways, the EIPA confirms that the Taylor Parties are proposing to enter into a Control Sale within the meaning of Section 1.9 of the Partnership Agreement.  The EIPA specifies a "series of related transactions" which will result in the Buyer: (i) succeeding the Taylor Parties as the General Partner; (ii) becoming the "Controlling Owner"; and (ii) being vested with "exclusive power and authority to act for and bind the Company." (*See* EIPA, § 9.7 and Exhibit I thereto.)  Greater "control" can hardly be imagined than the "exclusive power and authority" that will be vested in the Buyer through the series of related transactions set forth in the EIPA.

91.     Significantly for the people of Minnesota, the EIPA also contradicts Taylor's public statements about a purported obligation "in the contract" that the Buyer cannot move the Timberwolves and Lynx outside of Minnesota.

92.     Exhibit I (Governance Matters) to the EIPA requires the Buyer, if it becomes the General Partner, to present the issue to the Advisory Board before moving the team, but it does *not* require the Buyer to keep the franchises in Minnesota, and the Advisory Board  *cannot* stop the new General Partner from moving the teams.   Therefore, contrary to Taylor's public assurances, the Buyer, once it becomes the General Partner, will *not* be restricted under the EIPA from moving the franchises from Minnesota if the Buyer is inclined to do so.

93.     The bottom line is this:  The Taylor Parties indisputably are proposing to enter into a Control Sale under the Partnership Agreement (albeit to a Buyer who will have unfettered discretion to move the Timberwolves and Lynx outside of Minnesota once they become General Partner).  To quote the Partnership Agreement, the Proposed Transaction constitutes "a sale,

exchange or other disposition . . . in a . . . series of related transactions . . . of Partnership Interests which includes a majority of all the General Partnership Interests." (Partnership Agreement § 1.9C). Orbit thus has the right under Section 10.7 of Partnership Agreement to immediately exercise its Tag-Along Rights, and the Taylor Parties may not transfer any of their Partnership Interests unless and until they honor Orbit's Tag-Along Rights.

**C.      The Taylor Parties Are in Breach of Their Obligations to Orbit.**

94.      The Taylor Parties are in breach of their obligations to Orbit under Section 10.7 of the Partnership Agreement.

95.      Since announcing the Proposed Transaction, the Taylor Parties have steadfastly refused to acknowledge that they have proposed to enter into a Control Sale triggering Orbit's Tag-Along Rights under the Partnership Agreement. Instead, they have denied that they are proposing a Control Sale, and they also have failed and refused to take a number of other steps required under the Partnership Agreement.

96.      In breach of the Partnership Agreement, the Taylor Parties have not complied with the provisions of Section 10.7 of the Partnership Agreement. Section 10.7(b) requires the Taylor Parties to provide each of the Limited Partners, including Orbit, a written "Sale Notice" within ten days following execution of any definitive agreement, which here occurred no later than May 14, 2021. Therefore, since the EIPA was executed no later than May 14, 2021, the contractual deadline to provide a Sale Notice expired no later than ten days thereafter, or on May 24, 2021. The Taylor Parties did not provide a Sale Notice to Orbit by that date in accordance with the provisions of Section 10.7(b) of the Partnership Agreement.

97.      Although the Taylor Parties provided a copy of the EIPA to Orbit, nowhere in their letter transmitting the EIPA did the Taylor Parties provide written notice of a "proposed Tag-Along

Sale," as required by Section 10.7(b) of the Partnership Agreement. (*See* Partnership Agreement § 10.7(d)(i).) To the contrary, the Taylor Parties wrongly contended that "a 'Control Sale' for purposes of the MTBLP Partnership Agreement would not arise unless and until the Second Tranche option is exercised and consummated." (Exhibit G hereto).

98. In other words, instead of providing notice to Orbit as required that they were proposing a "Tag-Along Sale," the Taylor Parties took the position that *no such "Tag-Along Sale" is being proposed at this time* and, instead, "would not arise unless and until the Second Tranche option is exercised and consummated." (Exhibit G hereto). As such, the Taylor Parties have failed and, indeed, refused to provide a Sale Notice in compliance with the provisions of Section 10.7(b) of the Partnership Agreement.

99. In further breach of the Partnership Agreement, the Taylor Parties have ignored and failed to act on Orbit's Tag-Along Notices under Section 10.7(c)(i) of the Partnership Agreement. Upon receipt of the Tag-Along Notices, the Taylor Parties must use commercially reasonable efforts to obtain the Buyer's agreement to Orbit's participation in the Proposed Transaction at the Closing. (*See* Partnership Agreement § 10.7(d)(i).) If the Buyer does not agree, the Taylor Parties themselves must purchase Orbit's Partnership Interests at the Closing, at the same price and on the same terms and conditions that the Taylor Parties are selling their Partnership Interests. (*See id.* § 10.7(d)(i).)

100. Orbit delivered a Tag-Along Notice to the Taylor Parties on May 14, 2021, exercising its right to sell all of its Limited Partnership Interests as part of the Proposed Transaction. (Exhibit D hereto). By letter dated May 18, 2021, Orbit reiterated its election to sell all of its Partnership Interests, pursuant to the Tag-Along Rights contained in the Partnership Agreement, based on the enterprise value set forth in the EIPA. (Exhibit F hereto).

101.     The Taylor Parties, however, have not even acknowledged receipt of Orbit's Tag-Along Notices.  Instead, the Taylor Parties have expressly denied that Orbit possesses any Tag-Along Rights, and have neither used commercially reasonable efforts to obtain the Buyer's agreement to Orbit's participation, nor offered to purchase Orbit's Partnership Interests themselves, as the Partnership Agreement requires.

102.     Through their words and actions, the Taylor Parties have demonstrated that they intend to proceed with the Proposed Transaction, through Closing, without first honoring Orbit's Tag-Along Rights.  As a result of their wrongful actions and inactions, the Taylor Parties are in breach and/or anticipatory breach of their obligations under Section 10.7 of the Partnership Agreement.

103.     Prior to the transfer of any of the Taylor Parties' Partnership Interests as part of the Proposed Transaction, either the Buyer or the Taylor Parties must purchase all of Orbit's Limited Partnership Interests at the same price as the Taylor Parties will receive under the EIPA. Otherwise, as mandated by Section 10.7(d)(iii) of the Partnership Agreement, the "Selling Partner shall not (directly or indirectly) Transfer *any* of its Partnership Interests" to the Buyer.

104.     Simply put, Orbit's Tag-Along Rights must be honored *before* the Taylor Parties transfer *any* of their Partnership Interests to the Buyer – not years thereafter.  (*See also* Partnership Agreement § 10.1 ("A Partner may not Transfer or assign all or any part of such Partner's Partnership Interest except in accordance with this Agreement.").)  The Taylor Parties' continuing efforts to proceed with the Proposed Transaction, while refusing to honor Orbit's Tag-Along Rights, is a continuing and flagrant breach of the Partnership Agreement.

105.     The Taylor Parties cannot flout their Tag-Along obligations by structuring the disposition of Partnership Interests in "tranches" or by setting the deadline to transfer General

Partnership Interests for December 31, 2023 (although the transfer may occur any time before that date at the Buyer's discretion). Moreover, Orbit cannot be forced to wait until the Buyer exercises the Second Tranche option at some indeterminate date in the future to receive the benefit of its bargained-for Tag-Along Rights.

106. Although the Taylor Parties claim that the Proposed Transaction will not trigger Tag-Along Rights "unless and until the Second Tranche option is exercised and consummated" (Exhibit G hereto), the undeniable reality is that the Taylor Parties are proposing to enter into a "Control Sale." Therefore, the Tag-Along Rights *already* have been triggered.

107. As Orbit expressly negotiated when it agreed to join the Partnership, Section 10.7 of the Partnership Agreement guarantees that Orbit may exercise its Tag-Along Rights immediately when a Control Sale is first *proposed*. Since the Taylor Parties are violating those Tag-Along Rights, Orbit has no alternative but to seek appropriate relief from this Court.

## COUNT I

## BREACH OF LIMITED PARTNERSHIP AGREEMENT

108. Orbit restates and incorporates by reference each of the paragraphs set forth above.

109. The Partnership Agreement is an enforceable contract.

110. Orbit has performed all conditions precedent under the Partnership Agreement.

111. The Proposed Transaction constitutes a proposal to enter into a Control Sale, thereby immediately triggering Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement, which must be honored before the Taylor Parties transfer any of their Partnership Interests as part of the Proposed Transaction.

112. The Taylor Parties have breached the Partnership Agreement by, among other things, failing to deliver a Sale Notice to all Limited Partners, including Orbit, within ten (10) days of executing the EIPA, as required by Section 10.7(b) of the Partnership Agreement.

113.    The Taylor Parties have further breached the Partnership Agreement by failing to recognize, acknowledge, and act on Orbit's Tag-Along Notices in accordance with Section 10.7 of the Partnership Agreement.

114.    The Taylor Parties have further breached the Partnership Agreement by expressly denying that Orbit possesses any Tag-Along Rights, and by failing to use commercially reasonable efforts to obtain the Buyer's agreement to Orbit's participation in the Proposed Transaction, or offer to purchase Orbit's Partnership Interests themselves, as the Partnership Agreement requires.

115.    The Taylor Parties also have anticipatorily repudiated and breached Sections 10.1 and 10.7 of Partnership Agreement by agreeing and continuing to seek to transfer Partnership Interests to the Buyer without, among other things, (a) recognizing, acknowledging, and acting upon Orbit's Tag-Along Notices; (b) using commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Proposed Transaction, as required by Section 10.7(d)(i) of the Partnership Agreement; and (c) in the event that the Buyer does not agree to Orbit's participation, purchasing Orbit's Partnership Interests, as required by Section 10.7(d)(iii) of the Purchase Agreement.

116.    As a direct and proximate result of the Taylor Parties' wrongful actions and inactions, Orbit has suffered, and continues to suffer, damages and is entitled to damages in an amount to be proven at trial (but believed to total at least $300,000,000.00), including pre- and post-judgment interest, legal fees and costs of suit.

## COUNT II

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

117.    Orbit restates and incorporates by reference each of the paragraphs set forth above.

118.    The Partnership Agreement is an enforceable contract.

119.    Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract.

120.    The Taylor Parties structured the Proposed Transaction in a wrongful effort to circumvent Section 10.7 of the Partnership Agreement and suppress Orbit's Tag-Along Rights.  In so doing, the Taylor Parties are undermining the very purpose of Section 10.7 and are depriving Orbit of essential contractual rights that were specifically bargained for when the Taylor Parties sought Orbit's investment in the Partnership.

121.    Although the Taylor Parties provided a copy of the EIPA to Orbit, nowhere in their letter transmitting the EIPA did the Taylor Parties provide written notice of a "proposed Tag-Along Sale," as required by Section 10.7(b) of the Partnership Agreement.   (*See* Partnership Agreement § 10.7(d)(i).)  To the contrary, the Taylor Parties falsely took the position that *no such "Tag-Along Sale" is being proposed at this time* and, instead, "would not arise unless and until the Second Tranche option is exercised and consummated."  (Exhibit G) (emphasis added).  In doing so, the Taylor Parties are attempting to circumvent Orbit's bargained-for rights under Section 10.7 of the Partnership Agreement.

122.    By reason of the foregoing, the Taylor Parties are in breach of their implied covenant of good faith and fair dealing under the Partnership Agreement.  The Taylor Parties are willfully attempting to circumvent the provisions of the Partnership Agreement in a calculated but futile scheme to unjustifiably hinder Orbit's ability to exercise its Tag-Along Rights.

123.    As a direct and proximate result of the Taylor Parties' wrongful actions and inactions, Orbit has suffered, and continues to suffer, damages and is entitled to damages in an

amount to be proven at trial (but believed to total at least $300,000,000.00), including pre- and post-judgment interest, legal fees and costs of suit.

### COUNT III

### INJUNCTIVE RELIEF

124.    Orbit restates and incorporates by reference each of the paragraphs set forth above.

125.    Orbit is entitled to injunctive relief enjoining the Taylor Parties from transferring any of their Partnership Interests as part of the Proposed Transaction unless and until the Taylor Parties: (a) issue a Sale Notice to all Limited Partners, as required by Section 10.7(b) of the Partnership Agreement; (b) use commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Proposed Transaction at the Closing, as required by Section 10.7(d)(i) of the Partnership Agreement; and (c) in the event that Buyer does not agree to Orbit's participation, purchase Orbit's Partnership Interests at the Closing, as required by Section 10.7(d)(iii) of the Purchase Agreement.

126.    As set forth in the preceding paragraphs of the Complaint, Orbit is entitled to relief against the Taylor Parties under Section 10.7 of the Partnership Agreement and otherwise.

127.    If, however, the Taylor Parties are allowed to proceed to Closing under the EIPA and Transfer their Partnership Interests before Orbit's Tag-Along Rights are honored and enforced, Orbit will be irreparably harmed.  Orbit's contractual rights will be erased and circumvented, and Orbit will be left without an adequate legal remedy.

128.    By reason of the foregoing, there is a probability that the Taylor Parties will not be able to satisfy an award of adequate damages.  Left without an adequate remedy at law, Orbit is entitled injunctive relief to avert irreparable harm.

129.    Orbit will be irreparably harmed if the foregoing injunctive relief is not granted, the balance of harms favors Orbit, and an injunction is in the public interest.

## COUNT IV

## DECLARATORY JUDGMENT (MINN. STAT. § 555.01, *ET SEQ.*)

130.    Orbit restates and incorporates by reference each of the paragraphs set forth above.

131.    Orbit brings this cause of action pursuant to the Minnesota Uniform Declaratory Judgment Act, Minn. Stat. § 555.01, *et seq*.

132.    An actual controversy now exists between Orbit and the Taylor Parties as to whether the Proposed Transaction constitutes a proposal to enter into a Control Sale, thereby immediately triggering Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement.

133.    A further actual controversy now exists between Orbit and the Taylor Parties as to whether the Taylor Parties must honor Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement before transferring any of their Partnership Interests as part of the Proposed Transaction.

134.    Therefore, Orbit seeks a declaration from this Court that the Proposed Transaction constitutes a proposal to enter into a Control Sale, thereby immediately triggering Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement.

135.    Orbit seeks a further declaration from this Court that the Closing of the Proposed Transaction may not occur unless and until the Taylor Parties honor Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement, including by (a) issuing a Sale Notice to all Limited Partners, as required by Section 10.7(b) of the Partnership Agreement; (b) using commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Proposed Transaction at the Closing, as required by Section 10.7(d)(i) of the Partnership Agreement; and (c) in the event that Buyer does not agree to Orbit's participation, agreeing to

purchase Orbit's Partnership Interests at the Closing, as required by Section 10.7(d)(iii) of the Purchase Agreement.

136.    Orbit further seeks declaratory relief, costs, and all other relief permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Orbit seeks judgment in its favor and an order and judgment against the Taylor Parties that grants the following relief:

1.    A declaratory judgment that the Proposed Transaction constitutes a proposal to enter into a Control Sale, thereby immediately triggering Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement;

2.    A declaratory judgment that the Closing of the Proposed Transaction may not occur unless and until the Taylor Parties honor Orbit's Tag-Along Rights under Section 10.7 of the Partnership Agreement, including by: (a) issuing a Sale Notice to all Limited Partners, as required by Section 10.7(b) of the Partnership Agreement; (b) using commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Proposed Transaction at the Closing, as required by Section 10.7(d)(i) of the Partnership Agreement; and (c) in the event that Buyer does not agree to Orbit's participation, purchasing Orbit's Partnership Interests at the Closing, as required by Section 10.7(d)(iii) of the Purchase Agreement;

3.    Finding and declaring that the Taylor Parties have breached and/or anticipatorily breached and/or repudiated the Partnership Agreement;

4.    Granting injunctive relief enjoining the Taylor Parties from transferring any of their Partnership Interests as part of the Proposed Transaction unless and until the Taylor Parties: (1) issue a Sale Notice to all Limited Partners, as required by Section 10.7(b) of the Partnership Agreement; (2) use commercially reasonable efforts to obtain Buyer's agreement to Orbit's

participation in the Proposed Transaction at the Closing, as required by Section 10.7(d)(i) of the Partnership Agreement; and (3) in the event that Buyer does not agree to Orbit's participation, purchase Orbit's Partnership Interests at the Closing, as required by Section 10.7(d)(iii) of the Purchase Agreement;

5.      Awarding Orbit monetary damages in an amount to be proven at trial (but believed to total at least $300,000,000.00), including pre- and post-judgment interest;

6.      Awarding Orbit its costs in this action, including attorney fees; and

7.      Granting such other relief to which Orbit may be entitled under law, equity, and/or as the Court deems just and proper.

Respectfully submitted,

Dated:  May 26, 2021

**GREENBERG TRAURIG, LLP**

By:   */s/ Michael M. Krauss*
Michael M. Krauss (#0342002)
Peter D. Kieselbach (#0397531)
90 South 7th Street, Suite 3500
Minneapolis, MN  55402
(612) 259-9700
kraussm@gtlaw.com
kieselbachp@gtlaw.com

Anticipated Pro Hac Vice

Paul H. Schafhauser
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
T +1 973.443.3233
schafhauserp@gtlaw.com

*ATTORNEYS FOR PLAINTIFF*
*ORBIT SPORTS LLC*