# EXHIBIT F



Michael M. Krauss
Tel 612.259.9712
kraussm@gtlaw.com

May 18, 2021

VIA EMAIL AND CERTIFIED MAIL, RRR

Gregory W. Jackson, Esq.
Executive Vice President and Chief Legal Officer
1725 Roe Crest Drive
North Mankato, MN 56003
gregory.jackson@taylor.com

Re: Limited Partnership Agreement dated as of September 28, 1994 regarding the Minnesota Timberwolves Basketball Limited Partnership, as amended / Equity Interest Purchase Agreement, dated as of May 13, 2021 by and among Purple Buyer Holdings LLC, Minnesota Timberwolves Basketball Limited Partnership, and the "Seller Parties," including Taylor Sports Group, Inc. as "Seller Representative"

Dear Mr. Jackson:

We write to respond to Glen Taylor's May 17, 2021 letter to Meyer Orbach of Orbit Sports LLC ("Orbit"), by which Mr. Taylor enclosed a copy of the Equity Interest Purchase Agreement dated as of May 13, 2021 ("EIPA") by and among Purple Buyer Holdings LLC, as "Buyer," the Minnesota Timberwolves Basketball Limited Partnership, and the Taylor Sports Group, Inc., Taylor Corporation and Glen Taylor, as the "Seller Parties." We also write to follow up on our May 17, 2021 letter, which we transmitted to you shortly before Mr. Taylor forwarded his letter to Mr. Orbach. (Except as otherwise specified below, capitalized terms herein shall have the same meaning as set forth in our prior letter, the EIPA and/or the Partnership Agreement, as context requires.)

As explained below, despite providing a copy of the EIPA, the Taylor Parties are continuing to repudiate their obligations under the Partnership Agreement. Therefore, Orbit hereby renews its demand that the Taylor Parties rescind their repudiation of their obligations within twenty-four (24) hours. In particular, Orbit demands that the Taylor Parties commit, in writing, to: (1) issue a Sale Notice to all Limited Partners by no later than May 23, 2021, as Section 10.7(b) of the Partnership Agreement requires; (2) use commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Proposed Transaction at the Closing (as defined in the EIPA), as Section 7(d)(i) requires; and (3) in the event that Buyer does not agree to Orbit's participation, purchase Orbit's Partnership Interests at the Closing, as Section 7(d)(iii)

**Greenberg Traurig, LLP | Attorneys at Law**

90 South Seventh Street | Suite 3500 | Minneapolis, Minnesota 55402 | T +1 612.259.9700 | F +1 612.677.3101

Albany. Amsterdam. Atlanta. Austin. Berlin. Boston. Chicago. Dallas. Delaware. Denver. Fort Lauderdale. Houston. Las Vegas. London. Los Angeles. Mexico City. Miami. Milan. Minneapolis. New Jersey. New York. Northern Virginia. Orange County. Orlando. Philadelphia. Phoenix. Sacramento. Salt Lake City. San Francisco. Seoul. Shanghai. Silicon Valley. Tallahassee. Tampa. Tel Aviv. Tokyo. Warsaw. Washington, D.C. West Palm Beach. Westchester County.

Operates as: Greenberg Traurig Germany, LLP; A separate UK registered legal entity; Greenberg Traurig, S.C.; Greenberg Traurig Santa Maria; Greenberg Traurig LLP Foreign Legal Consultant Office; A branch of Greenberg Traurig, P.A., Florida, USA; GT Tokyo Horitsu Jimusho and Greenberg Traurig Gaikokuhojimubegoshi Jimusho; Greenberg Traurig Grzesiak sp.k.

www.gtlaw.com

Gregory W. Jackson, Esq.
May 18, 2021
Page 2

requires. If the Taylor Parties do not rescind their repudiation within 24 hours as set forth above, Orbit will seek appropriate relief in a Designated Court, including claims for declaratory, injunctive and monetary relief, in accordance with Section 17.10 of the Partnership Agreement.

**A.**     **The Partnership Agreement Guarantees Orbit Essential "Tag-Along Rights."**

The Disclosure Schedule to the EIPA confirms that Orbit is the largest non-Taylor Party limited partner under the Partnership Agreement. Specifically, Orbit holds 17.315489% of the limited partnership interests in the Timberwolves. *See* EIPA, Disclosure Schedule, § 3.3. Orbit's significant stake in the Timberwolves is no accident: The Taylor Parties solicited Orbit's investment at a time when they sorely required a capital infusion.

Before it made its initial investment in 2016, Orbit required that the Partnership Agreement be amended to guarantee Orbit and all other limited partners certain rights, known as "Tag-Along Rights," in the event of a Change in Control (as defined in the Agreement). (*See* Partnership Agreement, § 10.7.) The Tag-Along Rights were a precondition to Orbit's decision to join the Partnership, under the stewardship of the Taylor Parties, and to infuse it with much-needed capital. In short, the Tag-Along Rights were a significant factor in Orbit's decision to invest in the Timberwolves in the first place.

Under Section 10.7 of the Partnership Agreement, if and when the Taylor Parties might *propose* to enter into a "Control Sale" (as defined in the Agreement), all limited partners have the right to participate and sell their own interests in the Partnership. *See* Partnership Agreement, Section 10.7(a) ("[I]n the event that one or more members of the Taylor Group . . . *proposes* to enter into a Control Sale. . ., *then* each Limited Partner (the 'Tag-Along Partners') shall have the right (the 'Tag-Along Right'), to elect to participate in such Tag-Along Sale . . . ") (emphasis added). Once those Tag-Along Rights are triggered, the Selling Partner – i.e., the Taylor Parties in connection with the Proposed Transaction – is required to take various actions for the benefit of other partners, including Orbit. The Selling Partner, among other things:

(1)     Must give notice of the sale to all limited partners;

(2)     Must use commercially reasonable efforts to obtain the agreement of the Prospective Purchaser to allow the participation of limited partners who wish to participate;

(3)     Must purchase, at the negotiated price, the interests of any limited partner whose interests are not purchased by the Prospective Purchaser; and

(4)     May not proceed with the sale if all limited partners who wish to participate are not allowed to participate at the negotiated price.

Specifically, Section 10.7(b) states that in the event of a Control Sale, the Taylor Parties must provide the limited partners (the "Tag-Along Partners") a "Sale Notice" within ten days of entering into a definitive agreement. *See* Partnership Agreement § 10.7(b).

Gregory W. Jackson, Esq.
May 18, 2021
Page 3

**B.     The Proposed Transaction is a "Control Sale."**

As we explained in yesterday's letter, Section 1.7A of the Partnership Agreement defines a "Change in Control" that triggers Tag-Along Rights to include a "Control Sale." *See* Partnership Agreement § 1.7A. Section 1.9C of the Partnership Agreement, in turn, defines "Control Sale" as *"a sale, exchange or other disposition* (for cash or property with a discernible cash value) by one or more members of the Taylor Group, *in a single transaction or series of related transactions*, to any Person who is not a member of the Taylor Group, of Partnership Interests which includes a majority of all the General Partnership Interests (including the indirect sale, exchange or other disposition of such Partnership Interests through the sale, exchange or other disposition (for cash or property with a discernible cash value) of interests in any entity that owns, directly or indirectly, such Partnership Interests)." *Id.* at § 1.9C (emphasis added).

The Proposed Transaction indisputably constitutes a Control Sale. The Taylor Parties are proposing to sell or otherwise dispose of their Partnership Interests in one or more transactions involving a majority of all General Partnership Interests. In that regard, it bears emphasis that Section 1.9 of the Partnership Agreement encompasses an "*exchange or other disposition*" – even if not a "sale." *See* Partnership Agreement § 1.9 (emphasis added).

Simply put, under Section 1.9, a "Control Sale" does not necessarily need to involve a "sale"; an "exchange or other disposition" qualifies, too. Any construction of Section 1.9 of the Partnership Agreement that would require only a full-vested conveyance (a "sale") to constitute a Control Sale" would nullify the language used by the parties regarding an "exchange or other disposition," which in turn would violate basic principles of Minnesota contract law. *See Chergosky v. Crosstown Bell, Inc.,* 463 N.W.2d 522, 526 (Minn. 1990) ("Because of the presumption that the parties intended the language used to have effect," courts "attempt to avoid an interpretation of the contract that would render a provision meaningless.")

The Taylor Parties' own public statements underscore the reality that the Proposed Transaction constitutes a Control Sale. For instance, on May 14, 2021, the Taylor Parties and/or the Timberwolves issued a public statement "regarding the sale and future ownership of the Minnesota Timberwolves and Lynx," which provided in relevant part as follows:

> "Glen Taylor *has reached an agreement* with Marc Lore and Alex Rodriguez regarding *the sale and future ownership* of the Timberwolves and Lynx. *The transaction will close following league approval*, beginning *the transition of ownership* and a new chapter of Minnesota Timberwolves and Lynx basketball."

(Emphasis added.)

The public statement was consistent with Glen Taylor's own description of the Proposed Transaction in an April 12, 2021 email to the limited partners: "I am sure by now you have seen the news regarding the exclusive letter of intent I signed over the weekend with Alex Rodriguez and Marc Lore *to purchase the Timberwolves and Lynx franchises*. As the reports indicate, this

Gregory W. Jackson, Esq.
May 18, 2021
Page 4

agreement is for a 30 day window to negotiate and come to terms on final details. This agreement is structured for me to continue as the controlling partner for 2.5 years, *after which Alex and Marc will take full ownership*." (Emphasis added.)

These statements make clear that the intention of both parties to the Proposed Transaction is to sell control of the Timberwolves, together with their related assets, through the consummation of the Proposed Transaction.

The provisions of the EIPA further demonstrate that the Proposed Transaction is a Control Sale. Section 2.1 of the EIPA, for instance, demonstrates that the acquisition of the "Closing Units" is one of a series of transactions – all set forth in painstaking detail in a single document – that will result in a transfer of control to the Buyer. In fact, the "Call Options" set forth in Section 2.1(b) all will be "*[e]ffective as of the Closing and after giving effect to the purchase of the Closing Units by the Buyer*." EIPA, § 2.1(b) (emphasis added). Specifically, at Closing, "each of the Seller Parties will grant to the Buyer *a series of Call Options (as defined in Article VI) to acquire all of the remaining Taylor Units held by the Seller Parties on the terms and conditions set forth [t]herein*." *Id.* (emphasis added). In other words, the EIPA sets forth a "series of related transactions to [Buyer], of Partnership Interests which includes a majority of all the General Partnership Interests (including the indirect sale, exchange or other disposition of such Partnership Interests through the sale, exchange or other disposition (for cash or property with a discernible cash value) of interests in any entity that owns, directly or indirectly, such Partnership Interests)." *See* Partnership Agreement § 1.9C. That "series of related transactions, moreover, will be "effective" as of *day one*. *See* EIPA, § 2.1(b).

By virtue of the grant of the Call Options, the Taylor Parties have provided the Buyer with a clear path to control, and under the EIPA, the Taylor Parties have no means to prevent or otherwise avoid the sale of all of the General Partnership interests to the Buyer. The parties' mutual expectation that a change of control will occur is evidenced by their joint announcement of the transaction and is reinforced by the EIPA, which includes a defined term for "Contemplated Transactions" that includes the various tranches in addition to the sale at the initial closing. Thus, the Taylor Parties and the Buyer expressly contemplate more than a single transfer of limited partnership interests through the EIPA. The initial sale and subsequent tranches are set forth in a single, integrated agreement that includes direct and specific ties between transaction steps. There can be no conclusion but that these transactions are related and that, when taken together, the tranches constitute a series of transactions.

Furthermore, Section 9.7 and Exhibit I to the EIPA – artfully entitled "Certain Operating and Governance Matters" – sets forth the details of the change of control from the Taylor Parties to the Buyer. These sort of "governance matters" were never contemplated – much less, granted – when any prior non-Taylor investment was made in the Timberwolves, including Orbit's substantial investment.

For instance, the EIPA names Messrs. Lore and Rodriguez as Alternate Governors, thus vesting in them meaningful interim authority and providing further evidence of the parties' ultimate intentions. *See* EIPA, § 9.7 and Exhibit I thereto ("With respect to the period between the

Gregory W. Jackson, Esq.
May 18, 2021
Page 5

Closing Date and the Transition Date, the General Partner will appoint Alex Rodriguez and Marc Lore as Alternate Governors"). As you well know, the designation of "Governor" has significant meaning with the National Basketball Association. So far as Orbit is aware, at no time prior to the EIPA have the Taylor Parties ever proposed to designate any new investors in the Timberwolves as "Alternative Governors." The EIPA also proposes to restrict amendments to the drag- or tag-along rights in a manner that would be adverse to the ability of Messrs. Lore and Rodrguez to obtain control, to address HSR requirements part of the second tranche closing, and even includes the list of perquisites and other rights that the Taylor Parties will have once Messrs. Lore and Rodriguez assume control of the Timberwolves. *Id.*

In yet another "first" for the Timberwolves, the EIPA provides that "[t]he Company will establish an advisory board (the 'Advisory Board') selected by the limited partners of the Company" – but that *each of the Taylor Parties "agrees to vote their respective limited partnership interests in favor of two (2) representatives designated by [the Buyer]." See* EIPA, § 9.7 and Exhibit I thereto (emphasis added). The EIPA further provides that "[b]etween the Closing Date *and the Transition Date*, the General Partner will present to the Advisory Board for discussion *before causing the Company or any of its subsidiaries to take any of the [various enumerated] actions with respect to the Company or the Team." Id.* (emphasis added). In other words, immediately upon the Closing, the Buyer will become part of an "Advisory Board" and the General Partner will not cause the Company to take a series of actions without first presenting such actions to the "Advisory Board." *Id.* Again, no such "Advisory Board" ever was implemented during any of the many prior investments in the Timberwolves (including Orbit's substantial investment) – so it is particularly telling that the Taylor Parties have bargained with the Buyer to do so now.

Furthermore, the EIPA sets forth a procedure by which "*the Buyer, or its Affiliate, becomes the General Partner.*" *See* EIPA, § 9.7 and Exhibit I thereto (emphasis added). Specifically, the EPIA defines "*Controlling Owner*" as "the individual designated by the General Partner of the Company in accordance with NBA Rules consisting of: (a) Glen A. Taylor (or any successor designee by Taylor Sports Group, Inc.); or (b) *Marc Lore or Alex Rodriguez as designated by Buyer. Id.* (emphasis added). "*General Partner,*" in turn, is defined to include "*Buyer* with respect to any period between the Call Option Closing of the Second Tranche and the date on which the last of Taylor Sports Group, Inc., Taylor Corporation and Glen A.Taylor (Taylor') own Units of Company ('*Exit Date*')"). *Id.* (emphasis added). Thus, the EIPA provides for an "Exit Date" for the Taylor Parties, following which they will cede any remaining control to the Buyer. At that point, the Buyer, as "Controlling Owner," "will have *exclusive power and authority to act for and bind the Company . . . with respect to all matters relating to the NBA and the basketball and business operations of the Company and its subsidiaries* (including with respect to Core NBA Matters, as defined in the NBA Ownership Transfer Policies)." *Id.* (emphasis added).

In light of the above, the EIPA confirms that the Taylor Parties are proposing to enter into a Control Sale within the meaning of Section 1.9 of the Partnership Agreement. The EIPA specifies a series of transactions which will result in the Buyer: (i) succeeding the Taylor Parties as the General Partner; (ii) becoming the "Controlling Owner"; and (ii) being vested with "exclusive power and authority to act for and bind the Company." *See* EIPA, § 9.7 and Exhibit I

Gregory W. Jackson, Esq.
May 18, 2021
Page 6

thereto. Greater "control" can hardly be imagined than the "exclusive power and authority" that will be vested in the Buyer through the series of transactions set forth in the EIPA.

The bottom line is this: The Taylor Parties indisputably are proposing to enter into a Control Sale under the Partnership Agreement. To quote the Partnership Agreement, the Proposed Transaction constitutes "a sale, exchange or other disposition . . . in a . . . series of transactions . . . of Partnership Interests which includes a majority of all the General Partnership Interests." *See Fleetboston Robertson Stephens, Inc. v. Innovex, Inc.,* 172 F. Supp. 2d 1190, 1192 (D. Minn. 2001) (granting plaintiff's motion for summary judgment where the operative agreement entitled plaintiff to a "Transaction Fee" upon a "transaction (or *series of related transactions*) resulting in the sale of 50% or more of the company's voting stock or assets to another party).

**C.** **The Taylor Parties Are Continuing to Repudiate their Tag-Along Obligations under Section 10.7 of the Partnership Agreement By Falsely Asserting that Those Obligations Have Not Been Triggered.**

As noted, under Section 10.7 of the Partnership Agreement, if and when the Taylor Parties *propose* to enter into a "Control Sale" (as defined in the Agreement), all limited partners have the right to elect to participate and sell their own interests in the Partnership. *See* Partnership Agreement, § 10.7(a). Therefore, the Taylor Parties' Tag-Along obligations arise when a Control Sale is "proposed" – not merely if or when closing under such a Control Sale occurs, or when "control" might actually be conveyed to a third party. Indeed, the Partnership Agreement provides that when a Control Sale is proposed, "*then*" – not at some future date – "each Limited Partner (the 'Tag-Along Partners') *shall have the right (the 'Tag-Along Right'), to elect to participate in such Tag-Along Sale . . . .*" *Id.* (emphasis added).

In light of the above, the Taylor Parties' Tag-Along obligations under Section 10.7 of the Partnership Agreement are triggered immediately upon any "*proposal*" by them to enter into a Control Sale, whether or not closing of such a Control Sale is scheduled to occur – and whether or not "control" might actually vest – two days, two months or even two years later. To reiterate, the triggering event under Section 10.7 is when the Taylor Parties "propose" to enter into a Control Sale – not when the Taylor Parties might elect to close or actually transfer "control."

The EIPA clearly confirms that the Taylor Parties have proposed to enter into a Control Sale, thereby immediately triggering the Limited Partners' Tag-Along Rights under Section 10.7 of the Partnership Agreement. Although the Taylor Parties have now provided the EIPA to Orbit, they continue to refuse to acknowledge their ongoing Tag-Along obligations under Section 10.7. Instead, Mr. Taylor's letter plainly demonstrates that the Taylor Parties continue to repudiate their Tag-Along obligations.

In his letter, Mr. Taylor wrongly asserts that there is no Control Sale unless and until Buyer exercises and consummates its "Second Tranche option," which may not occur until December 31, 2023 (although it can occur at any time following Closing under the EIPA). Specifically, Mr. Taylor asserts that "the "Second Tranche is the only option including any general partnership interests *so a 'Control Sale' for purposes of the MTBLP Partnership Agreement would not arise*

Gregory W. Jackson, Esq.
May 18, 2021
Page 7

*unless and until the Second Tranche Option is exercised and consummated*." (Emphasis added). In doing so, Mr. Taylor suggests that the Taylor Parties do not currently have any Tag-Along obligations. Mr. Taylor further suggests that the Taylor Parties might be required to provide a Sale Notice under Section 10.7(b) only when "the Second Tranche Option is exercised and consummated" – not now. The Taylor Parties' assertions, however, flout the plain language of the Partnership and the EIPA.

Mr. Taylor suggests that the Taylor Parties "only" are conveying control through a series of "options," not a "sale" of control immediately upon closing under the EIPA. Section 1.9 of the Partnership Agreement, however, encompasses an "*exchange or other disposition*" of the Taylor Parties' interests through a "*series of related transactions*" – even if one or more or those "related transactions" may not be deemed a "sale." Therefore, the series of related transactions described in the EIPA indisputably constitute a "Control Sale" within the meaning of Section 1.9C. Put another way, a "Control Sale" will have occurred *immediately upon closing* of the EIPA – and not merely when the "Second Tranche option" is exercised, as the Taylor Parties wrongly claim.

In any event, as explained above, the Taylor Parties' Tag-Along obligations are triggered when the Taylor Parties *propose* to enter into a "Control Sale." They clearly have done so by executing the EIPA. Therefore, even though the Taylor Parties are wrong in their assertion that a "Control Sale" will not occur until the "Second Tranche option" is exercised, the Taylor Parties' assertion misses the mark entirely. By executing the EIPA, the Taylor Parties are "proposing" to enter into a "Control Sale" *regardless of when it might actually occur*. Therefore, the Taylor Parties' Tag-Along obligations have been triggered already.

D. **The Taylor Parties' Violation of Orbit's Tag-Along Rights Violates Both the Partnership Agreement and The Taylor Parties' Representations and Warranties Under the EIPA.**

Not surprisingly, the Buyer has required the Company to represent and warrant, in the EIPA, that the EIPA and Contemplated Transactions "do not and will not violate or conflict with [the Partnership Agreement]." (EIPA § 3.5(a).) Similarly, the Taylor Parties represent and warrant to the Buyer that "[t]he execution and delivery of this Agreement, and the consummation of the Contemplated Transactions, will not conflict with or result in any violation of or default under (or any event that, with notice or lapse of time or both, would constitute a default under) . . . (i) the Organizational Documents of Seller if it is not a natural person; [or] (ii) any Contract to which such Seller Party is a party or by which such Seller Party or any of his/her/its assets may be bound." (EIPA § 4.2(a).) In fact, these and other representations and warranties by the Taylor Parties are knowingly and willfully false.

As explained above, the plain terms of the EIPA demonstrate that the Taylor Parties have proposed to enter into a Control Sale, such that all Limited Partners have active Tag-Along rights. The Taylor Parties cannot avoid their Tag-Along obligations by structuring the disposition of Partnership Interests in "tranches" or scheduling the transfer of General Partnership Interests for 2023. Here is all that matters, and what cannot be denied: The Taylor Parties have proposed to

Gregory W. Jackson, Esq.
May 18, 2021
Page 8

enter into a sale or other disposition, in a series of related transactions, of Partnership Interests, including all of the General Partnership Interests. *See* Partnership Agreement, § 1.9C.

Tag-Along Rights do not arise only when the General Partners transfers a majority of its General Partnership Interests. Tag-Along Rights are triggered whenever the Taylor Parties propose to sell or otherwise dispose of *any* of their Partnership Interests, so long as the proposed disposition includes a majority of General Partnership Interests. That is precisely the case here. Tellingly, the EIPA's Seller Parties comprise not just the Taylor Corporation and Mr. Taylor (who own only the Limited Partnership Interests), but also Taylor Sports Group, Inc., which owns only General Partnership Interests and in fact is the Seller Parties' Representatives.

Section 10.7(b) entitles Orbit to exercise its Tag-Along Rights today, before closing on any part of the transaction. As Orbit expressly negotiated when it agreed to join and provide the Partnership with much-needed capital, Section 10.7 safeguards Orbit from undue risk arising from a deal structure in which it had no say.

### E. The Taylor Parties Have Breached Their Obligations to Orbit.

Under Minnesota law, an anticipatory breach occurs when a party expressly repudiates the contract, giving notice that he will not perform the contract before performance is due. *See Space Ctr., Inc. v. 451 Corp.,* 298 N.W.2d 443, 450 (Minn. 1980). Repudiation is "either by words or acts**,** which is communicated to the other party prior to the time fixed by the contract for his performance." *In re Haugen,* 278 N.W.2d 75, 79 n. 6 (Minn. 1979). That is exactly what the Taylor Parties have done here. By wrongfully insisting that a Control Sale will not occur until the "Second Tranche option" is exercised, the Taylor Parties continue to repudiate their Tag-Along obligations under Section 10.7(b) of the Partnership Agreement and, accordingly, have breached and/or anticipatorily breached the Partnership Agreement.

It appears that the Proposed Transaction has been structured in an effort to circumvent the Tag-Along Provisions of Section 10.7 of the Partnership Agreement. Orbit anticipated precisely this tactic when it negotiated for the Tag-Along Rights to apply to a "series of related transactions," and not just a "single transaction." Section 10.7 protects against a deal structure that subjects Limited Partners to indeterminate credit risk and may impair value over time, whether due simply to the passage of time, due to the impact of purchase price adjustments, additional debt obligations, changes in tax law, or otherwise. The agreed-upon definition of Control Sale ensures that Tag-Along Partners can exit in full, rather than be forced to assume such risks.

The Taylor Parties' actions in seeking to vitiate Orbit's Tag-Along Rights demonstrate a shocking lack of good faith. "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quotation omitted). Contrary to their obligations under Minnesota law, the Taylor Parties are, in fact, unjustifiably hindering Orbit's ability to exercise its Tag-Along Rights under Section 10.7 of the Partnership Agreement. In doing so, the Taylor Parties are undermining the very purpose of Section 10.7, and they are depriving Orbit of essential contractual rights that

Gregory W. Jackson, Esq.
May 18, 2021
Page 9

were specifically bargained for when the Taylor Parties sought Orbit's investment in the Timberwolves in the first place. The Tag-Along Rights were included in the Partnership Agreement to prevent the very sort of shenanigans that are now taking place. The Taylor Parties, however, are willfully attempting to circumvent the provisions of the Partnership Agreement in a calculated but futile scheme to vitiate Orbit's Tag-Along Rights. In these and other ways, the Taylor Parties have breached their obligations to Orbit.

**F.      Orbit Hereby Reiterates Its Tag-Along Notice and, If Necessary, Will Seek Appropriate Legal Redress Without Further Notice.**

In light of the above, Orbit hereby reiterates its Tag-Along Notice dated May 14, 2021 and, since it now has been provided with the EIPA, Orbit reiterates its election to sell all of its Partnership Interests, pursuant to the Tag-Along Rights contained in the Partnership Agreement, based on the Enterprise Value set forth in the EIPA. So that the record is abundantly clear, this letter shall constitute a further Tag-Along Notice on Orbit's behalf for purposes of Section 10.7(c).

The Partnership Agreement prohibits the Taylor Parties from transferring "any of its Partnership Interests" – including the "Closing Units" under the EIPA – unless and until all Limited Partners have exercised their Tag-Along Rights under Section 10.7. *See* Partnership Agreement, §§ 10.1, 10.7(d)(iii). In short, the Taylor Parties may not close and consummate any part of the Contemplated Transactions – including the initial part scheduled for 2021 – without first honoring Orbit's Tag-Along Rights in full.

Orbit therefore renews its demand that the Taylor Parties rescind their repudiation of their obligations under the Partnership Agreement within twenty-four (24) hours. Specifically, Orbit demands that the Taylor Parties commit, in writing, to: (1) issue a Sale Notice to all Limited Partners no later than May 23, 2021, as Section 10.7(b) of the Partnership Agreement requires; (2) use commercially reasonable efforts to obtain Buyer's agreement to Orbit's participation in the Contemplated Transactions at the Closing (as defined in the EIPA), as Section 7(d)(i) requires; and (3) in the event that Buyer does not agree to Orbit's participation, purchase Orbit's Partnership Interests at the Closing, as Section 7(d)(iii) requires. If the Taylor Parties fail to timely do so, Orbit will pursue appropriate claims and remedies under the Partnership Agreement and applicable law, including claims for declaratory, injunctive and monetary relief, without further notice.

In light of such claims against the Taylor Parties, please be reminded that under governing law, the Taylor Parties are required to take all appropriate measures to preserve and safeguard evidence, including electronically stored information, relating to this matter. The duty to preserve potentially relevant evidence is triggered when litigation is reasonably anticipated, which could occur before litigation is filed. We urge you to immediately inform all of the Taylor Parties' employees, agents or other representatives that they, too, must refrain from deleting or destroying any documents, data and other information that might be relevant to this matter, regardless of any pre-existing document retention policy. If the Taylor Parties fail to comply with their obligations in this regard, Orbit reserves its right to seek appropriate additional relief, together with other appropriate remedies or sanctions.

Gregory W. Jackson, Esq.
May 18, 2021
Page 10

      Nothing contained herein shall be construed to: (i) waive, limit, prejudice or otherwise adversely affect any right, remedy or power at law, in equity or otherwise held by Orbit, all of which rights, remedies and powers are hereby expressly reserved; or (ii) waive any other claims, causes of action and/or breaches by the Taylor Parties of their duties owed to Orbit.

      Very truly yours,

      */s/ Michael M. Krauss*

      Michael M. Krauss

cc:    Orbit Sports LLC
       Paul H. Schafhauser

*ADMIN 38682301v6*