# EXHIBIT B

EXECUTION VERSION

**EQUITY INTEREST PURCHASE AGREEMENT**

**by and among**

**PURPLE BUYER HOLDINGS LLC,**

**AS BUYER,**

**MINNESOTA TIMBERWOLVES BASKETBALL LIMITED PARTNERSHIP,**

**CERTAIN OF THE LIMITED PARTNERS**

**AND THE GENERAL PARTNER OF THE COMPANY,**

**AS SELLER PARTIES**

**AND**

**TAYLOR SPORTS GROUP, INC.,**

**AS THE SELLER PARTIES' REPRESENTATIVE**

**dated as of May 13, 2021**

## <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I. DEFINED TERMS; USAGE ................................................................................ 1

ARTICLE II. PURCHASE AND SALE OF UNITS ............................................................... 1

| | | |
|---|---|---|
| 2.1 | Basic Transaction | 1 |
| 2.2 | Purchase Price | 2 |
| 2.3 | Closing; Deliveries | 2 |
| 2.4 | Final Determination of Purchase Price | 3 |
| 2.5 | Adjustment Amount | 5 |
| 2.6 | Equitable Adjustments | 6 |

ARTICLE III. REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COMPANY ............................................................................................... 6

| | | |
|---|---|---|
| 3.1 | Organization, Existence & Good Standing of the Company | 6 |
| 3.2 | Subsidiaries | 6 |
| 3.3 | Capitalization | 6 |
| 3.4 | Corporate Records | 7 |
| 3.5 | No Conflict; No Consents | 7 |
| 3.6 | Financial Statements | 7 |
| 3.7 | Title, Necessary Assets and Liens | 8 |
| 3.8 | No Litigation; No Violations of Law; Permits; Licensing | 8 |
| 3.9 | Taxes | 8 |
| 3.10 | Employees | 9 |
| 3.11 | Employee Benefits | 9 |
| 3.12 | Intellectual Property | 9 |
| 3.13 | Contracts | 10 |
| 3.14 | Real Estate | 10 |
| 3.15 | Insurance | 10 |
| 3.16 | Related Party Transactions | 10 |

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES ............ 11

| | | |
|---|---|---|
| 4.1 | Organization and Authority of Non-Natural Person Seller Parties; Binding Obligation | 11 |
| 4.2 | No Conflicts; No Consents | 11 |
| 4.3 | Title to Units | 12 |
| 4.4 | No Brokers | 12 |

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 12

| | | |
|---|---|---|
| 5.1 | Organization and Authority of Buyer; Binding Obligation | 12 |
| 5.2 | No Conflicts; No Consents | 13 |
| 5.3 | No Brokers | 13 |
| 5.4 | Assurance of Closing | 13 |

| | | | |
|---|---|---|---|
| 5.5 | Investment Intent | ........................................................... | 13 |
| 5.6 | Accredited Investors | ......................................................... | 13 |
| 5.7 | Non-Reliance. | ............................................................. | 13 |

ARTICLE VI. CALL OPTION ............................................................... 14

| 6.1 | Grant of Option | ............................................................ | 14 |
| 6.2 | Call Price | ................................................................ | 16 |
| 6.3 | Exercise of Call Option | ..................................................... | 16 |
| 6.4 | Call Option Closing | ........................................................ | 16 |

ARTICLE VII. REMAINDER INTEREST OPTIONS.................................... 17

| 7.1 | Put Option | ................................................................ | 17 |
| 7.2 | Put Price | ................................................................. | 17 |
| 7.3 | Exercise of Put Option | ..................................................... | 17 |
| 7.4 | Put Option Closing | ........................................................ | 18 |

ARTICLE VIII. PRE-CLOSING COVENANTS REGARDING THE COMPANY .................. 18

| 8.1 | Access and Investigation | .................................................... | 18 |
| 8.2 | Operation of the Company | .................................................. | 18 |
| 8.3 | Filings and Notifications; Cooperation | ...................................... | 19 |
| 8.4 | Confidentiality; Publicity | .................................................. | 19 |

ARTICLE IX. POST-CLOSING COVENANTS ............................................ 19

| 9.1 | Perquisites | .............................................................. | 19 |
| 9.2 | Remainder Interest Rights | ................................................ | 20 |
| 9.3 | Certain Tax Matters | ...................................................... | 20 |
| 9.4 | Buyer Non-Solicit | ........................................................ | 21 |
| 9.5 | Approvals. | ............................................................... | 21 |
| 9.6 | Partnership Agreement | .................................................... | 21 |
| 9.7 | Certain Operating and Governance Matters. | ................................ | 21 |

ARTICLE X. INDEMNIFICATION......................................................... 22

| 10.1 | Indemnification by Seller Parties. | ......................................... | 22 |
| 10.2 | Indemnification by Buyer | .................................................. | 23 |
| 10.3 | Survival of Claims | ........................................................ | 23 |
| 10.4 | Limitations on Indemnification. | ............................................ | 23 |

ARTICLE XI. CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE........ 25

| 11.1 | Accuracy of Seller Parties' Representations | ................................ | 25 |
| 11.2 | Performance | .............................................................. | 25 |
| 11.3 | Accuracy of Company's Representations | .................................... | 25 |
| 11.4 | Bring Down Certificates | ................................................... | 26 |

11.5    No Material Adverse Change................................................ 26
11.6    NBA Approval ................................................................... 26
11.7    No Legal Prohibition .......................................................... 26
11.8    HSR Approval ................................................................... 26

ARTICLE XII. CONDITIONS PRECEDENT TO SELLER PARTIES' OBLIGATION
       TO CLOSE.......................................................................... 26

12.1    Accuracy of Buyer's Representations .................................... 26
12.2    Buyer's Performance .......................................................... 27
12.3    Bring Down Certificate ....................................................... 27
12.4    NBA Approval ................................................................... 27
12.5    No Legal Prohibition .......................................................... 27
12.6    HSR Approval ................................................................... 27
12.7    Partnership Agreement ........................................................ 27

ARTICLE XIII. SELLER PARTIES' REPRESENTATIVE ............................... 27

13.1    Designation and Replacement of Seller Parties' Representative ... 27
13.2    Authority .......................................................................... 28
13.3    Waiver ............................................................................. 28
13.4    Actions ............................................................................ 29

ARTICLE XIV. TERMINATION .............................................................. 29

14.1    Termination Events ............................................................ 29
14.2    Effect of Termination ......................................................... 30

ARTICLE XV. DISPUTE RESOLUTION .................................................... 30

15.1    Mediation ......................................................................... 30
15.2    Arbitration ........................................................................ 30

ARTICLE XVI. MISCELLANEOUS PROVISIONS ....................................... 31

16.1    Entire Agreement; Binding Nature ........................................ 31
16.2    Payments .......................................................................... 31
16.3    Assignment ....................................................................... 31
16.4    Interpretation .................................................................... 31
16.5    Notices ............................................................................ 31
16.6    Governing Law; Jurisdiction................................................ 34
16.7    Amendment; Waiver .......................................................... 34
16.8    Severability ...................................................................... 34
16.9    Time of Essence ................................................................ 34
16.10   Counterparts ..................................................................... 34
16.11   Representation by Counsel ................................................... 35
16.12   Post-Closing Representation of Seller Parties .......................... 35
16.13   Attorney-Client Privilege Carve Out ..................................... 35

<u>Exhibits and Schedules</u>

Exhibit A      Seller Parties
Exhibit B      Definitions; Rules of Construction
Exhibit C      Form of Guarantee
Exhibit D      Form of Assignment of Units
Exhibit E      Calculation of Purchase Price
Exhibit F      Calculation of Net Working Capital Adjustment
Exhibit G      Tranche Schedule
Exhibit H      Form of Joinder
Exhibit I      Governance Matters

Disclosure Schedule

## EQUITY INTEREST PURCHASE AGREEMENT

This Equity Interest Purchase Agreement (this "<u>Agreement</u>") is entered into as of May 13, 2021, by and among Purple Buyer Holdings LLC, a Delaware limited liability company (the "<u>Buyer</u>"), Minnesota Timberwolves Basketball Limited Partnership, a Minnesota limited partnership (the "<u>Company</u>"), those Persons set forth on <u>Exhibit A</u>, (each a "<u>Seller Party</u>" and collectively "<u>Seller Parties</u>"), Taylor Sports Group, Inc., as representative for the Seller Parties (the "<u>Seller Parties' Representative</u>") and solely with respect to <u>Article VII</u> herein, each of Marc Lore, individually ("<u>Lore</u>"), Alex Rodriguez, individually ("<u>Rodriguez</u>"), AROD Corporation, a Florida corporation ("<u>AROD</u>") and the Alex Rodriguez Revocable Trust DTD U/A 1/5/1998 (the "<u>Rodriguez Trust</u>" and collectively with Lore, Rodriguez and AROD, the "<u>Guarantors</u>" and each a "<u>Guarantor</u>").

**WHEREAS**, Seller Parties collectively own all of the outstanding general partnership interests of Company (the "<u>GP Units</u>"), which consists of 8.242648 GP Units, and 64.939458 of the limited partnership interests of Company (the "<u>Taylor LP Units</u>" and together with the GP Units, the "<u>Taylor Units</u>");

**WHEREAS,** Buyer desires to acquire from Taylor Corporation the Closing Units (as defined below) and to secure an option to acquire (a) all of the remaining Taylor Units (other than the Closing Units) and (b) all of the remaining limited partnership interests in the Company (the "<u>Other LP Units</u>" and collectively with the Taylor Units, the "<u>Units</u>");

**WHEREAS**, on the date hereof and as a condition and inducement to the Seller Parties and the Seller Parties' Representative to enter into this Agreement, each of the Guarantors have provided a guarantee of Buyer's obligations under this Agreement by executing and delivering that certain Guarantee attached as <u>Exhibit C</u> hereto; and

**WHEREAS**, the Parties to this Agreement intend that the franchises operated by the Company and its subsidiaries will continue to operate in the State of Minnesota from and after the date hereof.

**NOW THEREFORE**, in consideration of the mutual covenants and obligations set forth in this Agreement, Buyer and Seller Parties hereby agree as follows:

### ARTICLE I.

### DEFINED TERMS; USAGE

Capitalized terms have the meanings ascribed to them in <u>Exhibit B</u> if not otherwise defined herein.  This Agreement shall be interpreted in accordance with the rules of construction set forth in <u>Exhibit B</u>.

### ARTICLE II.

### PURCHASE AND SALE OF UNITS

2.1     <u>Basic Transaction</u>.

(a)     Buyer will acquire from Taylor Corporation twenty (20) of the Taylor LP Units (the "Closing Units") at the Closing;

(b)     Effective as of the Closing and after giving effect to the purchase of the Closing Units by the Buyer:

(i)     each of the Seller Parties will grant to the Buyer a series of Call Options (as defined in Article VI) to acquire all of the remaining Taylor Units held by the Seller Parties on the terms and conditions set forth herein; and

(ii)     Taylor Sports Group, Inc., as general partner, shall grant to the Buyer a Call Option (as defined in Article VI) to acquire the Other LP Units pursuant to an exercise by the general partner of the Drag-Along Rights as set forth in Section 10.8 of the Partnership Agreement.

2.2     Purchase Price.

(a)     The purchase price (the "Purchase Price"), and each element thereof, shall be calculated as of the Closing Date as:

(i)     Enterprise valuation of $1,500,000,000 (the "Enterprise Value");

(ii)     less Indebtedness;

(iii)     plus Cash;

(iv)     plus the amount by which Net Working Capital is more than the Net Working Capital Threshold or minus the amount by which Net Working Capital is less than the Net Working Capital Threshold (in each case calculated in accordance with Exhibit F).

(b)     Not less than three (3) Business Days prior to the Closing Date, the Company shall deliver to Buyer and the Seller Parties' Representative an estimate of each element of the Purchase Price (other than the Enterprise Value which shall not vary) as defined in Section 2.2(a) (the "Estimated Purchase Price Report").  The Parties will use such estimates (the "Estimated Purchase Price") for purposes of calculating the payment to be made to Taylor Corporation at Closing pursuant to Section 2.3(b)(i).  Exhibit E sets forth, for illustrative purposes, the calculation of the Purchase Price as of the dates, and using the values, set forth therein.

2.3     Closing; Deliveries.

(a)     Consummation of the purchase and sale of the Closing Units provided for in this Agreement (the "Closing") will take place via electronic transmittal of documents but shall be deemed to have occurred at the offices of Company commencing at 10:00 a.m. (local time) on (i) the third Business Day after the date on which the last of the conditions set forth in Articles XI and XII shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing); provided, that the Closing shall not occur prior to June 30, 2021, or (ii) at such other date

and time as Buyer and Seller Parties' Representative may otherwise agree.  The Closing will be deemed to be effective as of the close of business on such date (the "Closing Date").

(b)     At the Closing, the Buyer shall deliver:

(i)     Twenty percent (20%) of the Estimated Closing Purchase Price to Taylor Corporation as the portion of the Purchase Price for the Closing Units; and

(ii)     the certificate referred to in Section 12.3.

(c)     At the Closing:

(i)     Taylor Corporation shall deliver to the Buyer an assignment of the Closing Units which will appoint the Seller Parties' Representative as attorney-in-fact to transfer the Closing Units on the books of the Company with full power of delegation and substitution in the form of Exhibit D;

(ii)     Taylor Corporation shall deliver to the Buyer a duly completed and executed Internal Revenue Service Form W-9; and

(iii)     The Company and the Seller Parties' Representative shall deliver the certificates referred to in Section 11.4.

2.4     Final Determination of Purchase Price.

(a)     Within ninety (90) days following the Closing, Company shall prepare and deliver to Buyer and Seller Parties' Representative a calculation as of the Closing Date of each of the following (collectively, the "Final Purchase Price Report"):

(i)     Indebtedness;

(ii)     Cash;

(iii)     Net Working Capital;

(iv)     the Net Working Capital Threshold;

(v)     the final calculation of the Purchase Price using the amounts in this Section 2.4 in lieu of the amounts used to calculate the Estimated Closing Purchase Price at the Closing (the Purchase Price, as finally determined pursuant to Section 2.4 "Final Purchase Price"); and

(vi)     the Adjustment Amount.

(b)     During the period commencing ten (10) Business Days before the anticipated Closing Date and until the Purchase Price is finally determined pursuant to this Section 2.4, upon execution of such access letters as may be reasonably required by Company, Buyer and its Representatives shall, during reasonable business hours, be given reasonable access to (and copies of) the Company books, records, and other documents, including work papers, worksheets,

3

notes, and schedules, to the extent used in the preparation of the Estimated Purchase Price Report or the Final Purchase Price Report and the determination of the Estimated Purchase Price, the Final Purchase Price and the Adjustment Amount, for the purpose of reviewing the Estimated Purchase Price Report, the Final Purchase Price Report and determination of the Estimated Purchase Price, the Final Purchase Price and the Adjustment Amount, and Seller Parties and the Company shall cause the personnel of the Company to reasonably cooperate with Buyer and its Representatives in connection with such review.  Prior to delivering the Estimated Purchase Price Report or the Final Purchase Price Report, as applicable, Seller Parties' Representative and the Company shall consider in good faith any comments made by Buyer to the Estimated Purchase Price Report or the Final Purchase Price Report, as applicable, so long as such comments are made promptly and do not delay the proposed Closing Date.

(c)     If within thirty (30) days following delivery of the Final Purchase Price Report and the determination of the Final Purchase Price and the Adjustment Amount to Buyer, Buyer has not given Seller Parties' Representative notice of an objection as to any amounts set forth on the Final Purchase Price Report or the determination of the Adjustment Amount (which notice shall state in reasonable detail the basis of Buyer's objections and Buyer's proposed adjustments) (the "Objection Notice"), the Final Purchase Price Report and the determination of the Final Purchase Price and the Adjustment Amount as prepared by Company will be final, binding, and conclusive on the Parties.

(d)     If Buyer timely gives Seller Parties' Representative an Objection Notice and if Seller Parties' Representative and Buyer fail to resolve the issues raised in the Objection Notice within thirty (30) days after giving the Objection Notice, Seller Parties' Representative and Buyer shall submit the issues remaining in dispute for resolution to the post-acquisition purchase price dispute resolution practice of Alvarez & Marsal (or, if Alvarez & Marsal is providing services to Buyer or any of the Guarantors, any Seller Party or Company or is otherwise unable or unwilling to serve in such capacity, a recognized national or regional independent accounting firm mutually acceptable to Buyer and Seller Parties' Representative) (the "Independent Accountants").

(e)     The Parties shall negotiate in good faith in order to seek agreement on the procedures to be followed by the Independent Accountants, including procedures with regard to the presentation of evidence.  If the Parties are unable to agree upon procedures within ten (10) days of the submission to the Independent Accountants, the Independent Accountants shall establish such procedures giving due regard to the intention of the Parties to resolve disputes as promptly, efficiently, and inexpensively as possible, which procedures may, but need not, be those proposed by either Buyer or Seller Parties' Representative.  The Independent Accountants shall be directed to resolve only those issues in dispute and render a written report on their resolution of disputed issues with respect to the Final Purchase Price Report and the resulting Adjustment Amount as promptly as practicable, but no later than sixty (60) days after the date on which the Independent Accountants are engaged.  The determination by the Independent Accountants will be based solely on written submissions of Buyer, on the one hand, and Seller Parties' Representative, on the other hand, and will not involve independent review.  Any determination of the Final Purchase Price Report or the Adjustment Amount by the Independent Accountants will not be outside the range established by the amounts in (i) the Final Purchase Price proposed by Company, and (ii) Buyer's proposed adjustments thereto.  Absent fraud by such Independent

Accountants or manifest error, such determination will be final, binding, and conclusive on the Parties as of the date of the determination notice sent by the Independent Accountants.

      (f)      If issues are submitted to the Independent Accountants for resolution:

      (i)      Seller Parties' Representative and Buyer shall execute any agreement required by the Independent Accountants to accept their engagement pursuant to Section 2.4(d);

      (ii)      Seller Parties' Representative, the Company and Buyer shall promptly furnish or cause to be furnished to the Independent Accountants such work papers and other documents and information relating to the disputed issues as the Independent Accountants may request and are available to that Party or its accountants or other Representatives, and shall be afforded the opportunity to present to the Independent Accountants, with a copy to the other Party, any other written material relating to the disputed issues;

      (iii)      The determination by the Independent Accountants, as set forth in a report to be delivered by the Independent Accountants to both Seller Parties' Representative and Buyer, will include the revised Final Purchase Price Report and calculation of Final Purchase Price and the Adjustment Amount, reflecting the changes required as a result of the determination made by the Independent Accountants; and

      (iv)      Seller Parties and Buyer shall each bear one-half of the fees and costs of the Independent Accountants; provided, however, that the engagement agreement referred to in Section 2.4(f)(i) above may require the Parties to be bound jointly and severally to the Independent Accountants for those fees and costs, and in the event Seller Parties, on the one hand, or Buyer, on the other hand, pay to the Independent Accountants any amount in excess of one-half of the fees and costs of its engagement, the other Party(ies) agree(s) to reimburse Seller Parties or Buyer, as applicable, upon demand, to the extent required to equalize the payments made by Seller Parties and Buyer with respect to the fees and costs of the Independent Accountants.

      2.5      Adjustment Amount.

      (a)      If the Adjustment Amount as finally determined pursuant to Section 2.4 is a positive number, then the Purchase Price shall be increased by the Adjustment Amount and twenty percent (20%) of the Adjustment Amount shall be paid by Buyer to Taylor Corporation within three (3) Business Days after the final determination of the Adjustment Amount.

      (b)      If the Adjustment Amount as finally determined pursuant to Section 2.4 is a negative number, then the Purchase Price shall be decreased by the absolute value of the Adjustment Amount and Taylor Corporation shall pay to Buyer an amount equal to twenty percent (20%) of the Adjustment Amount within three (3) Business Days after the final determination of the Adjustment Amount.

(c)      Any amount that is paid pursuant to this <u>Section 2.5</u> shall be treated by the Parties for Tax purposes as an adjustment of the Purchase Price, unless otherwise required by Legal Requirements.

2.6      <u>Equitable Adjustments</u>. Notwithstanding anything to the contrary in this Agreement, if prior to the Closing or any applicable Call Option Closing or Put Option Closing, the number of outstanding or issuable Units shall have been increased, decreased, changed into or exchanged for a different number or kind of equity interest or other security as a result of a reorganization, recapitalization, equity issuance, dividend of Units, Unit split, reverse Unit split or other similar change in capitalization, an appropriate and proportionate adjustment shall be made to the terms of the Contemplated Transactions to give Buyer and the Seller Parties the same economic effect as contemplated by this Agreement prior to such event.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COMPANY

Except (A) as set forth on the disclosure schedule attached hereto (the "<u>Disclosure Schedule</u>") or (B) as would not cause a Material Adverse Effect, Company represents and warrants to Buyer as of the date of this Agreement and as of the Closing Date (or if a representation or warranty is made as of a specified date, as of such specified date) that:

3.1      <u>Organization, Existence & Good Standing of the Company</u>. The Company and each of its subsidiaries is a limited partnership or other legal entity duly organized, validly existing, and is in good standing under the laws of its respective jurisdiction of organization. The Company and each of its subsidiaries is qualified to do business as a foreign entity and in good standing in each jurisdiction in which it is required by applicable law to be qualified. The Company and each of its subsidiaries has the limited partnership or other entity power and authority to conduct its business as presently conducted and as contemplated to be conducted, to own or use its assets and property, and to perform its contractual obligations.

3.2      <u>Subsidiaries</u>. The Company is the sole owner of its subsidiaries, each of which are listed on <u>Section 3.2</u> of the Disclosure Schedule. The Company has no other subsidiaries.

3.3      <u>Capitalization</u>.

(a)      The capitalization and record and beneficial owners of all of the equity securities of the Company is as set forth on <u>Section 3.3</u> of the Disclosure Schedule.

(b)      Except as otherwise provided by the Partnership Agreement, NBA Rules or Legal Requirements related to securities laws:

(i)      Seller Parties own their respective Units free and clear of all Liens as of the Closing Date;

(ii)      All of the outstanding Units are duly authorized, validly issued, fully paid, and non-assessable;

(iii)    No other Units and no options, warrants, conversion rights, preemptive rights, Contracts, arrangements or contingencies of any kind, have been authorized or issued, obligating the Company or any of its subsidiaries to issue, sell, redeem or transfer any Units or other equity interests in the Company or any of its subsidiaries, or any securities convertible or exchangeable for Units or other equity interests in the Company or any of its subsidiaries;

(iv)    No voting trusts, equity holder agreements, proxies or other agreements or arrangements are in effect with respect to the voting or transfer of any Units or other equity securities of the Company or any of its subsidiaries;

(v)    No legend or other reference to any purported Lien appears upon any certificate representing equity securities of the Company or any of its subsidiaries; and

(vi)    No Units were issued in violation of the Securities Act or any other Legal Requirement.

3.4    <u>Corporate Records</u>. Company has made available to Buyer true and complete copies, as in effect on the date hereof, of the Company's Organizational Documents and those of its subsidiaries, all of which are listed on <u>Section 3.4</u> of the Disclosure Schedule.

3.5    <u>No Conflict; No Consents</u>. Subject to obtaining HSR Approval and NBA Approval, the execution and delivery of this Agreement, and the consummation of the Contemplated Transactions, do not and will not:

(a)    violate or conflict with the Company's Organizational Documents or any Legal Requirement;

(b)    result in the creation or imposition of any Lien on any of the Company's assets; or

(c)    violate, require any notice or consent under, or give rise to any right of modification, termination, or acceleration with respect to, any Material Contract to which the Company or any of its subsidiaries is a party or to which the business of the Company or any of its subsidiaries is subject. Seller Parties and the Company are not required to notify, or obtain any consent or waiver from, any Person (including any Governmental Entity) in connection with the execution and delivery of this Agreement or the consummation of the Contemplated Transactions.

3.6    <u>Financial Statements</u>.

(a)    Attached at <u>Section 3.6</u> of the Disclosure Schedule are copies of the Financial Statements.

(b)    The Financial Statements fairly present in all material respects in accordance with GAAP the financial position of the Company and its subsidiaries as of the dates thereof and the results of the operations and cash flows of the Company and its subsidiaries for the periods indicated.

(c)     Except for obligations or liabilities incurred in the Ordinary Course of Business since the date of the Most Recent Balance Sheet, the Company and its subsidiaries have no liabilities or obligations, secured or unsecured (whether absolute, accrued, known or unknown, contingent or otherwise, and whether due or to become due) other than such obligations or liabilities (A) that are disclosed, provided for, reflected in, reserved against or otherwise described on the Most Recent Balance Sheet, (B) arising under the terms of any Contracts of the Company or its subsidiaries (other than any liabilities arising from a breach thereof), or (C) liabilities referred to on any schedule or exhibit to this Agreement.

(d)     Since the date of the Most Recent Balance Sheet, the Company has not experienced any Material Adverse Effect.

3.7     <u>Title, Necessary Assets and Liens</u>. The Company and its subsidiaries have good and marketable title to all of their respective assets, free and clear of any and all Liens other than Permitted Liens. The assets owned and leased by the Company or its subsidiaries constitute all of the assets used in connection with the business of the Company and its subsidiaries, and such assets constitute all of the assets necessary for the conduct of the business of the Company and its subsidiaries as it is currently conducted.

3.8     <u>No Litigation; No Violations of Law; Permits; Licensing</u>.

(a)     No litigation is pending against the Company or any of its subsidiaries.

(b)     No order, writ, injunction or decree of any Governmental Entity or arbitration tribunal is binding upon the Company or any of its subsidiaries.

(c)     Neither the Company nor any of its subsidiaries is in violation of any applicable Legal Requirement.

(d)     All necessary registrations, licenses, permits, approvals or orders of all Governmental Entities with respect to the conduct of the business of the Company and its subsidiaries have been obtained by the Company or its subsidiaries and are in full force and effect as of the Closing Date.

3.9     <u>Taxes</u>.

(a)     Since January 1, 2018, each of the Company and each of its subsidiaries has timely filed (taking into account applicable extensions) all Tax Returns that it was required to file, and except for Taxes being contested in good faith by appropriate proceedings, has duly paid all Taxes due and payable. The Company has established sufficient reserves for all accrued Taxes not yet due and owing.

(b)     All Tax Returns filed by the Company and its subsidiaries since January 1, 2018 are true, correct and complete in all material respects. No audits of any Company or Company subsidiary Tax Returns are in progress or pending, or have been threatened in writing.

(c)     Since January 1, 2018, each of the Company and each of its subsidiaries has withheld and paid all Taxes required to have been withheld and paid in connection with any amount paid or owing to any employee.

(d)     The Company and each of its subsidiaries is properly classified as a partnership for U.S. federal and applicable state income Tax purposes and has a valid election in effect pursuant to Section 754 of the Internal Revenue Code of 1986, as amended ("Code").

3.10     Employees. All compensation due and owing to any employee of the Company or any of its subsidiaries as of the Closing Date have been paid in full or accrued in accordance with GAAP.

3.11     Employee Benefits.

(a)     With respect to each Benefit Plan, the Company has heretofore made available to Buyer correct and complete copies of each of the following documents:

(i)     the Benefit Plan and all related documents (including all amendments thereto),

(ii)     the three most recent Form 5500 annual reports, if applicable, including all attachments thereto, filed with the Department of Labor with respect to each such Benefit Plan,

(iii)     the summary plan description prepared for each such Benefit Plan (including all amendments thereto), and

(iv)     all Contracts with third-party administrators, actuaries, investment managers, consultants or other independent contractors related to each such Benefit Plan.

(b)     Each Benefit Plan has been administered and operated in material compliance with:

(i)     its terms; and

(ii)     all applicable Legal Requirements, including ERISA.

3.12     Intellectual Property.  Subject to the rights of the NBA Entities and the NBA Contracting Parties, the Company owns the entire right, title and interest in and to, or has the right to use pursuant to a valid and enforceable license, all Company IP.  To the Company's Knowledge, since January 1, 2018:

(a)     the conduct of the Company's or its subsidiaries' business, and the Company's or its subsidiaries' products, processes and services, have not infringed upon the Intellectual Property rights of any Person in any material respect;

(b)     no Person has infringed or otherwise violated, or is currently infringing or otherwise violating, any Company IP; and

(c)     there are no pending legal or administrative proceedings, Governmental Entity investigations or inquiries, or claims, demands or actions:

(i)     challenging the validity, enforceability or ownership of any of the Company IP or the Company's or its subsidiaries' rights with respect thereto; or

(ii)    alleging any infringement, misappropriation or other violation of the Intellectual Property of any Person by the Company or any of its subsidiaries.

3.13    Contracts.  Each Material Contract is valid and binding on the Company or its applicable subsidiary in accordance with its terms and is in full force and effect. The Company or its applicable subsidiary is not in material breach or violation of any Material Contract and no event has occurred which, with the giving of notice or the passage of time, would result in a default or violation thereunder. To Company's Knowledge, no other party to any Material Contract is in material breach or violation of that Material Contract and no event has occurred which, with the giving of notice or the passage of time, would result in a default or violation thereunder. The Company or its applicable subsidiary has not received from any party to a Material Contract any written notice of any material breach of, or default or violation under, or intention to terminate any Material Contract.  Company has heretofore made available to Buyer a true and complete copy of each Material Contract.

3.14    Real Estate. Neither the Company nor any of its subsidiaries owns any real property. Section 3.14 of the Disclosure Schedule lists all Leases entered into by the Company or any of its subsidiaries and contains a description of the premises leased and the parties to such lease. The Company or its applicable subsidiary is not in default under any Lease, and no event has occurred that with notice or the passing of time would constitute a default by the Company or such subsidiary under any Lease. To Company's Knowledge, no lessor is in material default under any Lease, and no event has occurred that with notice or the passing of time would constitute a default by the lessor under any Lease. No dispute exists with respect to the Company's or its applicable subsidiary's right to enjoy the premises under the Leases.

3.15    Insurance. The assets and business of the Company and its subsidiaries are insured under the various policies of insurance set forth on Section 3.15 of the Disclosure Schedule, each of which is currently, and will be after the Closing Date, in full force and effect without modification other than extensions or renewals occurring in the Ordinary Course of Business. The Company has timely paid all premiums due and payable with respect to each policy set forth on Section 3.15 of the Disclosure Schedule, and, to the Company's Knowledge, no additional premiums are due as of the Closing Date. The Company and its subsidiaries have not received any written notice of cancellation or non-renewal with respect to (or disallowance of, or reservation of rights with respect to, any claim under) any such policies.

3.16    Related Party Transactions.  Section 3.16 of the Disclosure Schedule sets forth a complete and accurate list as of the date hereof of all (a) material transactions or Contracts between or among the Company or any of its subsidiaries, on the one hand, and any Seller Party or any Affiliate of any such Seller Party (other than the Company or any of its subsidiaries), any current or former director, officer, manager or family member of any such Seller Party or Affiliate, or any Person in which any such current or former director, officer, manager, partner or family member

10

has a material interest; and (b) material properties, rights or assets that are used by the Company or any of its subsidiaries that are owned or leased by any Seller Party or any Affiliate of any such Seller Party (other than the Company or any of its subsidiaries), or, to Seller Party's Knowledge, by any current or former director, officer, manager or family member of any such Seller Party or Affiliate, or, to any Person in which any such current or former director, officer, manager, partner or family member has a material interest (any transaction or contract of the type described in clause (a) or (b), a "Related Party Transaction"). The Seller Parties have made available to Buyer prior to the date hereof true and complete copies of any Contract that provides for a Related Party Transaction.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Each Seller Party hereby represents and warrants to Buyer solely with respect to himself, herself or itself as follows:

4.1     <u>Organization and Authority of Non-Natural Person Seller Parties; Binding Obligation</u>.

(a)     If a Seller Party is not a natural person, such Seller Party:

(i)     is duly organized, validly existing and in good standing under the laws of its state of formation;

(ii)     has the requisite power and authority to enter into and perform its obligations under this Agreement;

(iii)     has taken all action necessary to authorize its entry into and performance of its obligations under this Agreement; and

(iv)     has caused this Agreement to be executed and delivered on its behalf by its duly authorized officer whose signature is set forth on its behalf on the signature page of this Agreement.

(b)     This Agreement constitutes a legal, valid and binding obligation of each Seller Party enforceable against each Seller Party in accordance with its terms.

4.2     <u>No Conflicts; No Consents</u>.

(a)     The execution and delivery of this Agreement, and the consummation of the Contemplated Transactions, will not conflict with or result in any violation of or default under (or any event that, with notice or lapse of time or both, would constitute a default under), require any consent under, result in the acceleration or required prepayment of any indebtedness pursuant to the terms of, result in the creation or imposition of any Lien under any provision of, or give the right to or result in the amendment, modification, termination, cancellation, acceleration or consent with respect to:

(i)        the Organizational Documents of Seller if it is not a natural person;

(ii)       any Contract to which such Seller Party is a party or by which such Seller Party or any of his/her/its assets may be bound; or

(iii)      any Legal Requirement applicable to such Seller Party.

(b)        No consent, approval, authorization, permit, order, filing, registration or qualification of or with any Governmental Entity or other Third Party is required to be obtained by any Seller Party in connection with the execution and delivery of this Agreement or consummation of the Contemplated Transactions.

4.3      <u>Title to Units</u>. Each Seller Party is the sole direct and beneficial owner of the Units indicated as being owned or held by such Seller Party on <u>Exhibit A</u> hereto free and clear of any and all Liens (except restrictions in the Partnership Agreement or under applicable Securities Laws), and Buyer will receive good and marketable title to all such Units as a consequence of the Contemplated Transactions free and clear of any and all Liens.

4.4      <u>No Brokers</u>. No Seller Party has employed or retained, or has any liability to, any intermediary, broker, investment banker, agent or finder on account of this Agreement or the Contemplated Transactions.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller Parties as of the date of this Agreement and as of the Closing Date (or if a representation or warranty is made as of a specified date, as of such specified date) that:

5.1      <u>Organization and Authority of Buyer; Binding Obligation</u>.

(a)        Buyer:

(i)       is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware;

(ii)      has the requisite power and authority to enter into and perform its obligations under this Agreement;

(iii)      has taken all action necessary to authorize its entry into and performance of its obligations under this Agreement; and

(iv)      has caused this Agreement to be executed and delivered on its behalf by its duly authorized officer, manager or other representative whose signature is set forth on its behalf on the signature page of this Agreement.

(b)     This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

5.2     <u>No Conflicts; No Consents</u>.

(a)     The execution and delivery of this Agreement, and the consummation of the Contemplated Transactions, will not conflict with or result in any violation of or default under (or any event that, with notice or lapse of time or both, would constitute a default under), require any consent under, result in the acceleration or required prepayment of any indebtedness pursuant to the terms of, result in the creation or imposition of any Lien under any provision of, or give the right to or result in the amendment, modification, termination, cancellation, acceleration or consent with respect to:

(i)      the Organizational Documents of Buyer,

(ii)     any Contract to which Buyer is a party or by which Buyer or any of its respective assets may be bound, or

(iii)    any Legal Requirement applicable to Buyer.

(b)     Subject to obtaining HSR Approval and NBA Approval, no consent, approval, authorization, order, filing, registration or qualification of or with any Governmental Entity or Third-Party is required to be obtained by Buyer in connection with the execution and delivery by Buyer of this Agreement or the consummation of the Contemplated Transactions.

5.3     <u>No Brokers</u>. None of Buyer or its Affiliates has employed or retained, or has any liability to, any intermediary, broker, investment banker, agent or finder on account of this Agreement or the Contemplated Transactions, except for Inner Circle Sports LLC.

5.4     <u>Assurance of Closing</u>. Buyer will have immediately available funds as of the Closing sufficient to pay the portion of the Purchase Price payable pursuant to <u>Section 2.3(b)(i)</u> and there is no financing contingency to the Closing.

5.5     <u>Investment Intent</u>.  Buyer is acquiring the Closing Units and the option to acquire additional Units for its own account and not with a view to their distribution within the meaning of the Securities Act.

5.6     <u>Accredited Investors</u>.  Buyer is an accredited investor within the meaning of the Securities Act.

5.7     <u>Non-Reliance</u>.

(a)     OTHER THAN AS SET FORTH IN THIS AGREEMENT, BUYER IS NOT RELYING UPON ANY OTHER INFORMATION, REPRESENTATION OR WARRANTY (INCLUDING ORAL REPRESENTATIONS AND WARRANTIES) BY ANY SELLER PARTY, SELLER PARTIES' REPRESENTATIVE, THE COMPANY, OR ANY OF THEIR EMPLOYEES, AGENTS OR REPRESENTATIVES.  BUYER HAS BEEN ADVISED THAT NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY

STATEMENT NOT CONTAINED IN THIS AGREEMENT, AND THAT ANY INFORMATION OR STATEMENT NOT CONTAINED HEREIN MUST NOT BE RELIED UPON.  BUYER UNDERSTANDS THAT THE SELLER PARTIES, SELLER PARTIES' REPRESENTATIVE AND THE COMPANY ARE NOT PROVIDING ANY TAX OR LEGAL ADVICE SPECIFIC TO BUYER'S CIRCUMSTANCES AND BUYER HAS CONSULTED, TO THE EXTENT DEEMED APPROPRIATE BY BUYER, WITH ITS OWN ADVISERS AS TO THE FINANCIAL, TAX, LEGAL AND RELATED MATTERS CONCERNING THE CONTEMPLATED TRANSACTIONS.

(b)    BUYER AND ITS REPRESENTATIVES (1) HAVE HAD ACCESS TO AND THE OPPORTUNITY TO REVIEW ALL OF THE DOCUMENTS MADE AVAILABLE IN THE DATA ROOM MAINTAINED ON BEHALF OF THE COMPANY, AND (2) HAVE BEEN AFFORDED ACCESS TO CERTAIN BOOKS AND RECORDS, CERTAIN FACILITIES AND CERTAIN OFFICERS, MANAGERS, EMPLOYEES AND OTHER REPRESENTATIVES OF THE COMPANY AND ITS SUBSIDIARIES FOR PURPOSES OF CONDUCTING A DUE DILIGENCE INVESTIGATION WITH RESPECT THERETO. BUYER HAS  CONDUCTED AN INDEPENDENT INVESTIGATION OF THE FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES AND OPERATIONS OF THE COMPANY, EACH OF ITS SUBSIDIARIES AND ANY OF THEIR RESPECTIVE JOINT VENTURES AND BUSINESSES, AND, IN MAKING ITS DETERMINATION TO PROCEED WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, BUYER HAS RELIED SOLELY ON THE RESULTS OF SUCH INDEPENDENT INVESTIGATION AND VERIFICATION AND ON THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY EXPRESSLY AND SPECIFICALLY SET FORTH IN ARTICLE III AND OF EACH SELLER PARTY SPECIFICALLY SET FORTH IN ARTICLE IV.

## ARTICLE VI.

### CALL OPTION

6.1    Grant of Option.  If the Closing occurs as contemplated herein, each of the Seller Parties hereby grants to Buyer, and, with respect to the Other LP Units, Taylor Sports Group, Inc. hereby grants to Buyer, a series of options (each a "Call Option" and collectively, the "Call Options") to acquire all of the Units owned by such Seller Party, or, in the case of the Other LP Units, owned by any other Person, which are not Closing Units (the "Call Option Units") on the terms and conditions set forth herein.

(a)    Each Call Option may be exercised by the Buyer at any time following the Closing Date prior to the respective dates specified for the respective portion of the Call Option Units set forth below at Section 6.1(b) (respectively, each a "Tranche" and the relevant exercise period, each a "Call Period").

(b)    The Call Options are as follows:

(i)    The First Tranche consists of twenty (20) LP Units (or if, as of the applicable Call Option Closing, a different number of Units is outstanding or issuable, a

14

number of LP Units representing twenty percent (20%) of the fully-diluted equity interest in the Company) to be purchased from Taylor Corporation for an amount in cash equal to twenty percent (20%) of the Final Purchase Price (the "First Tranche Base Call Price") and may only be exercised during the Call Period of between the day after the Closing and December 31, 2022;

(ii)     The Second Tranche consists of all of the outstanding GP Units, to be purchased from Taylor Sports Group, Inc., and 31.757351 LP Units (or if, as of the applicable Call Option Closing, a different number of Units is outstanding or issuable, a number of LP Units, that, combined with the GP Units to be purchased pursuant to such Call Option, represents forty percent (40%) of the fully-diluted equity interest in the Company) to be purchased from the Seller Parties and the Non-Taylor Partners (or any transferee thereof) as specified on Exhibit G.  The aggregate consideration for the Units purchased in the Second Tranche shall be cash in an amount equal to forty percent (40%) of the Final Purchase Price, (the "Second Tranche Base Call Price") plus the Call Adjustment Factor, and may only be exercised after the exercise of the Call Option with respect to the First Tranche and before December 31, 2023;

(iii)     The Third Tranche consists of twenty (20) LP Units (or if, as of the applicable Call Option Closing, a different number of Units is outstanding or issuable, a number of LP Units representing twenty percent (20%) of the fully-diluted equity interest in the Company as of the date of the consummation of the Second Tranche Call Option) to be purchased from the Seller Parties (or any transferee thereof) as specified on Exhibit G. The aggregate consideration for the Units purchased in the Third Tranche shall be cash in an amount equal to twenty percent (20%) of the Final Purchase Price, (the "Third Tranche Base Call Price") plus the Call Adjustment Factor, and may only be exercised after the exercise of the Call Option with respect to the Second Tranche and before December 31, 2024; and

(iv)     Notwithstanding the percentages for each of the Call Options described in Sections 6.1(a)(i), 6.1(a)(ii) and 6.1(a)(iii), the Parties acknowledge that the total number of outstanding Units equals 99.999999. The unissued 0.000001 of a Unit necessary to make the percentages set forth in this Section 6.1(a) accurate shall be taken into account in the Call Option with respect to the Second Tranche.

(c)     The Call Option for each Tranche may only be exercised during the respective Call Periods described above simultaneously with respect to all Units in such Tranche. For the avoidance of doubt, however, Buyer may exercise the Call Option for all Tranches simultaneously or aggregate Call Options for later Tranches so long as the order set forth in Section 6.1(b) is maintained.

(d)     In the event that Buyer fails to exercise any Call Option prior to the specified expiration date for the respective Tranche, all subsequent Call Options shall immediately terminate and thereafter be null and void.

(e)     In the event that Buyer agrees with any Non-Taylor Partners designated to sell LP Units as part of the Second Tranche to remain as a partner in the Company and to not sell

15

all or a portion of the scheduled LP Units in such Second Tranche (the "Excluded LP Units"), then the Seller Parties scheduled to sell LP Units in the Third Tranche shall have the right, but not the obligation, to accelerate the sale of their LP Units from the Third Tranche to the Second Tranche in an amount up to the number of Excluded Units.  The Parties acknowledge that the goal of this provision is to maintain the same total amount of LP Units to be sold in the closing related to the Second Tranche Call Option.

(f)     Upon Buyer's exercise of the Call Option with respect to the Second Tranche, Taylor Sports Group, Inc., as general partner, will invoke and enforce the Drag/Tag Rights to require each of the Non-Taylor Partners to sell the Other LP Units owned by such Non-Taylor Partners on the terms set forth herein applicable to the Seller Parties.  In connection therewith, Taylor Sports Group, Inc. shall direct such Non-Taylor Partners to (i) execute and deliver to Buyer a joinder agreement to the terms of this Agreement in the form attached at Exhibit H; (ii) become a "Seller Party" for all purposes herein and (iii) execute and deliver to Buyer an assignment related to all of the Other LP Units held by such Non-Taylor Partners in the form attached hereto as Exhibit D.

6.2     Call Price.  The exercise price for the Call Option (the "Call Price") shall be calculated as the Base Call Price, plus the Call Adjustment Factor.

6.3     Exercise of Call Option.  Buyer may exercise each Call Option only in a written notice (the "Call Exercise Notice") delivered to Seller Parties' Representative within the applicable Call Period which:

(a)     Specifies the Tranche(s) covered by the Call Exercise Notice; and

(b)     Specifies the desired closing date for the exercise of the Call Option, such date to be not less than sixty (60) days and not more than ninety (90) days following the Call Exercise Notice.

6.4     Call Option Closing.

(a)     The consummation of the exercise of each Call Option (each a "Call Option Closing") must occur, subject to prior NBA Approval, no earlier than sixty (60) days following the Call Exercise Notice and no later than ninety (90) days following the delivery of the Call Exercise Notice (which ninety (90)-day period shall be automatically extended by an additional ninety (90) days if all NBA Approvals or other required approvals of any Governmental Entity have not yet been obtained) (the "Call Expiration Date").

(b)     At or prior to each Call Option Closing:

(i)     Buyer shall deliver payment of the applicable Call Price to each Seller Party selling Units in such Call Option Closing; and

(ii)     Each Seller Party selling Units in such Call Option Closing shall deliver each of the documents referred to in Sections 6.1(f)(i) and 6.1(f)(iii).

(c)     If the Call Option Closing with respect to any Tranche does not occur prior to the applicable Call Expiration Date for such Tranche for any reason, all remaining Call Options shall be terminated and are thereafter of no force or effect; provided, however, if the failure to satisfy any condition to such Call Option Closing is due to any Seller Party materially breaching its obligations (i) under this Agreement which directly causes the failure of any of the conditions set forth in Sections 11.6 (NBA Approval), 11.7 (No Legal Prohibition) or 11.8 (HSR Approval) (in each case, after Buyer has provided such Seller Party with written notice of such material breach) or (ii) under Section 6.1(f), Section 6.4(b)(ii) or Section 9.7(b) which results in the failure of the condition set forth in Section 11.2, then such Call Option and the remaining Call Options shall continue to survive and the time periods set forth in this Section 6.4 shall be tolled, and shall not re-start, until such breaching Seller Party cures its breach under this Agreement. Notwithstanding the foregoing, the time periods above shall not be extended or tolled if the NBA notifies the Parties that it denies NBA Approval or otherwise prohibits such extension or tolling, provided that Buyer shall retain any claim for Damages against the Seller Parties with respect to any breach by them.

## ARTICLE VII.

## REMAINDER INTEREST OPTIONS

7.1     Put Option.  If Buyer acquires the GP Units, as of the earlier of (a) the Call Option Closing with respect to the Third Tranche and (b) the expiration of the Call Period with respect to the Third Tranche (the "Put Option Commencement Date"), the Guarantors grant to each Seller Party which as of such date holds any Units (each a "Holder") an irrevocable option (the "Put Option") to require the Guarantors to purchase all remaining Units owned by such Seller Party (the "Remainder Interest") on the terms and conditions set forth herein and in the Guarantee.

7.2     Put Price.  The aggregate exercise price for the Put Option (the "Put Price") shall be the Final Purchase Price, multiplied by the percentage of the fully-diluted equity interest in the Company that the Units being sold in such Put Option Closing represented of as of the GP Unit Closing Date, as set forth on Exhibit G (the "Base Put Price"), plus (b) the Put Adjustment Factor. All amounts paid pursuant to the Put Options shall be in cash and in United States currency.

7.3     Exercise of Put Option.

(a)     Each Holder may exercise the Put Option only in a written notice to Buyer (the "Put Exercise Notice") issued after the Put Option Commencement Date and before the date that is two (2) years following the Put Option Commencement Date (the "Put Period") which:

(i)     Specifies the Units covered by the Put Exercise Notice; and

(ii)     Specifies the desired closing date for the exercise of the Put Option which must be not less than sixty (60) days following the date of the Put Exercise Notice.

(b)     If the Put Option is not exercised prior to the expiration of the Put Period, the Put Option is terminated and thereafter of no force or effect.

7.4     Put Option Closing.

(a)     The consummation of the exercise of the Put Option (the "Put Option Closing") must occur, subject to prior NBA Approval, not later than 180 days following the date of the Put Exercise Notice (the "Put Expiration Date").

(b)     At or prior to the Put Option Closing:

(i)     The Guarantors shall deliver payment of the Put Price; and

(ii)     Holder shall deliver an assignment related to the Remainder Interest being sold and shall receive the Put Price.

(c)     If the Guarantors fail or refuse to make payment of the Put Price at the Put Option Closing (at a time when all conditions to the applicable Put Option Closing have been satisfied or waived, except for those conditions that by their nature can only be satisfied at the applicable Put Option Closing, but which are capable of being satisfied at such time), then the Put Price shall accrue interest at the rate of 12% from and after the scheduled Put Option Closing.

## ARTICLE VIII.

## PRE-CLOSING COVENANTS REGARDING THE COMPANY

8.1     Access and Investigation.  Prior to the Closing Date and upon reasonable notice from Buyer, Company shall, subject to the NBA Ownership Transfer Policies:

(a)     afford Buyer reasonable access, during regular business hours, to Company's personnel, assets, Contracts, and Records;

(b)     furnish Buyer with copies of all such Contracts and Records as Buyer may reasonably request;

(c)     furnish Buyer with such additional financial, operating, and other relevant data and information as Buyer may reasonably request; and

(d)     otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the business, condition (financial or otherwise), assets, results of operations, or prospects of Company.  In addition, Buyer shall have the right to have the Real Property and the tangible personal property of Company inspected, at Buyer's sole cost and expense, but excluding the performance of subsurface or other intrusive testing.

8.2     Operation of the Company.   Prior to the Closing Date, Seller Parties' Representative shall cause Company to use reasonable commercial efforts to:

(a)     conduct the business of Company only in the Ordinary Course of Business;

(b)     preserve intact the current business organization of Company, keep available the services of the officers, employees, and agents of Company, and maintain its relations

and goodwill with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with Company; and

> (c)     comply with all material Legal Requirements applicable to Company

8.3     <u>Filings and Notifications; Cooperation</u>.  As promptly as practicable after the date of this Agreement, and in any event within the applicable time period prescribed by Legal Requirements, each Party shall, and Seller Parties' Representative shall cause Company to, make all filings and notifications required by Legal Requirements to be made by them in connection with the Contemplated Transactions (including all filings under the HSR Act).  Each Party shall, and shall cause its Representatives to, cooperate with the other Parties:

> (a)     with respect to all filings and notifications that Buyer shall be required by Legal Requirements to make in connection with the Contemplated Transactions; and

> (b)     in identifying and obtaining authorization of any Governmental Entity required in connection with the Contemplated Transactions and for Buyer to own and operate Company from and after the GP Unit Acquisition Date.

8.4     <u>Confidentiality; Publicity</u>.

> (a)     Buyer shall fully comply with the terms of the Non-Disclosure Agreement between the Guarantors, Taylor Sports Group, Inc. and the Company dated April 9, 2021 (the "<u>NDA</u>") as a "Recipient" (as defined in such NDA).  The terms of the NDA are incorporated into this Agreement as if fully set forth herein.

> (b)     Without the prior written consent of Seller Parties' Representative, Buyer will not, and Buyer will cause its respective Representatives not to, make any release to the press or make any statement to any other Person with respect to either the fact that discussions or negotiations are taking place concerning the Contemplated Transactions or the existence or contents of this Agreement, except:

>> (i)     as required by this Agreement; and

>> (ii)     disclosures to Buyer's Representatives and to NBA employees and agents, in each case who need to know information in connection with the Contemplated Transactions (all of whom shall be instructed to keep such disclosures confidential).

## ARTICLE IX.

## POST-CLOSING COVENANTS

9.1     <u>Perquisites</u>. From and after the GP Unit Closing Date, Buyer shall cause Company to provide Glen A. Taylor (or his heirs), without charge, for use in his/their sole discretion, surviving for the greater of his life or ten (10) complete NBA seasons following the GP Unit Closing Date, the following benefits:

(a)     Four (4) courtside seats for each home NBA and WNBA regular season and play-off game;

(b)     one (1) suite for each home NBA and WNBA regular season and play-off game (either the current suite provided to Mr. Taylor or one substantially comparable as mutually agreed); and

(c)     two (2) reserved parking spaces for each home NBA and WNBA regular season and play-off game.

9.2     <u>Remainder Interest Rights</u>.  For the duration of the period that any Holder owns any Remainder Interest:

(a)     Buyer (or its Affiliate or assignee), as general partner, shall waive any restrictions and affirmatively grant consent for any transfer of all or any portion of the Remainder Interest by Holder to any other Person that would otherwise be required pursuant to the terms of the Partnership Agreement;

(b)     Holder (and any transferee holding such Remainder Interest pursuant to an assignment under <u>Section 9.2(a)</u>) shall be subject to, and beneficiary of, the drag-along rights and tag-along rights as set forth in the Partnership Agreement (collectively, the "<u>Drag/Tag Rights</u>");

(c)     Buyer covenants not to take any action or permit any action to alter or amend the Drag/Tag Rights without the prior written consent of the Holder (or any transferee holding such Remainder Interest pursuant to an assignment under <u>Section 9.2(a)</u>) which consent may be granted or withheld in such Person's sole discretion; and

(d)     No Holder (or any transferee holding such Remainder Interest pursuant to an assignment under <u>Section 9.2(a)</u>) shall be required to respond to any Capital Call pursuant to the Partnership Agreement and the failure to respond to, or participate in, any such Capital Call shall not alter or diminish in any respect any Call Option Price or the Put Option Price.

9.3     <u>Certain Tax Matters</u>.

(a)     On or prior to each Call Option Closing or Put Option Closing, as applicable, each participating Seller Party shall deliver to Buyer a duly completed and executed Internal Revenue Service Form W-9.

(b)     For purposes of reporting the Tax consequences of the transactions contemplated by this Agreement, the Purchase Price (as determined for income Tax purposes) shall be allocated among the assets of the Company in accordance with the Code as reasonably determined in good faith by the Seller Parties' Representative.

(c)     For purposes of allocating tax items for a taxable period in which a closing occurs, the Company will use the interim closing method under Section 706 of the Code and Treasury Regulations Section 1.706-4 using the "calendar day" convention.

9.4     Buyer Non-Solicit.  From and after the date of this Agreement, Buyer agrees that it will not, directly or indirectly, including through any of its Representatives, solicit to acquire or acquire any of the Units from the owners thereof other than in strict compliance with, and pursuant to the terms of, this Agreement.

9.5     Approvals.

(a)     Without limiting the provisions of Section 8.3, each of the Parties (or their applicable Affiliates) shall promptly (and in any event within five (5) Business Days) after the date of Buyer's exercise of the Call Option with respect to the Second Tranche, file any Notification and Report Forms that it may be required to file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the HSR Act.  Each Party will furnish to each other's counsel such necessary information and reasonable assistance as another Party may request in connection with its preparation of any filing or submission that is necessary under the HSR Act and any other applicable antitrust Legal Requirements.  Each Party shall use its commercially reasonable efforts to obtain all necessary approvals under the HSR Act and all other applicable antitrust Legal Requirements, and shall make any further filings or information submissions pursuant thereto that may be necessary, proper or advisable.

(b)     Each Party shall, and shall cause its Affiliates to, promptly after the date of this Agreement, and in connection with each exercise of a Call Option or a Put Option, promptly prepare and file with the NBA all filings required by such Party (or its Affiliates, as applicable) to be filed with the NBA to obtain the NBA Approvals.  Buyer shall, and shall cause its Affiliates to, use their commercially reasonable efforts to obtain the NBA Approvals (including by executing and delivering documents required by the NBA in connection therewith), and shall make any further filings or information submissions pursuant thereto that may be necessary, proper or advisable, but in each case, shall file complete and correct responsive information as promptly as reasonably possible. Buyer shall provide the Seller Parties' Representative with regular updates on the process of obtaining the NBA Approvals, including copies of all filings and material correspondence with the NBA Entities related thereto.  The Sellers Parties Representative shall, and shall cause the Company to, provide reasonable cooperation and shall assist, to the extent reasonably requested by Buyer and its Representatives, with Buyer's and its Affiliates' efforts to obtain the NBA Approval (including by executing and delivering documents required by the NBA in connection therewith).

(c)     Buyer shall bear and pay all fees and expenses associated with applying for and securing the NBA Approval and the HSR Approval regardless of whether any such approval or consent is obtained and regardless of whether the Closing or any of the other Contemplated Transactions are consummated.

9.6     Partnership Agreement.  From and after the Closing Date, Buyer (and its Affiliates) shall vote all LP Units owned by any such Person and give any consent or issue or waive receipt of any notice required by the Partnership Agreement as directed by the general partner to permit or effect the consummation of the Contemplated Transactions, including the transfer of Units as contemplated herein.

9.7     Certain Operating and Governance Matters.

(a)     Attached hereto and incorporated herein by reference is Exhibit I, which the Parties agree addresses certain governance matters with respect to the Company and its subsidiaries for the time periods specified therein.

(b)     From and after the Closing Date and until the earlier of:

(i)      any Call Expiration Date for which the applicable Call Option is not exercised or consummated, or

(ii)     the Put Expiration Date if the Put Option is not exercised or consummated, or

(iii)    all of the Units have been acquired by Buyer,

each of Buyer, any Buyer Affiliate or assignee of Buyer acquiring Units, Taylor Corporation and Glen A. Taylor or any assignee of Taylor Corporation or Glen A. Taylor agree to vote their respective LP Units in opposition to any amendment to the Partnership Agreement.

(c)     From and after the date hereof and until the earlier of:

(i)      the Second Tranche Call Option Closing and

(ii)     the Second Tranche Call Option Expiration Date,

Taylor Sports Group, Inc. (or any successor thereof or assignee as general partner of the Company), shall not effect or permit any amendment to the Partnership Agreement that would alter the Drag/Tag Rights in a manner adverse to Buyer or the Parties' ability to consummate the Contemplated Transactions.

## ARTICLE X.

## INDEMNIFICATION

10.1    <u>Indemnification by Seller Parties</u>.

(a)     Effective as of and after the Closing, each Seller Party, severally and not jointly, hereby agrees to indemnify, hold harmless and defend Buyer from and against all Damages arising out of :

(i)      any breach in any representation or warranty made by such Seller Party in <u>Article IV</u> of this Agreement; or

(ii)     any breach or failure of any Seller Party to perform any covenant or obligation set forth in this Agreement.

(b)     The maximum aggregate Damages for which any Seller Party shall have an indemnification obligation pursuant to <u>Section 10.1(a)(i)</u> shall not exceed the portion of the Purchase Price actually received by such Seller Party.

(c)     If the Closing occurs, Seller Parties shall have no liability under this <u>Article X</u> or otherwise for:

      (i)     any breach in any representation or warranty made by the Company in <u>Article III</u> of this Agreement; or

      (ii)     any breach of any of the pre-Closing covenants set forth in <u>Article VIII</u> of this Agreement.

(d)     Buyer expressly waives the right to indemnification with respect to any matter of which Buyer or its Representatives had Knowledge prior to the date hereof.

(e)     For the avoidance of doubt, no Seller Party shall be liable for any breach or inaccuracy of any representation, warranty or covenant of the Company or of any other Seller Party contained in this Agreement.

10.2     <u>Indemnification by Buyer</u>.

(a)     Effective as of and after the Closing, Buyer hereby agrees to indemnify, hold harmless and defend Seller Parties and Company from and against all Damages arising out of:

      (i)     any breach in any representation or warranty made by Buyer in <u>Article V</u> of this Agreement; or

      (ii)     any breach or failure of Buyer to perform any covenant or obligation set forth in this Agreement.

10.3     <u>Survival of Claims</u>.

(a)     The representations and warranties with regard to Company set forth in <u>Article III</u> shall expire as of the Closing Date.

(b)     The representations and warranties of Seller Parties set forth in <u>Article IV</u> and of Buyer set forth in <u>Article V</u> shall survive the Closing Date for a period of one (1) year and shall thereafter be of no force or effect.

(c)     Each covenant and agreement of the Parties contained in this Agreement shall survive for the period expressly specified therein, if any, or until fully performed; provided, however, any pre-Closing covenant or obligations contained in <u>Article VIII</u> shall expire immediately after the Closing.

10.4     <u>Limitations on Indemnification</u>.

(a)     No Party has relied upon any representation, warranty or covenant except as expressly set forth in this Agreement.

(b) From and after the Closing, except (i) as otherwise provided in this Article X, (ii) in connection with the final determination of the Adjustment Amount under Section 2.4, or (iii) claims for specific performance or other equitable relief, the provisions of this Article X provide the exclusive remedy for:

(i) any breach of any representation, warranty or covenant set forth in this Agreement; and

(ii) any matter arising from or with respect to the Contemplated Transactions whether arising in contract, tort or otherwise.

(c) Each Party shall use commercially reasonable efforts to mitigate any Damage subject to indemnification under Section 10.1 or Section 10.2, as applicable, provided that the reasonable costs and expenses of such mitigation shall be included in the Damages subject to such indemnification.

(d) Any liability for indemnification under Section 10.1 or Section 10.2 shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement. Buyer shall not be entitled to be indemnified pursuant to Section 10.1 for the amount of any liability included in the calculation of Indebtedness or Net Working Capital or to the extent taken into account in the calculation of the Adjustment Amount, as finally determined.

(e) If any insurance proceeds are actually received by any Party from any Third Party with respect to a Damage indemnifiable pursuant to Section 10.1 or Section 10.2, as applicable, such amount received (net of any costs and expenses of collecting such insurance proceeds) shall reduce the amount of the Damage for which Seller Parties or Buyer, as applicable, are responsible. If payment has already been made by the indemnifying party to the other Party with respect to the Damage, then the amount of the insurance proceeds received which applies to the Damage (net of any costs and expenses of collecting such insurance proceeds) shall be promptly paid to such indemnifying party. The Parties shall use commercially reasonable efforts to collect amounts available under any insurance coverage.

(f) The Parties mutually acknowledge and agree that the other Parties would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement could not be adequately compensated in all cases by monetary damages alone. Accordingly, Buyer and the Seller Parties agree that, in addition to any other right or remedy available at law or in equity but consistent with Section 14.2, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to obtain temporary, preliminary, and permanent injunctive relief to prevent any breach or threatened breach of this Agreement, without posting any bond or giving any other undertaking. If an equitable remedy described in this Section 10.4(f) providing for the consummation of the Closing is granted, such relief shall be in lieu of any termination right available to such Party under Section 14.1.

# ARTICLE XI.

## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligations to purchase the Units and to take the other actions required pursuant to this Agreement to be taken by Buyer at the Closing, or at any Call Option Closing or any Put Option Closing, as applicable, are subject to the satisfaction, at or prior to the Closing, or the applicable Call Option Closing or Put Option Closing, as applicable, of each of the following, which (except for Section 11.6) may be waived in whole or in part by Buyer:

11.1    Accuracy of Seller Parties' Representations.   (a) Each of the representations and warranties set forth in Section 4.3 (Title to Units) shall be true and correct in all respects as of the date hereof and as of the Closing Date, and at any Call Option Closing and any Put Option Closing in which such Seller Party participates, as if made anew at and as of the Closing Date or as of the date of such Call Option Closing or the date of such Put Option Closing; provided, however, any failure of Section 4.3 (Title to Units) to be true and correct as to the identity of the particular Seller Party set forth on Exhibit A due to a transfer or assignment of Units made in compliance with Section 16.3 (Assignment) shall be disregarded in satisfying this condition, and (b) each of Seller Parties' representations and warranties in Article IV other than Section 4.3 (Title of Units), shall be true and correct in all respects as of the Closing Date, and at any Call Option Closing and any Put Option Closing, as applicable, in which such Seller Party participates, as if made anew at and as of the Closing Date or as of the date of such Call Option Closing or Put Option Closing, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all respects at and as of such date except for, in the case of this clause (b), any inaccuracy or omission that would not cause a Material Adverse Effect.

11.2    Performance of Covenants. The covenants and obligations that each Seller Party and the Company (as applicable) is required to perform or to comply with pursuant to this Agreement at or prior to the Closing, or any Call Option Closing or Put Option Closing, as applicable, will have been duly performed and complied with in all material respects at or prior to the Closing, or such Call Option Closing, or Put Option Closing, as applicable; provided that for purposes of this Section 11.2, a covenant shall only be deemed to have not been performed if such Seller Party or the Company has materially breached such covenant and failed to cure within five (5) days after notice (or if earlier, the End Date or the Call Expiration Date or Put Expiration Date, as applicable).

11.3    Accuracy of Company's Representations. (a) Each of the representations and warranties set forth in Section 3.2 (Subsidiaries), Section 3.3 (Capitalization) and Section 3.4 (Corporate Records) (solely with respect to the Partnership Agreement), in each case disregarding all qualifications contained therein (or in the lead-in to Article III) relating to materiality or "Material Adverse Effect," shall be true and correct in all but *de minimis* respects as of the date hereof and as of the Closing Date, as if made anew at and as of the Closing Date; provided, however, any failure of Section 3.3 (Capitalization) to be true and correct as to the identity of the particular individuals or entities set forth in Section 3.3 of the Disclosure Schedules due to a transfer or assignment of Units made in compliance with Section 16.3 (Assignment) shall be disregarded in confirming the satisfaction of this condition, and (b) each of the other

25

representations and warranties set forth in <u>Article III</u> shall be true and correct in all respects as of the Closing Date as if made anew at and as of the Closing Date, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all respects at and as of such date except for, in the case of this clause (b), any inaccuracy or omission that would not cause a Material Adverse Effect to the Company.

  11.4 <u>Bring Down Certificates</u>.

    (a) Seller Parties' Representative shall have delivered to Buyer a certificate signed by an officer of the Seller Parties' Representative, dated as of the Closing Date, the date of the applicable Call Option Closing or the date of the applicable Put Option Closing, as applicable, certifying that the conditions specified in <u>Section 11.1</u> and <u>Section 11.2</u> (with respect to the Seller Parties that are a Party to this Agreement on the date hereof or any of their assignees or transferees) have been fulfilled.

    (b) The Company shall have delivered to Buyer a certificate signed by an officer of the Company, dated as of the Closing Date, certifying that the conditions specified in <u>Section 11.2</u> (with respect to the Company) and <u>Section 11.3</u> have been fulfilled.

  11.5 <u>No Material Adverse Change</u>.  Since the date of this Agreement, the Company will not have suffered any Material Adverse Effect.

  11.6 <u>NBA Approval</u>.  NBA Approval for the Closing, each Call Option Closing and the Put Option Closing, as applicable, shall have been issued and be in full force and effect.

  11.7 <u>No Legal Prohibition</u>.  There will not be in effect any Legal Requirement that prohibits the sale of the Units by the applicable Seller Parties to Buyer or the consummation of any of the Contemplated Transactions.

  11.8 <u>HSR Approval</u>.  With respect to the Second Tranche Call Option Closing, if required pursuant to the HSR Act, the HSR Approval shall have been obtained.

## ARTICLE XII.

## CONDITIONS PRECEDENT TO SELLER PARTIES' OBLIGATION TO CLOSE

  Seller Parties' obligations to sell the Units and to take the other actions required pursuant to this Agreement to be taken by Seller Parties at the Closing, or at any Call Option Closing or any Put Option Closing, as applicable, are subject to the satisfaction, at or prior to the Closing or the applicable Call Option Closing or Put Option Closing, as applicable, of each of the following conditions (any of which, except for <u>Section 12.4</u>, may be waived in whole or in part by Seller Parties' Representative):

  12.1 <u>Accuracy of Buyer's Representations</u>. Each of the Buyer's representations and warranties in this Agreement will have been accurate in all material respects as of the date of this Agreement and will be accurate in all material respects as of the Closing Date as if then made.

12.2     Buyer's Performance.  The covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing or any Call Option Closing or Put Option Closing, as applicable, will have been duly performed and complied with in all material respects at or prior to the Closing, or such Call Option Closing, or Put Option Closing, as applicable.

12.3     Bring Down Certificate.  Seller Parties' Representative will have received a certificate executed by Buyer confirming:

        (a)     the accuracy of Buyer's representations and warranties in all material respects as of the Closing Date; and

        (b)     the performance of and compliance with in all material respects Buyer's covenants and obligations to be performed or complied with by Buyer at or prior to the Closing, or any Call Option Closing or Put Option Closing, as applicable.

12.4     NBA Approval.  NBA Approval for the Closing, each Call Option Closing and the Put Option Closing, as applicable, shall have been issued and be in full force and effect.

12.5     No Legal Prohibition.  There will not be in effect any Legal Requirement that prohibits the sale of the Units by the applicable Seller Parties to Buyer or the consummation of any of the Contemplated Transactions.

12.6     HSR Approval.  With respect to the Second Tranche Call Option Closing, if required pursuant to the HSR Act, the HSR Approval shall have been obtained.

12.7     Partnership Agreement. The Seller Parties' Representative will have received a joinder and related documents required by the Partnership Agreement as in effect on the date hereof (including, without limitation, the documents or certificates referenced in Sections 10.4 and 10.5 of the Partnership Agreement), duly executed by Buyer and in a form reasonably acceptable to Seller Parties' Representative.

## ARTICLE XIII.

## SELLER PARTIES' REPRESENTATIVE

13.1     Designation and Replacement of Seller Parties' Representative. The Parties have agreed that it is desirable to designate a representative to act on behalf of the Seller Parties for certain limited purposes, as specified herein. The Seller Parties have designated Taylor Sports Group, Inc. as the initial Seller Parties' Representative and execution of this Agreement by the Seller Parties shall constitute ratification and approval of such designation. The Seller Parties' Representative may resign at any time, and the Seller Parties' Representative may be removed by the vote of the Seller Parties which collectively hold at such time (or following the Closing, held immediately prior to the Closing) more than fifty percent of the voting rights attached to the Units (excluding Buyer and its Affiliates) (the "Majority Sellers"). In the event that a Seller Parties' Representative has resigned or been removed, a new Seller Parties' Representative shall be appointed by a vote of the Majority Sellers, such appointment to become effective upon the written acceptance thereof by the new Seller Parties' Representative.

13.2     Authority. Each Seller Party agrees to be bound by all notices received or given by, and all agreements and determinations made by, and all documents executed and delivered by Seller Parties' Representative under this Agreement, and authorizes the Seller Parties' Representative as such Seller Party's exclusive agent and attorney-in-fact to act on behalf of such Seller Party with respect to this Agreement  and to take any and all actions and make any decisions required or permitted to be taken by the Seller Parties' Representative pursuant to this Agreement, including the exercise of power to: (i) receive any and all payments owing to such Seller Party under this Agreement, (ii) terminate, amend, waive any provision of, or abandon, this Agreement, (iii) assert and review claims, make demands and commence actions on behalf of such Seller Party under this Agreement, (iv) dispute or to refrain from disputing any claim made by such Seller Party, negotiate and compromise any dispute that may arise under, and exercise or refrain from exercising remedies available to such Seller Party under, this Agreement, or under applicable Legal Requirements in connection with the transactions contemplated hereby and thereby (including with respect to the Final Purchase Price and the Adjustment Amount), and any indemnification obligations under Article X), and to sign any releases or other documents with respect to such dispute or remedy on behalf of such Seller Party (and to bind the Seller Parties in so doing), (v) give such instructions and do such other things and refrain from doing such things as Seller Parties' Representative shall deem appropriate to carry out the provisions of this Agreement, (vi) give any and all consents and notices under this Agreement, perform all actions, exercise all powers, receive service of process with respect to any Action under this Agreement and any other agreement or instrument in connection with the transactions contemplated hereby or thereby, (vii) agree to, negotiate and authorize, receive or make payments in connection with the Adjustment Amount, and indemnification obligation of Buyer or any Seller Party and any other payment pursuant to the terms of this Agreement, and fulfill all duties otherwise assigned to Seller Parties' Representative in this Agreement, and (viii) take all actions necessary or appropriate in the good faith judgment and sole discretion of the Seller Parties' Representative for the accomplishment of the foregoing. Each Seller Party hereby expressly acknowledges and agrees that Seller Parties' Representative has the sole and exclusive authority to act on such Seller Party's behalf in respect of all matters arising under or in connection with this Agreement after execution of this Agreement, notwithstanding any dispute or disagreement among them, and that no Seller Party shall have any authority to act unilaterally or independently of Seller Parties' Representative in respect to any such matter. Buyer shall be entitled to deal exclusively with the Seller Parties' Representative on matters relating to this Agreement and the transactions contemplated hereby and rely exclusively (without independent verification or investigation) on any and all actions taken by Seller Parties' Representative under this Agreement as the duly authorized and valid action of all Seller Parties without any liability to, or obligation to inquire of, any Seller Parties. All notices, counter notices or other instruments or designations delivered by any Seller Party in regard to this Agreement shall not be effective unless, but shall be effective if, signed by Seller Parties' Representative, and if not, such document shall have no force or effect whatsoever, and Buyer may proceed without regard to any such document.

13.3     Waiver. Each Seller Party waives and releases Seller Parties' Representative from any liability whatsoever arising from any decision, act, consent or instruction of Seller Parties' Representative, including an amendment, extension or waiver of this Agreement taken in good faith by Seller Parties' Representative.

13.4    Actions. A decision, act, consent or instruction of Seller Parties' Representative, including an amendment, extension or waiver of this Agreement, shall constitute a decision of the Seller Parties and shall be final, binding and conclusive upon the Seller Parties and Buyer may conclusively and absolutely, rely, without any inquiry, upon any such decision, act, consent or instruction of Seller Parties' Representative as being the decision, act, consent or instruction of the Seller Parties. Buyer is hereby relieved from any liability or obligation to any Person, including any Seller Party, for any acts done by any of them in accordance with or reliance on such decision, act, consent or instruction of Seller Parties' Representative.

## ARTICLE XIV.

## TERMINATION

14.1    Termination Events.  Subject to Section 14.2, by notice given prior to or at the Closing, this Agreement may be terminated as follows:

(a)    by mutual consent of Buyer and Seller Parties' Representative (on behalf of all Seller Parties);

(b)    by Buyer if a material breach of any provision of this Agreement has been committed by any Seller Party or the Company, in each case, such that the conditions set forth in Article XI, as the case may be, could not be satisfied as of the Closing; provided, however, that Buyer may not terminate this Agreement pursuant to this Section 14.1(b) (i) unless any such breach has not been cured within five (5) days after written notice by Buyer to the Seller Parties' Representative informing the Seller Parties' Representative of such breach or (ii) if Buyer is then in material breach of any provision of this Agreement so as to cause the conditions to Closing set forth in Article XII to not be satisfied as of the Closing;

(c)    by Seller Parties' Representative if a material breach of any provision of this Agreement has been committed by Buyer such that the conditions set forth in Article XII, as the case may be, could not be satisfied as of the Closing; provided, however, that Seller Parties' Representative may not terminate this Agreement pursuant to this Section 14.1(c) (i) unless any such breach has not been cured within five (5) days after written notice by Buyer to the Seller Parties' Representative informing the Seller Parties' Representative of such breach or (ii) if any Seller Party or the Company is then in material breach of any provision of this Agreement so as to cause the conditions to Closing set forth in Article XI to not be satisfied as of the Closing;

(d)    by Buyer if satisfaction of any condition in Article XI by July 31, 2021 or such later date as the Parties may agree in writing (the "End Date") becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement);

(e)    by Seller Parties' Representative if satisfaction of any condition in Article XII by the End Date becomes impossible (other than through the failure of Seller Parties to comply with their obligations under this Agreement) or if an NBA Entity communicates in writing that any approval required under NBA Rules in respect of this Agreement or any of the transactions contemplated hereby will not be provided; or

(f)     by Seller Parties' Representative if the Closing has not occurred on or before the End Date; provided, however, that such termination right shall not be available to Seller Parties' Representative if (i) a material breach of this Agreement by Company or any Seller Party has been a direct cause of the failure of the Closing to occur on or before the End Date and (ii) Buyer has not breached this Agreement in any material respect from the date hereof through the End Date.

14.2    Effect of Termination.  If this Agreement is terminated pursuant to Section 14.1,

(a)     this Agreement shall become null and void and of no further force and effect; provided, that this Section 14.2, Article XV and Article XVI together with the Definitions and Rules of Construction set forth in Exhibit B and the NDA will survive the termination of this Agreement and will remain in full force and effect,

(b)     the termination of this Agreement will not relieve any Party from any liability for any breach of this Agreement occurring prior to termination, and

(c)     the exercise of a Party's right of termination will constitute an election of remedies hereunder and in no case will a Party be permitted to terminate this Agreement and also obtain equitable relief as provided under Section 10.4(f) to cause the Closing to occur.

## ARTICLE XV.

## DISPUTE RESOLUTION

15.1    Mediation.  Prior to initiating any arbitration demand, the Parties shall mediate any dispute or controversy in good faith using a mediator agreed to by the Parties. No arbitration demand may be filed until the Parties have completed the mediation.

15.2    Arbitration. Any dispute or controversy which arises out of, touches upon or relates in any way to the Agreement or the Contemplated Transactions shall be resolved by binding arbitration pursuant to the American Arbitration Association commercial arbitration rules then in effect. The arbitration shall take place in Minneapolis, Minnesota.  The Parties shall agree on a single arbitrator for claims less than five million dollars ($5,000,000) who shall be a retired Hennepin County or federal district court magistrate judge from the district of Minnesota. In the event the Parties cannot agree on an appropriate arbitrator one shall be appointed by the Chief Judge of the Hennepin County District Court.  Any dispute or controversy involving a claim in excess of five million dollars ($5,000,000) shall be determined by three (3) arbitrators, the first one selected as described above. Each Party shall have the right to appoint one additional arbitrator provided that the arbitrator is a lawyer who has not previously represented the appointing Party or its affiliates. The prevailing Party shall be entitled to prejudgment interest and costs (but not including attorneys' fees) to the maximum extent allowed by applicable Legal Requirements. The Parties shall divide all costs of the arbitrators equally. Any Party unsuccessfully contesting confirmation of any ensuing arbitration award shall be liable for the prevailing Party's costs, prejudgment interest and reasonable attorneys' fees incurred in confirming the arbitration award. Discovery in the arbitration shall be circumscribed to the greatest extent possible. Neither Party

shall be allowed more than two depositions and thirty document requests. To the greatest extent practicable, the arbitration shall be held within six (6) months of the initial arbitral conference call.

## ARTICLE XVI.

## MISCELLANEOUS PROVISIONS

16.1    <u>Entire Agreement; Binding Nature</u>. This Agreement, the NDA, the Disclosure Schedule and the Exhibits and Schedules attached hereto contain the entire agreement of the Parties with respect to the subject matter hereof and supersede, merge, and replace all prior negotiations, offers, promises, representations, warranties, agreements, and writings with respect to such subject matter, both written and oral. There are no agreements, warranties, covenants or undertakings other than those expressly set forth herein. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

16.2    <u>Payments</u>.  All payments required by this Agreement shall be made in U.S. Dollars by delivery of immediately available funds by wire transfer to accounts designated by the specified recipient.

16.3    <u>Assignment</u>.  This Agreement and all rights and obligations hereunder shall not be assignable by any Party without the prior written consent of Seller Parties' Representative (in the case of Buyer) or Buyer (in the case of any Seller Party); provided, that (a) from and after the Closing, Buyer may assign any of its rights with respect to any Call Option to any Affiliate of Buyer (but not its obligation to pay the applicable Call Option Price), without the prior written consent of Seller Parties' Representative, provided that such transferee assumes the obligations of Buyer with respect to such Call Option and executes and delivers a customary joinder agreement to become party to this Agreement in a form reasonably acceptable to Seller Parties' Representative and  (b) Seller Parties may transfer their respective rights and obligations hereunder in conjunction with the sale or other disposition of their respective Units; provided that such transferee assumes the obligations of such Seller Party with respect to such Units and executes and delivers a customary joinder agreement to become party to this Agreement in a form reasonably acceptable to Buyer. Any assignment or transfer shall be subject to prior NBA approval.

16.4    <u>Interpretation</u>. The section, paragraph and schedule headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. The recitals are true and correct and hereby incorporated by this reference and made a part of this Agreement. Where the context requires, the use of the singular form herein shall include the plural, the use of the plural shall include the singular, and the use of any gender shall include any and all genders.

16.5    <u>Notices</u>.

(a)    All notices, consents, waivers, requests, claims and other communications ("<u>Notices</u>") which are required to be given or may be given pursuant to the terms of this Agreement shall be in writing signed by the Party or an officer of the Party giving notice or by counsel for

such Party and shall be sufficient in all respects if delivered in person, or mailed by registered or certified mail, postage prepaid, sent by commercial expedited delivery service or sent by electronic mail, as follows:

| | |
|---|---|
| If to a Seller Party (or Seller Parties): | To the named Seller Party at the respective address listed on the signature page(s). |
| If to the Company: | Minnesota Timberwolves Basketball Limited Partnership c/o Ethan Casson 600 Hennepin Ave., Suite 300 Minneapolis, MN 55403 Ethan.Casson@timberwolves.com |
| With copies to (which copies shall be mandatory to effect notice but shall not alone constitute notice): | Taylor Sports Group, Inc. c/o Glen A. Taylor Seller Parties' Representative 1725 Roe Crest Drive North Mankato, MN 56002-3728 GATaylor@taylorcorp.com |
| | AND |
| | Gregory W. Jackson Taylor Sports Group, Inc. 1725 Roe Crest Drive North Mankato, MN 56002-3728 Gregory.Jackson@taylor.com |
| | AND |
| | Ballard Spahr LLP 80 South Eighth Street Suite 2000 Minneapolis MN 55402 Attention: Michael R. Kuhn Email: kuhnm@ballardspahr.com |
| If to Seller Parties' Representative: | Taylor Sports Group, Inc. c/o Glen A. Taylor 1725 Roe Crest Drive North Mankato, MN 56002-3728 GATaylor@taylorcorp.com |

| | |
|---|---|
| With copies to (which copies shall be mandatory to effect notice but shall not alone constitute notice): | AND<br><br>Gregory W. Jackson<br>Taylor Sports Group, Inc.<br>1725 Roe Crest Drive<br>North Mankato, MN 56002-3728<br>Gregory.Jackson@taylor.com |
| If to Buyer: | Purple Buyer Holdings LLC<br>c/o Marc Lore and Alex Rodriguez<br>2675 Bayshore Drive<br>Coconut Grove, FL 33133<br>MarcLore409@gmail.com<br>AR@arodcorp.com |
| If to any Guarantor: | To the named Guarantor at the respective address listed in the Guarantee. |
| With copies to (which copies shall be mandatory to effect notice but shall not alone constitute notice): | Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Attention: Edward D. Herlihy<br>            David E. Shapiro<br>Email:    EDHerlihy@wlrk.com<br>          DEShapiro@wlrk.com |

or such replacement recipient and address as any Party hereto shall have designated by Notice to the other Parties as provided herein.

(b)     Any Notice shall be effective when the Party giving the Notice has complied with Section 16.5(a) and when received by all Persons specified to receive such Notice. A Notice is deemed to have been received as follows:

(i)     upon receipt as indicated on the signed receipt, if given by hand or sent by registered or certified mail or commercial expedited delivery service;

(ii)     upon acknowledgment of receipt by the recipient, if delivered by electronic mail; or

(iii)     if the Party to whom Notice is sent refuses delivery or if the Notice cannot be delivered due to a change in address for which no Notice was provided, then upon rejection, refusal or inability to deliver.

33

Notwithstanding the foregoing provisions, if any Notice is received after 5 p.m. on any Business Day or on any day other than a Business Day where received, the Notice shall be deemed to have been delivered at 9 a.m. on the next following Business Day.

16.6    <u>Governing Law; Jurisdiction</u>. This Agreement shall be exclusively governed by and construed in accordance with the laws of the State of Minnesota, without giving effect to any provision (whether of the State of Minnesota or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Minnesota other than non-waivable provisions of U.S. federal law. Except as otherwise provided by <u>Article XV</u> of this Agreement, the Parties hereby agree that the courts of the State of Minnesota and the U.S. federal courts situated in Minneapolis, Minnesota, and the appellate courts having jurisdiction thereover, shall have exclusive jurisdiction with respect to any and all disputes arising under or in connection with this Agreement. By execution of this Agreement, each Party submits to the jurisdiction of such courts and hereby irrevocably waives any and all objections, which he, she, or it may have with respect to venue in any of such courts. EACH OF THE PARTIES IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH THIS AGREEMENT OR ANY DISPUTE ARISING FROM OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

16.7    <u>Amendment; Waiver</u>. This Agreement may not be amended except by an instrument in writing signed by Buyer and the Seller Parties' Representative (on behalf of Company and all Seller Parties), and prior NBA approval.  No waiver of any provision of this Agreement, and no consent to any departure by any Party therefrom, shall be effective unless it is in writing and signed by the Party from whom such waiver is sought, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

16.8    <u>Severability</u>. If any provision or portion of a provision of this Agreement is found invalid or unenforceable, the validity or enforceability of the remaining provisions or portions hereof shall not be affected.

16.9    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

16.10   <u>Counterparts</u>.

(a)    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and each of which may bear the signature(s) of one or more of the Parties, but all of which together shall constitute one and the same instrument.

(b)    A copy of this Agreement shall be as valid for all purposes as a copy bearing that Party's original signature if:

(i)    bearing the facsimile, photostatic, PDF or other copy of the manual signature of a Party; or

(ii)    executed by a Party via a recognized electronic signature service including Adobe Sign or DocuSign.

16.11   <u>Representation by Counsel</u>. Each of the Parties hereto has been represented or has had the opportunity to be represented by legal counsel of their own choice.

16.12   <u>Post-Closing Representation of Seller Parties</u>. In any dispute or proceeding arising under or in connection with this Agreement after Closing, Seller Parties, Seller Parties' Representative, Taylor Sports Properties, Inc. and each of their respective Affiliates will have the right, at the Seller Parties' Representative's election, to retain any one or more of Dorsey & Whitney LLP, Saul Ewing Arnstein & Lehr LLP, Ballard Spahr LLP, Fredrikson & Byron P.A. or attorneys from Taylor Corporation to represent it in such matter. Buyer, for itself and for the Company, its Subsidiaries and their respective successors and assigns, hereby waives any conflicts of interest arising from such representation and consents to any such representation in any such matter.

16.13   <u>Attorney-Client Privilege Carve Out</u>. All communications involving attorney-client confidences between or among Company, Seller Parties, Seller Parties' Representative, their respective Affiliates, employees and Representatives, and Dorsey & Whitney LLP, Saul Ewing Arnstein & Lehr LLP, Ballard Spahr LLP, Fredrikson & Byron P.A. and attorneys from Taylor Corporation in the course of the negotiation, documentation, and consummation of this Agreement or any of the matters contemplated herein shall, following the Closing, be deemed to be attorney-client confidences that belong solely to Seller Parties and their Affiliates (and not Company or any of its subsidiaries). Accordingly, neither Company nor any of its subsidiaries shall have access to any such communications, or to the above described attorney-client communications or the files of Dorsey & Whitney LLP, Saul Ewing Arnstein & Lehr LLP, Ballard Spahr LLP, Fredrikson & Byron P.A. or Taylor Corporation relating to their respective engagements by Seller Parties or Company (or any of their Affiliates) in respect of this Agreement or any of the matters contemplated herein, whether Closing shall have occurred or not.

*[Remainder of page intentionally left blank.  Signatures on following pages.]*

**IN WITNESS WHEREOF**, the Parties to this Agreement have set their signatures below as of the date first set forth above.

**Buyer:**

Purple Buyer Holdings LLC

By: _____

Name: Marc Lore

Title:   Co-President


By: _____

Name: Alex Rodriguez

Title:   Co-President

Address: 2675 Bayshore Drive
Coconut Grove, FL 33133
marclore409@gmail.com and
ar@arodcorp.com


**Company:**

Minnesota Timberwolves Basketball
Limited Partnership

By: Taylor Sports Group, Inc.
Its: General Partner


By: _____

Title:_____

Address:
c/o Ethan Casson
600 Hennepin Ave., Suite 300 Minneapolis,
MN 55403
Ethan.Casson@timberwolves.com


**Seller Parties:**

Taylor Sports Group, Inc.

By: _____

Title:_____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com


Taylor Corporation

By: _____

Title:_____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com


_____

Glen A. Taylor, Individually

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

**IN WITNESS WHEREOF,** the Parties to this Agreement have set their signatures below as of the date first set forth above.

**Buyer:**

Purple Buyer Holdings LLC

By: _____

Name: Marc Lore

Title:   Co-President

By: _____

Name: Alex Rodriguez

Title:   Co-President

Address: 2675 Bayshore Drive
Coconut Grove, FL 33133
marclore409@gmail.com and
ar@arodcorp.com

**Company:**

Minnesota Timberwolves Basketball Limited Partnership

By: Taylor Sports Group, Inc.
Its: General Partner

By: _____

Title:_____

Address:
c/o Ethan Casson
600 Hennepin Ave., Suite 300 Minneapolis, MN 55403
Ethan.Casson@timberwolves.com

**Seller Parties:**

Taylor Sports Group, Inc.

By: _____

Title:_____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

Taylor Corporation

By: _____

Title:_____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

_____

Glen A. Taylor, Individually

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

**IN WITNESS WHEREOF**, the Parties to this Agreement have set their signatures below as of the date first set forth above.

*Buyer:*

Purple Buyer Holdings LLC

By: _____

Title: _____

*Seller Parties:*

Taylor Sports Group, Inc.

By: _____
Name: Glen A. Taylor
Title: Chairman

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

*Company:*

Minnesota Timberwolves Basketball Limited Partnership

By: Taylor Sports Group, Inc.
Its: General Partner

By: _____
Name: Glen A. Taylor
Title: Chairman

Address:
c/o Ethan Casson
600 Hennepin Ave., Suite 300
Minneapolis, MN 55403
Ethan.Casson@timberwolves.com

Taylor Corporation

By: _____
Name: Glen A. Taylor
Title: Chairman

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

_____
Glen A. Taylor, Individually

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

*Seller Parties' Representative*:

Taylor Sports Group, Inc.

By: _Glen A Taylor_
Name: Glen A. Taylor
Title: Chairman

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com


**SOLELY WITH RESPECT TO ARTICLE VI
HEREIN:**

*Guarantors*:

_____

Marc Lore


_____

Alex Rodriguez


AROD CORPORATION


By: _____
Name: _____
Title: _____

THE ALEX RODRIGUEZ REVOCABLE TRUST
DTD U/A JANUARY 5, 1998


By: _____
Name: _____
Title: _____

*Seller Parties' Representative*:

Taylor Sports Group, Inc.

By: _____

Title:_____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com

**SOLELY WITH RESPECT TO ARTICLE VI
HEREIN:**

*Guarantors*:

_____
Marc Lore

_____
Alex Rodriguez

AROD CORPORATION

By: _____
Name: Alex Rodriguez
Title:   President

THE ALEX RODRIGUEZ REVOCABLE TRUST
DTD U/A JANUARY 5, 1998

By: _____
Name: Alex Rodriguez
Title:   Trustee

*Seller Parties' Representative*:

Taylor Sports Group, Inc.

By: _____

Title: _____

Address: 1725 Roe Crest Drive
North Mankato, MN 56002-3728
GATaylor@taylorcorp.com and
Gregory.Jackson@taylor.com


**SOLELY WITH RESPECT TO ARTICLE VI HEREIN:**

*Guarantors*:

_____
Marc Lore

_____
Alex Rodriguez


AROD CORPORATION

By: _____
Name: Alex Rodriguez
Title:   President


THE ALEX RODRIGUEZ REVOCABLE TRUST
DTD U/A JANUARY 5, 1998

By: _____
Name: Alex Rodriguez
Title:   Trustee

37