# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

---

Orbit Sports, LLC,                          Court File No.: 0:21-cv-01289-ECT-TNL

        Plaintiff,

v.

Glen Taylor, Taylor Corporation,
and Taylor Sports Group, Inc.,

        Defendants.

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

38618327.1

## I.    INTRODUCTION

Defendants (collectively "the Taylor Parties") own the majority of the Limited Partner ("LP") and all the General Partner ("GP") interests in the Minnesota Timberwolves Basketball Limited Partnership (the "Partnership").  On May 13, 2021 the Taylor Parties entered into an Equity Interest Purchase Agreement (the "Equity Agreement") that conveys a 20% LP interest in the Partnership to a company controlled by Alex Rodriguez and Mark Lore ("Buyer") and grants them three additional options to acquire all of the remaining LP and GP interests, which options will expire if not exercised by December 31, 2022, December 31, 2023 and December 31, 2024 respectively.  The Second Tranche Option is an option to acquire all the GP interests in the Partnership from the Taylor Parties together with all the LP interests owned by non-Taylor Parties including the Plaintiff.  In the event of their exercise, each separate option transaction must be separately reviewed and approved by the National Basketball Association ("League").

The Partnership Agreement is governed by Minnesota law and provides that whenever there is a "sale, exchange or other disposition" of a majority of the GP interest, a "Control Sale" occurs, allowing the General Partner a priority option to exercise its "Drag-Along" right to force all the other Limited Partners to sell out their interests simultaneously  to the same Buyer on the same terms and conditions.  The Partnership Agreement further provides that if the General Partner declines to exercise its Drag-Along Right, then the Limited Partners have the right to "Tag Along" in the sale and sell their interests to the same Buyer on the same terms and conditions.

2

If and when the Buyer exercises its Second Tranche Option pursuant to the Equity Agreement and approval is obtained from the League, then ownership of the Taylor Parties' GP interest in the Partnership would transfer to the Buyer.  In that event, a Control Sale will have occurred under the Partnership Agreement.  The Plaintiff, Orbit Sports, LLC ("Orbit" or "Plaintiff") is a Limited Partner who alleges that the mere grant of the option to the Buyer to acquire the Taylor Parties' GP interest pursuant to the Equity Agreement constitutes a "Control Sale" under the terms of the Partnership Agreement, regardless of whether the Second Tranche Option is ultimately exercised or not and whether or not League approval is ever obtained.  The Plaintiff further argues the grant of this option entitles it to an immediate buyout of its LP interest for $300 million pursuant to alleged "Tag-Along" rights, regardless of whether the Taylor Parties ultimately sell, exchange or otherwise dispose of their GP interest to the Buyer or not.  This argument fails for three primary and independently sufficient reasons.

First, as a matter of black-letter Minnesota law, the grant of an option does not constitute "a sale, exchange, or other disposition" of property, as required for a Control Sale under the plain terms of the Partnership Agreement.  Unless and until the Second Tranche Option is exercised, and League approval is actually obtained, the Equity Agreement cannot constitute a Control Sale, and Orbit's claims fail.  Plaintiff's contorted interpretation of the Partnership Agreement would create an absurdity in which Orbit "tags along" on a Control Sale which never occurs.

Second, §§ 10.7 and 10.8 granting the Drag Along Right and Tag-Along Rights are both specifically "[s]ubject to Section 10.1" of the Partnership Agreement,  which expressly provides that until and unless requisite League approval is obtained, any "proposed Transfer . . . shall not be effective *for any purpose . . ."* Therefore, regardless of whether the options are exercised, the grant of the Second Tranche Option under the Equity Agreement without League approval cannot constitute a Control Sale and cannot trigger either the Drag-Along Right or Tag-Along rights  under the Partnership Agreement. Plaintiff's claims fail for this additional reason.

Third, Tag-Along Rights allowing Limited Partners to be bought out are only triggered under the Partnership Agreement if the Taylor Parties <u>do not</u> exercise the so-called "Drag-Along Right" in the event of a Control Sale.  Here, if the Second Tranche Option granted under the Equity Agreement is exercised, the Taylor Parties are required by that same agreement to exercise their Drag-Along Right and the Plaintiff's LP interest will be bought out simultaneously with the Taylor Parties' GP Interest and on the same economic terms.  Plaintiff's strained interpretation of the Partnership Agreement as allowing it to exercise Tag-Along rights when the General Partner will have exercised its Drag-Along Right, flies in the face of the plain language of the Partnership Agreement and would deprive the Taylor Parties of their Drag-Along Right in violation of the Partnership Agreement and render multiple provisions in the Partnership Agreement meaningless, in violation of black-letter principles of Minnesota contract law. Plaintiff's claims fail for this third reason as well.

4

Ultimately, there is simply no plausible reading of the Partnership Agreement, or controlling Minnesota law, requiring a $300 million payment to Orbit, now, for its LP interests, when there may never be a sale, exchange or other disposition of the GP interests necessary to constitute a "Control Sale." Plaintiff's interpretation ignores both the plain language and structure of the Partnership Agreement. For these reasons, the Taylor Parties move to dismiss all of Orbit's claims pursuant to Fed. R. Civ.P 12(b)(6). Because the Equity Agreement and the Partnership Agreement are unambiguous the Court need only review the terms of those Agreements and apply settled Minnesota law to them. Once it does this, it will be readily apparent that no Control Sale has taken place and that the Plaintiff has no rights to exercise any "Tag-Along" rights under the Partnership Agreement.

Because the Agreements at issue are unambiguous and Minnesota law is clear that the grant of an option does not convey any interest in the property at issue, this Court can appropriately interpret the contract in the context of a motion to dismiss. For this reason, the Taylor Parties also respectfully request that the Court stay discovery until it has ruled on Defendants' motion as discovery is unnecessary to the resolution of the dispositive legal issues before the Court.

## II.    FACTUAL BACKGROUND

### A.    The Parties and the Purple Buyer Equity Interest Purchase Agreement.

The Taylor Parties collectively own the majority of Limited Partner ("LP") interests in the Partnership and Taylor Sports Group, Inc. is the General Partner ("GP"). (Compl.

[Dkt. #1]  ¶¶  1, 35.)   The Partnership owns and operates the NBA's Minnesota Timberwolves and the WNBA's Minnesota Lynx basketball teams.  (*Id.* ¶¶ 1, 36.)

Orbit is a Limited Partner owning approximately 17% of the LP interests of the Partnership.  (Compl. ¶ 2.)

On May 13, 2020, the Taylor Parties entered into the Equity Agreement pursuant to which Taylor Corporation agreed to sell a 20% LP interest in the Partnership to Purple Buyer Holdings LLC ("Buyer"), a corporation owned indirectly  by Mark Lore and Alex Rodriguez.  Pursuant to NBA transfer regulations, both the initial Equity Agreement, and every  separate  transaction  contemplated  by  the  Equity  Agreement   is  subject  to independent approval by the League.  (Compl. ¶ 61 and Ex. B.)[1]

**B.    The Equity Agreement Grants the Buyer the Right to Purchase All Remaining LP and GP interests in the Partnership through a Grant of Options.**

After the initial sale of a 20% LP interest, the Equity Agreement grants the Buyer options to acquire parts or all of the additional GP and LP interests in the Partnership; however, the Buyer has no obligation to exercise any of the options.  In summary, the Equity Agreement provides as follows:

1.    First Tranche Option – allows Buyer the option, if timely and properly exercised, to acquire an additional 20% LP interest from Taylor Corporation (Equity  Agreement  ¶  6.1(b)(i)  closing  on  First  Tranche  needs  to  occur

---

[1] The Court may consider the Partnership Agreement and other documents attached to or referenced in the Complaint on a motion to dismiss because they are deemed incorporated by reference into the Complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

6

between the day after Closing of sale of first 20 percent LP interest and before December 31, 2022.  (Equity Agreement § 6.1(b).)

2.  Second Tranche Option – allows Buyer the option, if timely and properly exercised, to purchase entire GP interest (~8.2%) plus all the non-Taylor LP interests plus LP interests from Taylor Corporation sufficient to aggregate to 40% in this Tranche, (*Id*. b(ii).)  The Closing on the Second Tranche Option must occur after consummation of the First Tranche Option and before December 31, 2023.

3.  Third Tranche Option – allows Buyer the option, if timely and properly exercised, to purchase final 20% LP interest from Taylor (mostly from Glen Taylor and balance of Taylor Corporation's LP interest) (*Id*. b 3). Consummation of the Third Tranche Option must occur after consummation of the Second Tranche Option and before December 31, 2024.  (Equity Agreement § 6.1(b).)

The Equity Agreement expressly provides that "League Approval for . . . any Call Option Closing … shall have been issued and be in full force and effect" is a condition precedent to Buyer's consummation of each separate option (Article XI Preamble and § 11.6).  The request for League approval must be made both "promptly after the date of this Agreement"[2] and "in connection with each exercise of a Call Option."  (Equity Agreement § 9.5(b).)  Obviously, it remains unknown whether Buyer will exercise each separate option and, if so, whether or not the League will grant its approval.

Further, the Buyer can exercise the Call Option for all Tranches simultaneously or aggregate Call Options for later Tranches so long as the sequence

---

[2] League rules require both a preliminary approval of the transaction documents and of each individual subsequent transfer under the Equity Agreement.

of Tranches set forth in § 6.1(b) is maintained.  (Equity Agreement § 6.1(c).)
However, if the Buyer fails to timely exercise the Option for any Tranche, then all
subsequent Call Options shall immediately terminate and be null and void.  (*Id.*
§ 6.1(d).).  Thus, if Buyer fails to exercise either the First Tranche Option or the
Second Tranche Option, the Taylor Parties would maintain ownership of the GP
interests and no "Control Sale" would result from the Equity Agreement.

Finally, the Equity Agreement expressly provides that in the event the Buyer
exercises the Second Tranche Option, at that point the Taylor Parties shall exercise
their Drag-Along Right under the Partnership Agreement (described below) to
ensure the simultaneous transfer of all non-Taylor LP interests:

> (f)     Upon Buyer's exercise of the Call Option with respect to the Second
> Tranche, Taylor Sports Group, Inc., as General Partner, will invoke and
> enforce the Drag/Tag Rights to require each of the Non-Taylor Partners to
> sell the Other LP Units owned by such Non-Taylor Partners on the terms set
> forth herein applicable to the Seller Parties.

(Equity Agreement § 6.1(f).)

## C.     The Partnership Agreement.

The Partnership is governed by the Partnership Agreement.[3]  (Compl. ¶ 35.)  A copy
of the Partnership Agreement and all amendments is attached to the Complaint as Exhibit A
[Dkt. #2-1].  The Partnership Agreement was amended in conjunction with the Orbit

---

[3] The Partnership was formed under the provisions of the Uniform Limited Partnership
Act, as codified in Minnesota Statutes Chapter 322A.  (Partnership Agreement §§ 1.1, 2.1.)
The partnership is therefore governed by Minnesota law.

38618327.1

acquisition of LP units in 2016 (*See* Partnership Agreement at "3rd Amendment").

(Compl. ¶ 41.)  The 3rd Amendment entered into in 2016 provided the General Partner

with a "Drag-Along Right" and non-Taylor Limited Partners with "Tag-Along Rights" if

certain conditions are met.  (*Id.*)  The 3rd Amendment provides that it, too, is governed by

Minnesota law.  (*Id.* ¶ 15).

      1.      <u>The Definition of Control Sale.</u>

A "Control Sale" is defined by § 1.9C of the Partnership Agreement as follows:

> Control Sale.  "Control Sale" means *a sale, exchange or other disposition*
> (for cash or property with a discernible cash value) by one or more members
> of the Taylor Group, in a single transaction or series of related transactions,
> to any Person who is not a member of the Taylor Group, of Partnership
> Interests *which includes a majority of all the General Partnership Interests*
> …

(emphasis added).

As discussed below, the phrase "sale, exchange or other disposition" has a

commonly understood legal meaning which requires that title to the GP interest actually

transfer to a third party.

      2.      <u>The Occurrence of a Control Sale Triggers the Drag-Along Right or<br>Tag-Along Rights But Not Both.</u>

Upon the occurrence of a Control Sale, the Partnership Agreement provides that the

General Partner can require that all Limited Partners sell their LP interests to the Buyer

pursuant to the "Drag-Along Right"  (§ 10.8).  Alternatively, and only if, the General

Partner does not exercise its Drag-Along Right then, and only then, the non-Taylor Limited

38618327.1

Partners have the right to demand to be bought out on the same terms and conditions pursuant to the "Tag-Along Rights" (§ 10.7).

> (a)     General Partner's Unconditional Drag-Along Right.

Upon the occurrence of a League-approved Control Sale, § 10.8(a) of the Partnership Agreement gives the General Partner the right to "drag along" the non-Taylor Limited Partners in the sale, effectively allowing the General Partner to force a sale of the non-Taylor LP interests on the same terms and conditions as the GP sale. Section 10.8 (a) provides in pertinent part:[4]

> Section 10.8 – Drag-Along Rights.
>
> (a)     General. Subject to Section 10.1, if one or more members of the Taylor Group …desires to approve or consummate a Change in Control (a "***Drag-Along Sale***") such members of the Taylor Group (the "***Offering Group***"), shall have the right (the "***Drag-Along Right***") to require each of the other Partners (each, a "***Dragged Partner***"), to approve and participate in the Drag-Along Sale on and pursuant to the terms and conditions set forth in this Section 10.8 and on the same terms and for the same price that the Offering Group will participate …. If the Drag-Along Right is timely and properly exercised by the Offering Group, each Dragged Partner shall vote all of his, or its Partnership Interests or give written consent with respect thereto, including consenting to the admission of the prospective buyer as a General Partner or, as the case may be, sell all of his, or its Partnership Interests and take all such other action with respect to the Drag-Along Sale, as in any case shall be reasonably directed by the Offering Group to effect the Drag-Along Sale in accordance with Section 10.8.

(Partnership Agreement § 10.8(b)(bolding in original).)

---

[4] Section 10.8(b) of the Partnership Agreement provides that the Taylor Parties need not give written notice of their assertion of Drag-Along Rights until 15 days prior to "the consummation date of the Drag-Along Sale."

As noted above, the Taylor Parties must exercise their Drag-Along Right in connection with the exercise of the Second Tranche Option such that if the Buyer acquires their GP interests, the remaining non-Taylor LP interests will be bought out on the same terms and conditions enjoyed by the Taylor Parties.  (Equity Agreement § 6.1(f).)  Thus, if the Buyer exercises the Second Tranche Option and the League approves it, all non-Taylor Limited Partners, including the Plaintiff, will be simultaneously bought out on the same terms and conditions as the Taylor Parties.

(b)      Limited Partners' Conditional Tag-Along Rights.

If, and only if, the General Partner does not exercise its Drag-Along Right pursuant to § 10.8, then the non-Taylor Limited Partners have the right to exercise Tag-Along Rights under § 10.7 of the Partnership Agreement.  When triggered, Tag-Along Rights allow the non-Taylor Limited Partners to participate and sell their own interests in the Partnership at the same price and on the same terms as the Control Sale of the GP interests.  (Compl. ¶ 43, citing Partnership Agreement § 10.7(a).)  Section 10.7 provides:

> 10.7 Tag-Along Rights.
>
> Participation Right. Subject to Section 10.1, in the event that one or members of the Taylor Group … *proposes to enter into a Control Sale* (such participating members of the Taylor Group, collectively the **"Selling Partner"**), and the *Selling Partner does not exercise the Drag-Along Right* (defined below) with respect to such sale (**the "Tag-Along Sale"**), then each Limited Partner  (the "Tag-Along Partners") shall have the right (**the "Tag-Along Right"**) to elect to participate in such Tag-Along Sale on and pursuant to the terms and conditions set forth in this Section 10.7 at the same price and on the same other terms and conditions applicable to the Selling Partner.

(Partnership Agreement § 10.7(a) (emphasis added; **bolding in original**).)  As discussed below, because the Taylor Parties will have exercised their Drag-Along Right in connection

with the exercise of the Second Tranche Option, Plaintiff's Tag-Along Rights will never

arise.

> (c) Neither the Drag-Along Right Nor Tag Along Rights Can Exist Until and Unless there is an Actual Control Sale Approved by the NBA.

Both §§ 10.7 and 10.8 begin with the same preamble: "Subject to § 10.1." This

section makes clear that no proposed transaction will trigger Drag-Along Right or Tag-

Along Rights until and unless there is a transaction actually approved by the League:

> No Proposed Transfer which …. fails to comply in all respects with all applicable NBA regulations including the obtaining of any required consents, *will be effective for any purpose.*

(emphasis added). Obviously, no League approval for the exercise of the Second Tranche

Option has been requested, much less granted. Under the Equity Agreement and League

Rules it will only be applied for if the Buyer actually exercises the Second Tranche Option.

(Equity Agreement § 9.5(b).)

> (d) In Order To Exercise Drag-Along Right or Tag Along Rights, It Is Necessary To Know Both The Closing Date and Purchase Price, Both Of Which Are Presently Unknowable.

Both § 10.7(b) and § 10.8(b) of the Partnership Agreement provide that in order to

exercise Tag-Along Rights or Drag-Along Right a Notice must be provided to affected

parties that at a minimum includes "the purchase price" and "date and time of closing,"

among other things. But the closing date cannot be determined unless and until Buyer

exercises the respective option and specifies in such notice the desired closing date ("Call

Option Closing") (Equity Agreement § 6.4(a)). Further, the applicable Purchase Price for

each Tranche cannot be calculated until the intended date of the Call Option Closing is specified so that the Base Call Price and Call Adjustment Factor can be calculated. (Equity Agreement Ex. B § 1(c) and (f).)

Thus, § 6.3 of the Equity Agreement provides that "Buyer may exercise each Call Option only in a written notice …. which: … (b) [s]pecifies the desired closing date for the exercise of the Call Option . . ." At this point it is not even known whether, let alone when, the Buyer will exercise the Second Tranche Option (following its required exercise of the First Tranche Option). The only thing known is that the exercise date must be between the exercise date of the First Tranche Option (whenever that will be) and before December 31, 2023. (Equity Agreement § 6.1(ii).)[5]

Similarly, until the date of the Call Option Closing is known it is not possible to determine the purchase price. For example, the Purchase Price of the Second Tranche Option is to be calculated based upon a calculation adding 40% of the Final Purchase Price as adjusted for the Indebtedness Adjustment "plus the Call Adjustment Factor." (Equity Agreement § 6.1(b)(ii)).

The "Indebtedness Adjustment" is defined as follows:

"Indebtedness Adjustment" means an increase (with respect to an increase in Net Indebtedness) or a decrease (with respect to a decrease in Net Indebtedness) in the Net Indebtedness from Closing until the applicable Call Option Closing multiplied by the percentage of Units acquired in the respective Call Option Closing allocated on a per Unit basis.

---

[5] Obviously if the Buyer fails to timely exercise the First Tranche Option, then both the Second and Third Tranche Options are immediately voided. (Equity Agreement, § 6.1(d).)

13

(Equity Agreement Ex. B § 1(t).)

The "Call Adjustment Factor" is defined in Exhibit B to the Equity Agreement[6] as follows:

> "Call Adjustment Factor" means, with respect to (i) each Call Option exercised after Closing other than the First Tranche Call Option …an amount equal to four percent (4%), compounded annually, of the Base Call Price, calculated on the basis of a year of three hundred sixty (360) days but charged on the basis of the actual number of days elapsed between the Closing Date and the applicable Call Option Closing…

(Equity Agreement Ex. B § 1(f). )

Because it is not possible to calculate either the Indebtedness Adjustment or the number of days between the Closing Date and the Call Option Closing for the Second Tranche Option (which is unknown), it is not currently possible to calculate the purchase price for the Second Tranche Option.

### D.    Orbit's Complaint.

Orbit alleges that the Equity Agreement constitutes a "Control Sale" and thus entitles it to receive notice and a right to exercise Tag-Along Rights pursuant to § 10.7 of the Partnership Agreement.  (Compl. ¶¶ 109-116.)  Orbit alleges the Taylor Parties have breached the Partnership Agreement by failing to deliver a Sale Notice of Tag-Along Rights to all non-Taylor Limited Partners, including Orbit, within ten days of executing the Equity Agreement.  (*Id.* ¶ 112, *citing* Equity Agreement § 10.7(b).)  The lynchpin of

---

[6] The Plaintiff did not attach Ex. B to the Equity Agreement to the Complaint but it is incorporated by reference and we attach it as Ex. B to the Declaration of Courtland Merrill ("Merrill Decl.").

14

Orbit's claim is that the mere "proposal" by the Taylor Parties to grant an option which could, if exercised and approved by the League, result in a Control Sale is enough to trigger its Tag-Along Rights.  (Compl. ¶ 43.)

As discussed below, Orbit's contention is illogical and wholly unsupported by the terms of the Partnership Agreement because (1) the option may expire without being exercised, (2) NBA approval may not be obtained, (3) the Taylor Parties maintain full control of the GP interests (and thus control the Partnership) unless and until consummation of the Second Tranche Option, (4) the Taylor Parties are obligated to exercise the Drag-Along Right if the Second Tranche Option is exercised, and (5) neither the purchase price or closing date for a potential Control Sale are determinable.  Thus, Orbit's strained interpretations would render multiple provisions in the Partnership Agreement completely meaningless.  This would violate basic contract law construction principles that a court must harmonize all provisions of an agreement to effectuate the intent of the parties, as opposed to selecting an interpretation which renders one or more provisions meaningless. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

Orbit also alleges breach of an alleged implied duty of good faith and fair dealing, and entitlement to injunctive relief and a declaratory judgment.  (Compl. ¶¶ 117-136.) Each of these claims hinges on the Plaintiff demonstrating a breach of Section § 10.7 of the Partnership Agreement due to the Taylor Parties failure to provide alleged Tag-Along Rights upon execution of the Equity Agreement.  (*Id.* ¶¶ 120, 125, 134.)  For the reasons set forth below, Plaintiff's claims fail.

38618327.1

In ¶ 66 of its Complaint, Orbit alleges that it sent "multiple follow up letters to the Taylor Parties citing the provisions of the Partnership Agreement in detail and explaining that Orbit's Tag-Along Rights had been triggered as a result of the Proposed Transaction set forth in the Equity Agreement. Indeed, one such letter addressing alleged Tag-Along Rights was sent on May 17, 2021. See Exhibit A to Merrill Decl. In that letter the plaintiff asserted that "[t]hese "Tag Along Rights" were, and remain intended to ensure that no Limited Partner will be forced to remain in the Partnership without having a say in the identity of the General Partner." Plaintiff presupposes that as a result of the grant of the Second Tranche Option it will find itself with a new General Partner not to its liking. But that can and will never happen. The Equity Agreement expressly provides that if and when Buyer exercises the Second Tranche Option, it will be acquiring not just the Taylor Parties' GP interests, but all of the non-Taylor LP interests as well. (*See* Equity Agreement § 6.1(b)(ii) and Equity Agreement Ex. G[7].)

## III.   LEGAL ARGUMENT

All of Orbit's claims fail as a matter of law for multiple and independently sufficient reasons. The Taylor Parties did not breach the terms of the Partnership Agreement by agreeing to grant options to acquire their respective GP and/or LP units. Because there has been no breach of the Partnership Agreement, Orbit's remaining claims for breach of the

---

[7] Plaintiff omitted Ex. G to the  Equity Agreement. It is attached as Exhibit C to the Merrill Decl.

16

duty of good faith and fair dealing, and injunctive and declaratory relief, also fail as a matter of law.

### A. Legal Standard on a Motion to Dismiss.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Even in the context of motions to dismiss breach of contract claims, this Court has repeatedly granted motions to dismiss , where, as here, a plaintiff's claim rests on an implausible construction of the contract. *See, e.g. Michaels Stores, Inc. v. Sun Life Assurance Co.,* 413 F. Supp. 3d 854, 855 (D. Minn. 2019*)* ("Sun Life's motion [to dismiss] will be granted because the interpretation of the lease Michaels advances is not reasonable

and, therefore, not plausible."); *Esanbock v. Weyerhaeuser Co.,* 367 F. Supp. 3d 925, 932 (D. Minn. 2019) ("Because the contract is not ambiguous, there is no need for discovery and a summary trial on its meaning."); *Syngenta Seeds, LLC v. Warner,* 2021 W.L. 679289 at *10 (D. Minn.  Feb. 22, 2021) (granting motion to dismiss breach of noncompete provision which required defendant's active participation in the development of a new seed product where plaintiff had failed to plead a plausible claim that the defendant had done so).

For purposes of a motion to dismiss, the Court may assume that the well-pled facts pleaded in the complaint are true. *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, the Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

**B.    The Complaint Fails to State a Claim for Breach of the Partnership Agreement.**

Count I of the Complaint alleges a claim for breach of the Partnership Agreement based upon the alleged failure  to give written notice of a Tag-Along Rights pursuant to the Equity Agreement.  (Compl. ¶¶ 109-116.)  Under Minnesota law, "[a] claim of breach of contract requires proof of three elements: (1) the formation of a contract; (2) the

18

performance of conditions precedent by the plaintiff; and (3) the breach of the contract by the defendant." *Thomas B. Olson Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008).  In this case, the Complaint fails to plead a breach of the Partnership Agreement based on alleged failure to give notice of Tag-Along Rights.

    1. <u>Interpretation of an unambiguous contract is a question of law for the Court.</u>

  As a preliminary matter, Orbit does not appear to contend that there is any term in the Partnership Agreement that is ambiguous.  The parties used unambiguous terms throughout the Partnership Agreement to define what constitutes a Control Sale, and what conditions give rise to the creation of the Drag-Along Right and/or Tag-Along Rights. Interpretation of an unambiguous contract is a matter of law for the Court.[8] *E.g., Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).  When interpreting a contract, the Court's goal is to divine the parties' intent.  *Id.*  If a contract is unambiguous, the parties' intent is manifest from the terms of the contract itself.  *Id.*  The language of a contract must be read as a whole and in a manner that gives meaning to all of its provisions. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).  When a contractual provision is clear and unambiguous, a court will not rewrite, modify, or limit its effect "by a strained construction."  *Travertine Corp.*, 683 N.W.2d at 271.  Importantly, the Court must "attempt to avoid an interpretation of the contract that would render a provision meaningless."  *Shaw v. Farm Bureau Prop.& Casualty Insur. Co*., No. 20-CV-

---

[8] The Third Amendment to the Partnership Agreement provides that any dispute between the parties will be resolved by the Court and not a jury.  (Third Amendment, § 17.10.)

534 (NEB/TNL), 2021 WL 323958 at *2 (D. Minn. Feb. 1, 2021) (quoting) *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990)).

As we demonstrate below, Plaintiff's proposed interpretation of the Partnership Agreement violates this maxim in multiple ways, rendering several provisions a nullity. Further, when construing a contract, courts must examine all parts of the contract and give language therein a reasonable construction using the ordinary and plain meaning of contract's terms. 13 Richard A. Lord, *Williston on Contracts* §§ 32:1 – 32:5 (4th ed. 2000). Here, the parties expressed their intent in the unambiguous words, and those words should be given their plain and ordinary meaning. Because Plaintiff's attempted construction of the Partnership Agreement is unreasonable, and therefore implausible, this dispute can and should be resolved on a Rule 12 basis. *Michael Stores*, 413 F. Supp. 3d at 855.

> 2.  The Equity Agreement does not trigger a Control Sale because the Call Options do not constitute a "sale, exchange or other disposition. . . which includes a majority of the General Partnership Interest."

Orbit's Complaint alleges a breach of § 10.7(a) of the Partnership Agreement as a result of the Taylor Parties having allegedly "proposed" a Control Sale but failing to provide a written notice of Tag-Along Rights under § 10.7(b). (Compl. ¶¶ 94-96, *citing* Partnership Agreement § 10.7.) But execution of the Equity Agreement simply does not trigger a Control Sale because as a matter of black-letter Minnesota law the grant of an option does not constitute a "a sale, exchange or other disposition" of the Taylor Parties' GP interests, as required by § 1.9C of the Partnership Agreement.

20

A "Control Sale" is defined by § 1.9C as "a sale, exchange or other disposition . . . which includes a majority of all the General Partnership Interests". (Partnership Agreement § 10.7(a).) The Second Tranche Option does not transfer any GP interest to Buyer. It is an offer to do so, but no "sale, exchange or other disposition" will occur unless the option is in fact exercised and League approval is obtained. (Equity Agreement § 6.1(b)(ii).)

Each term defining a Control Sale— "sale, exchange or other disposition" — requires the actual transfer of a property right. *Weisbart v. First Nat'l Bank of Dalhart*, 568 F.2d 391, 395 (5th Cir. 1978) ("Employment of the doctrine [of *ejusdem generis*] mandates that "other disposition" refer to a transaction of the same general type as a sale or exchange. Therefore, …at the minimum it must meet the threshold test of these two transactions by effecting a transfer of property.")

In *Bremer Bank, N.A. v. Matejcek*, 916 N.W.2d 688 (Minn. App. 2018), the Court of Appeals adopted the reasoning of the Fifth Circuit in *Weisbart*. The question before the Court of Appeals was whether the Bank had exercised its right to dispose of a motorhome. *Id*. The court observed that the meaning of "otherwise dispose" had not been defined by statute or caselaw to date. *Id.* at 693-94. It then identified "dispose" as a general term following a list of specific terms and applied the principle of *ejusdem generis*, which provides that "when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed." *Id.* at 694 (quotation omitted). The Court thus reasoned that

21

"dispose" in this context means a transaction to sell, lease, or license collateral since "dispose" followed a listing of those terms. *Id.* at 694. The court then concluded that the Bank did not "otherwise dispose" of the motorhome because it "did not transfer ownership or possession rights in the motorhome." *Id.* at 695.

Moreover, the "Call Options" in § 6.1(b) of the Equity Agreement clearly do not transfer or otherwise convey a property right. Under Minnesota law, an option is defined as "merely a continuing offer to sell . . . which is irrevocable until the expiration of the time limit of the option." *Karwoski v. Karwoski*, No. A04-1234, 2005 WL 949045, at *2-3 (Minn. Ct. App. Apr. 26, 2005); *Nafstad v. Merchant*, 303 Minn. 569, 571, 228 N.W.2d 548, 550 (Minn. 1975). An option remains a unilateral undertaking and *conveys no interest in its subject matter* until the optionee effectively exercises it. *Abrahamson v. Abrahamson*, 613 N.W.2d 418, 423 (Minn. Ct. App. 2000) (emphasis added); *accord ML Gordon Sash & Door Co. v. Mormann*, 271 NW 2d 436 (Minn. 1978) ("As a general rule an option to purchase real property, prior to its exercise, conveys no interest in the land").

The Call Options in the Equity Agreement therefore do not constitute a "sale, exchange or other disposition" of partnership interests, both as a matter of contract interpretation and based on the plain meaning of the words.[9] As a rule of contract

---

[9] As a matter plain and ordinary usage, the word "disposition" clearly connotes a transfer of ownership. *See Merriam-Webster* https://www.merriam-webster.com/dictionary/disposition ("disposition": a "final arrangement: SETTLEMENT," "transfer to the care or possession of another") (last viewed 6/11/2021); *see also Oehler v. Falstrom*, 273 Minn. 453, 142 N.W.2d 581, 585 (1966) (describing disposition as absolute transfer of title); *In re Hencke's Estate*, 416, 4 N.W.2d 353, 357-58 (Minn. 1942) (interchanging term

interpretation, "when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed." *Bremer Bank, N.A. v. Matejcek*, 916 N.W.2d at 694. Here, "other disposition" follows "sale" and "exchange." Thus, "other disposition" is clearly of the same type as "sale" and "exchange"—a transaction actually passing title to the partnership interest. *Id.* at 694 (concluding "otherwise dispose" following "sell, lease, license" meant a transaction to sell, lease or license).

Because the Equity Agreement does not obligate Buyer to purchase any GP Interests, there is no "sale, exchange, or disposition" within the meaning of § 1.9C, unless and until the Second Tranche Option is actually exercised and League approval is received. As such, no non-Taylor Limited Partner is entitled to issuance of a Tag-Along Notice upon a mere grant of an option nor even upon its exercise.

3.   Plaintiff's proposed construction would nullify at least four separate provisions of the Partnership Agreement.

If there were any doubt that a mere proposal of a grant of option does not constitute a "Control Sale" - and there is not - § 10.1 of the Partnership Agreement puts the matter to rest by noting that "[n]o proposed Transfer" for which requisite League consents have not been obtained "will be effective for any purpose."[10] There is nothing ambiguous about this

---

"disposition" and "sale" when discussing sale of real property); *Western R. Co. of Minn. v. De Graff*, 27 Minn. 1, 7, 6 N.W. 341, 342 (Minn. 1880) (same).

[10] "Transfer is a defined term under the Partnership Agreement and requires the existence of a "sale, assignment, trade, transfer, bequest, encumbrance, pledge, hypothecation, gift

language. If a proposed Control Sale is not effective "for any purpose" until and unless the League approves it, such a proposal cannot be effective to trigger Tag-Along Rights prior to League approval. To hold otherwise would write § 10.1 (and the §§ 10.7 and 10.8 references to § 10.1) out the Agreement and render it a nullity. Plaintiff's strained interpretation would also render § 10.7(b), requiring written notice of a closing date and purchase price in connection with the exercise of Tag Along Rights, a nullity since those items are presently unknown and unknowable making it impossible for the Taylor Parties to exercise Plaintiff's alleged Tag-Along Rights. It would also render the language in § 10.7(a) that Tag-Along Rights can only be exercised if the Drag-Along Right has not been exercised a nullity as well, since here Taylor is clearly obligated to exercise its Drag-Along Right under the Equity Agreement. Finally, it would also deprive the Taylor Parties of their unconditional right under § 10.8 of the Partnership Agreement to exercise their Drag-Along Right in connection with a Control Sale. A proposed construction of a contract that would render four separate contract provisions null and void cannot possibly be a reasonable, let alone plausible, construction.

Moreover, the fact that the Partnership Agreement expressly provides that "any proposed Transfer", unless approved by the League, is not effective for "any purpose" underscores the utter implausibility of Plaintiff's position. Orbit's proposed interpretation,

---

"or any other disposition of all or any portion of a Partnership Interest." (Partnership Agreement § 1.27.)

while ignoring multiple provisions of the Partnership Agreement, attempts to create the right to "tag-along" even without an underlying transfer of the GP interests.

> 4.   The Taylor Parties Exercise of the Drag-Along Right Precludes Plaintiff from Asserting Tag-Along Rights.

A second and independent reason that the Equity Agreement does not trigger Plaintiff's Tag-Along Rights is that under the Second Tranche Option, the Taylor Parties are obligated to exercise their Drag-Along Right if that option is exercised (*see supra* pp. 9-10).   As a matter of law, therefore, there can be no Tag-Along Rights since those only arise under § 10.7 if the Taylor Parties have not exercised their Drag-Along Right.  Because the Taylor Parties are contractually obligated to do so, no Tag-Along Rights can spring into existence.  The Partnership Agreement requires more than simply a Control Sale to trigger Tag-Along Rights; § 10.7(a) also requires that the Taylor Parties "not exercise the Drag-Along Right … with respect to such sale . . ."  (Partnership Agreement § 10.7(a).)

Here, the Equity Agreement specifically requires that Taylor Sports Group exercise their Drag-Along Right in the event the Second Tranche Option is exercised.  (Equity Agreement § 6.1(f).)  Because the Taylor Parties will exercise their Drag-Along Right, the non-Taylor Limited Partners do not receive Tag-Along Rights under Section 10.7(a), regardless of whether a Control Sale has occurred.

**C.   The Complaint Fails to State a Claim for Breach of the Duty of Good Faith and Fair Dealing.**

Although Minnesota recognizes an implied covenant of good faith and fair dealing inherent in every contract, *In re Wren*, 699 N.W.2d 758, 765 n.10 (Minn. 2005), the implied

covenant cannot be used to create obligations where none exist. *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503 (Minn. 1995). To survive a motion to dismiss, Orbit must allege "sufficient facts which, if proven, would support an inference of bad faith." *See White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 885 (D. Minn. 1997). It cannot possibly do so.

Contrary to Orbit's assertions to the contrary, absolutely nothing in the Partnership Agreement prohibits the Taylor Parties from structuring a potential transaction utilizing options. The acquisition by the Buyer of all the GP and LP interests will require it to come up with $1.5 billion in cash, and it is neither surprising nor unusual that a potential buyer would request to structure such a transaction over a period of years because it is extremely difficult to come up with that level of liquidity in one fell swoop. Nor does anything in the Partnership Agreement preclude the General Partner from proposing a form of transaction which may, at some future time, constitute a Control Sale through the grant of one or more options, or from contractually committing to exercise its Drag-Along Right in the event the option to transfer GP interests is exercised, thereby precluding the existence of Tag-Along Rights. Thus, Plaintiff's breach of implied covenant of good faith claim is simply an improper attempt to create new, unbargained for rights under the Partnership Agreement directly contrary to its existing terms. *See Watkins Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 994 (8th Cir. 2013) ("The implied covenant of good faith and fair dealing serves only to enforce existing contractual duties, and not to create new ones." (quoting *Teng Moua v. Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 893 (D. Minn. 2011)).

26

Plaintiff baldly asserts that the Taylor Parties are obligated to provide a "Sale Notice" even though there has been no "Control Sale" much less League approval of such a sale, and notwithstanding that the Equity Agreement obligates the Taylor Party to exercise their Drag-Along Right if the Second Tranche Option is exercised.  This is clearly an attempted re-write of the Partnership Agreement.  Even Plaintiff admits that the purpose of the Tag-Along Rights is to prevent it from being saddled with a General Partner that it did not have a say in selecting.  (Ex. A to Merrill Decl.).  That will not happen here because under the Equity Agreement the Taylor Parties are obligated to exercise the Drag-Along Right and obligate each non-Taylor Limited Partner to join in the Second Tranche Option on the same financial terms as the Taylor Parties and at the same time as the Taylor Parties. There is simply no unfairness in that.

Instead, what the Plaintiff seeks is a grotesque windfall in which it can exercise "Tag-Along Rights" to a transaction which may never occur at a putative purchase price which may never be paid regardless of whether the Second Tranche Option is exercised. This "heads I win, tails you lose" approach is completely contrary to the language and structure of the Partnership Agreement.  Indeed, Plaintiff cannot identify any unfairness to it from the proposed transaction.  If the Buyer exercises the Second Tranche Option, then Plaintiff gets simultaneously dragged along on the same economic terms as paid for the GP interest.  If the Buyer does not consummate the Second Tranche Option for any reason, then there will be no new General Partner, no transfer of any GP interests, no Control Sale, the Plaintiff's LP interest will not be purchased and everything will remain the same with

27

Buyer simply acquiring an LP interest which is irrelevant to the triggering of the Drag-Along Right or Tag-Along Rights.

    **D.    Plaintiff Has No Grounds for Injunctive Relief.**

In Count III of the Complaint, Orbit alleges entitlement to injunctive relief enjoining the Taylor Parties from transferring any partnership interests.  (Compl. ¶ 125.)  Injunctive relief is not a separate cause of action.  *See Thompson v. JPMorgan Chase Bank, N.A.*, No. 13-2230, 563 Fed. Appx. 440, 442, 2014 WL 1586992, at *1 n.1 (6th Cir. Apr. 22, 2014); *Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 46 (D. Mass. 2013); *Interactive Media Ent. & Gaming Ass'n, Inc. v. Gonzales*, Civ. A. No. 07-2625MLC, 2008 WL 5586713, at *1 n.1 (D.N.J. Mar. 4, 2008), aff'd sub nom. *Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen. of U.S.*, 580 F.3d 113 (3d Cir. 2009) (request for injunctive relief is not a freestanding claim).

Here, the sole basis for Orbit's claim for injunctive relief is the Taylor Parties' alleged breach of the Partnership Agreement.  (Compl. ¶ 126.)  Orbit's claim for injunctive relief fails as a matter of law because Orbit's claim for breach contract (Count I) fails. (Compl. ¶¶ 125-129.)  A claim for injunctive relief requires success on the merits. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Orbit's claim for breach of contract fails as a matter of law.  Accordingly, Orbit's Complaint fails to allege a plausibly successful claim on the merits that would support injunctive relief.

Moreover, Orbit's Complaint also fails to plausibly allege any grounds for irreparable harm.  A plaintiff seeking injunctive relief must demonstrate that it has suffered

an irreparable injury, and that remedies available at law, such as monetary damages, are inadequate to compensate for that injury.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, Orbit alleges it will be irreparably harmed if the Taylor Parties can deny Orbit Tag-Along Rights allegedly owed under the Partnership Agreement.  (Compl. ¶ 127.) Orbit's own Complaint admits its alleged injury is compensable by a measurable monetary amount.  Orbits alleges Taylor's breach of the Partnership Agreement will cause it to suffer $300,000,000.00 in money damages.  (Compl. ¶ 116.)  Accordingly, Orbit fails to allege any irreparable injury supporting injunctive relief because Orbit admits its claimed injury is readily addressable by money damages.

### E.    Plaintiff Has No Grounds for Declaratory Relief.

Orbit's claim for declaratory relief alleges nothing more than Orbit's claim for breach of contract.  (Compl. ¶¶ 131-136.)  Orbits alleges a controversy exists regarding whether the Equity Agreement triggered Orbit's Tag-Along Rights under § 10.7 of the Partnership Agreement.  (*Id.* ¶ 132.)  Respectfully, this controversy exists only in Plaintiff's mind; the Partnership Agreement is crystal clear that Orbit has no Tag-Along Rights where, as here, there is no Control Sale unless and until the Second Tranche Option is exercised and, if exercised, is approved by the League.  In that event the Taylor Parties are obligated to exercise their Drag-Along Right.  A district court may dismiss a request for a declaratory judgment where the core controversy will be decided by the parties' claim for breach of contract.  *See, e.g., Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160, 2007 WL

1791252, at *3 (N.D. Tex. Jun. 21, 2007) (dismissing declaratory judgment action under Rule 12(b)(6) that duplicated an existing breach of contract claim).  Orbit's Tag-Along Rights under § 10.7 of the Partnership Agreement will be decided when the Court decides Orbit's claim for breach of the Partnership Agreement.

### F.    The Court Should Stay Discovery Pending a Ruling on This Motion.

The Court has the power to stay proceedings in order to control its docket, to conserve judicial resources, and to provide for the just determination of cases before it. *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  The power to "stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

When a motion facially challenges the legal sufficiency of a claim, such as a motion to dismiss based on failure to state a claim for relief, it is appropriate to resolve the motion before discovery begins.  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997).  Such a motion presents a purely legal question; there are no issues of fact because the allegations contained in the pleading are presumed to be true.  *Id.*  Therefore, neither the parties nor a district court have any need for discovery before a ruling on the motion.  *Id.*

That is particularly true where one of the parties, here the Plaintiff, advances claims that are simply not based on a plausible construction of the underlying contract and where

the contract itself is unambiguous.  *See, e.g. Michaels Stores, Inc. v. Sun Life Assurance Co.,* 413 F. Supp. 3d 854, 855 (D. Minn. 2019.)

Respectfully, here the issue for the Court is purely a legal one:  has there been a Control Sale, and if not, is Plaintiff nonetheless entitled to assert Tag-along Rights even though a Control Sale may never take place.  This is simply not an issue that requires factual development.  The answer is plainly within the four corners of the Partnership Agreement.  Good cause exists for a stay of discovery until the motion is resolved. Federal Rules of Civil Procedure directs that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  A stay of discovery in this case will further the purpose of Rule 1.

A stay of discovery will not prejudice Orbit, or give the Taylor Parties any strategic advantage.  This case is in its infancy.  Discovery has not yet commenced.  The Court has not set an initial pretrial conference.  No scheduling order has been issued, and no trial date has been set.  The parties have not yet conferred pursuant to Rule 26(f) of the Federal Rules of Civil Procedure.  And the Taylor Parties make this request for a stay, before the parties have expended any resources on discovery.

## IV.   CONCLUSION

For all of the reasons set for above, the Taylor Parties respectfully request that the Court grant their motion and dismiss Orbit's Complaint, with prejudice, under Federal Rule of Civil Procedure 12(b)(6) and stay discovery until the Court has had an opportunity to rule on this motion.

31

38618327.1

Dated: June 11, 2021 **SAUL EWING ARNSTEIN & LEHR, LLP**

By   *s/ Alain Baudry*
    Alain M. Baudry (MN #186685)
    Courtland C. Merrill (MN #311984)
    Lauren F. Schoeberl (MN #398249)
    33 South Sixth Street, Suite 4750
    Minneapolis, MN 55402
    Telephone: (612) 225-2946
    Facsimile: (612) 677-3844
    Email:  alain.baudry@saul.com
    Email:  cmerrill@saul.com
    Email:  lauren.schoeberl@saul.com

    Jeffrey S. Robbins (*Pro Hac Admission Pending*)
    SAUL EWING ARNSTEIN & LEHR, LLP
    131 Dartmouth Street, Suite 501
    Boston, MA 02116
    Telephone: (617) 912-0941
    Facsimile: (617) 729-4151
    Email:  jeffrey.robbins@saul.com

    *Attorneys for Defendants Glen Taylor, Taylor Corporation, and Taylor Sports Group, Inc.*

32

38618327.1