UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Orbit Sports LLC, | File No. 21-cv-1289 (ECT/TNL) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Glen Taylor, Taylor Corporation, and Taylor Sports Group, Inc., | |
| Defendants. | |

Michael M. Krauss and Peter Kieselbach, Greenberg Traurig, LLP, Minneapolis, MN; Paul Hans Schafhauser, Greenberg Traurig, LLP, Florham Park, NJ, for Plaintiff Orbit Sports LLC.

Alain M. Baudry, Courtland C. Merrill, and Lauren F. Schoeberl, Saul Ewing Arnstein & Lehr, LLP, Minneapolis, MN, for Defendants Glen Taylor, Taylor Corporation, and Taylor Sports Group, Inc.

Defendant Glen Taylor, together with Taylor Corporation and Taylor Sports Group, Inc.—two companies that he controls—are the principal owners of the Minnesota Timberwolves and Minnesota Lynx professional basketball teams. Recently, Taylor announced that he would transition ownership of the teams to Purple Buyer Holdings, LLC, a company controlled by Alex Rodriguez and Marc Lore. The way the deal is structured, Taylor and his companies will sell a 20% ownership share of the teams at a closing scheduled for June 30, 2021 (or shortly thereafter). At that closing, Taylor will also extend a series of standing offers—known as "Call Options"—that Rodriguez and Lore may or may not accept later to acquire a controlling interest in the teams.

Plaintiff Orbit Sports, LLC currently owns a minority share of the teams.  In this lawsuit, Orbit claims that: (1) the proposed transaction with Rodriguez and Lore violates the Partnership Agreement that it entered into with Taylor when it invested in the teams, and (2) Taylor violated his duty to deal with Orbit in good faith.  Orbit has moved for a preliminary injunction that would either put a stop to the June 30 closing or else require Taylor to deposit the proceeds of the June 30 sale into an escrow account while this case proceeds.  Taylor and his companies responded by filing a motion to dismiss Orbit's Complaint entirely.

The outcome of these motions largely comes down to one question: whether the sale set to occur on June 30 counts as a "Control Sale" under the Parties' written Partnership Agreement.  As explained in detail below, it does not.  As of June 30, there will be no definitive agreement to transfer a controlling interest in the teams to Rodriguez and Lore. This conclusion undermines the remaining arguments Orbit raises about the terms of the Partnership Agreement.  And Orbit has not plausibly alleged that, in structuring the deal the way he did, Taylor acted in bad faith.  Defendants' motion to dismiss will therefore be granted, and Orbit's claims will be dismissed with prejudice.  It is appropriate to deny Orbit's motion for a preliminary injunction for separate, independent reasons.  Setting aside the fact that Orbit is not likely to succeed on the merits of its claims, it has not shown that it will suffer irreparable harm if the closing goes forward, and neither the balance of the equities nor the public interest favors an injunction.

I[1]

A

The Parties in this case are all partners in the Minnesota Timberwolves Basketball Limited Partnership, the business entity that owns and operates the Minnesota Timberwolves and Minnesota Lynx professional basketball teams. The governing Limited Partnership Agreement divides ownership interests in the Partnership between a General Partner and a collection of Limited Partners. Compl. ¶ 35, Ex. A at 1 ("Partnership Agreement") [ECF Nos. 1, 4-1]. The General Partner has "exclusive management and control of the business of the Partnership, and all decisions regarding the management and affairs of the Partnership shall be made by the General Partner." Partnership Agreement § 7.1. This includes the power to "perform any and all acts . . . necessary, customary, or incidental to the acquisition, ownership, operation, administration, and management" of the teams and to "take any and all actions it deems necessary or prudent to comply with [National Basketball Association ("NBA")] Regulations." *Id.* § 7.1(a)–(b). The role of a Limited Partner is, unsurprisingly, limited. A Limited Partner has the right to receive a pro rata share of the Partnership's income (as well as the duty to absorb a pro rata share of its losses) based on the percentage of the Partnership that it owns. *See id.* §§ 6.1–6.3, 6.6.

---

[1]    In accordance with the standards governing a motion to dismiss under Rule 12(b)(6), this factual background is generally drawn from the Complaint and materials that it necessarily embraces. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Additional material beyond the pleadings, which the Parties submitted with their briefing surrounding the motion for a preliminary injunction, will only be considered in connection with that motion. *See Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1115 n.2 (D. Minn. 2000).

With a few exceptions not relevant here, however, "no Limited Partner shall have the right to participate or interfere in the management or control of the Partnership business." *Id.* § 9.3.

When the Partnership Agreement first took effect in 1994, there were only two Partners, both of which are business entities that Taylor controls. Defendant Taylor Sports Group, Inc. was (and still is) the General Partner. *Id.* § 4.1. Defendant Taylor Corporation was the sole Limited Partner. *Id.* § 4.2.

Over the years, the Limited Partnership pool has expanded. As relevant here, in 2016, Orbit became a Limited Partner when it invested and acquired a minority ownership interest. Compl. ¶ 3. Its total ownership share is now more than 17% of the Partnership. *Id.* ¶ 40. This makes it the largest non-Taylor Limited Partner. *Id.*

At the center of this dispute are restrictions that the Partnership Agreement places on a Partner's ability to transfer its partnership interests. In general, no Partner—General or Limited—may "Transfer[2] or assign all or any part of [its] Partnership Interest except in accordance with" the Partnership Agreement. Partnership Agreement § 10.1. When Orbit became a Limited Partner in 2016, the Partners added—allegedly at Orbit's insistence—two new and related transfer restrictions. Compl. ¶¶ 3–4. These restrictions apply when a member or members of the "Taylor Group," which includes all three Taylor Defendants,

---

[2]     The Partnership Agreement defines "Transfer," when used as a verb, to mean "to sell, to assign, to trade, to transfer, to bequeath, to encumber, to pledge, to hypothecate, to give or in any other way to dispose of all or any portion of a Partnership Interest or any interest therein." Partnership Agreement § 1.27.

decide to enter into a "Control Sale." *See* Partnership Agreement §§ 10.7(a), 10.8(a).  A Control Sale is

> a sale, exchange or other disposition (for cash or property with a discernible cash value) by one or more members of the Taylor Group, in a single transaction or series of related transactions, to any Person who is not a member of the Taylor Group, of Partnership Interests which includes a majority of all the General Partnership Interests[.]

*Id.* § 1.9C.

Both of the newly added transfer restrictions address what happens to the ownership interests of Limited Partners in the event of a Control Sale.  The first restrictions, governed by section 10.8 of the Partnership Agreement, are known as "Drag-Along Rights."  They essentially allow the Taylor Group to force other Limited Partners to sell some or all of their partnership interests in a Control Sale:

> Subject to Section 10.1, if one or more members of the Taylor Group (which includes one or more persons that collectively own, directly or indirectly, a majority of the General Partnership Interests), desires to approve or consummate a Change in Control[3] (a "***Drag-Along Sale***"), such members of the Taylor Group (the "***Offering Group***"), shall have the right (the "***Drag-Along Right***") to require each of the other Partners (each, a "***Dragged Partner***"), to approve and participate in the Drag-Along Sale on and pursuant to the terms and conditions set forth in this Section 10.8 and on the same terms and for the same price that the Offering Group will participate . . . .  If the Drag-Along Right is timely and properly exercised by the Offering Group, each Dragged Partner shall vote all of his, or its Partnership Interests or give written consent with respect thereto, including consenting to the admission of the prospective buyer as a General Partner or, as the case may be,

---

3   The Partnership Agreement defines "Change in Control" to include a "Control Sale," and no Party has suggested that there is any relevant difference between the two terms for purposes of this case.  *See* Partnership Agreement § 1.7A.

> sell all of his, or its Partnership Interests and take all such other
> action with respect to the Drag-Along Sale, as in any case shall
> be reasonably directed by the Offering Group to effect the
> Drag-Along Sale[.]

*Id.* § 10.8(a).   The Taylor Group has "not less than fifteen (15) days prior to the consummation date of the Drag-Along Sale" to exercise its Drag-Along Rights. *Id.* § 10.8(b).  To do so, it must send the Limited Partners a written "Drag-Along Notice" that "set[s] forth in reasonable detail the name or names of the proposed purchaser . . ., the Partnership Interest to be sold (directly or indirectly) by the [Taylor] Group, the purchase price and other material terms and conditions of the Drag-Along Sale and the anticipated closing date." *Id.*  If it wants, the Taylor Group can require Limited Partners to "sell all of their Partnership Interests." *Id.*  But even if the Taylor Group does not so require, a Limited Partner can still "elect to sell all (but not less than all) of its Partnership Interests." *Id.* § 10(b)(i).  And the provision incorporates one other significant protection for Limited Partners: if the prospective purchaser is not willing to purchase all of the Partnership Interests that a Limited Partner elects to sell, then the Taylor Group must purchase the excess interests itself.  *Id.* § 10(b)(ii), (iv).

The second type of transfer restrictions, governed by section 10.7 of the Partnership Agreement, are known as "Tag-Along Rights."  These rights are essentially the converse of Drag-Along Rights in that they allow Limited Partners to compel the Taylor Group to let them participate in a Control Sale:

> Subject to Section 10.1, in the event that one or more members
> of the Taylor Group (which includes one or more persons that
> collectively own, directly or indirectly, a majority of the
> General Partnership Interests) proposes to enter into a Control

> Sale (such participating members of the Taylor Group, collectively the "***Selling Partner***"), and the Selling Partner does not exercise the Drag-Along Right (defined below) with respect to such sale (the "***Tag-Along Sale***"), then each Limited Partner (the "***Tag-Along Partners***") shall have the right (the "***Tag-Along Right***") to elect to participate in such Tag-Along Sale on and pursuant to the terms and conditions set forth in this Section 10.7 at the same price and on the same other terms and conditions applicable to the Selling Partner[.]

*Id.* § 10.7(a). When the Taylor Group plans to enter into a Control Sale, it has "ten (10) days following execution of any definitive agreement . . . entered into with respect to the [Control] Sale" to send the Limited Partners a written notice that

> describe[s] in reasonable detail (i) the Partnership Interests to be sold (directly or indirectly) by the Selling Partner; (ii) the name of the proposed buyer (the "***Prospective Purchaser***"); (iii) the purchase price and the other material terms and conditions of the sale; (iv) the proposed date, time and location of the closing of the sale; and (v) copy of the definitive agreement so entered into[.]

*Id.* § 10.7(b). Each Limited Partner has fifteen days after receiving this notice to elect to exercise its Tag-Along Right. *Id.* § 10.7(c)(i). A Limited Partner who makes this election is generally "entitled to sell in the contemplated Tag-Along Sale up to all of [its] Partnership Interest[s]." *Id.* To make sure that this happens, the Taylor Group has two alternative and sequential obligations. First, the Taylor Group must "use commercially reasonable efforts to obtain the agreement of the Prospective Purchaser" to purchase the Limited Partners' interests. *Id.* § 10.7(d)(i). If that doesn't work, then the Taylor Group must essentially purchase the Limited Partners' interests itself. *Id.* § 10.7(d)(ii)–(iii). Specifically, if the Prospective Purchaser does not allow a Limited Partner to participate in the sale or is unwilling to purchase the full amount of Partnership Interests that the Partners

7

wish to sell, then the Taylor Group may not "Transfer any of its Partnership Interests to [the] Prospective Purchaser pursuant to [the] Tag-Along Sale" unless the Taylor Group first purchases everything the Limited Partner elects to sell.  *Id.* § 10.7(d)(iii).

B

The events leading up to this lawsuit began in the spring of 2021.  On April 12, Taylor informed the Limited Partners that he had signed an "exclusive letter of intent" with Alex Rodriguez and Marc Lore "to purchase the Timberwolves and Lynx franchises" and that the deal would be "structured for [Taylor] to continue as the controlling partner for 2.5 years, after which Alex and Marc [would] take full ownership."  Compl. ¶ 73, Ex. H [ECF No. 4-8].  On May 13, after a period of negotiations, Taylor and his businesses entered into an Equity Interest Purchase Agreement with Purple Buyer Holdings, LLC, an entity that Rodriguez and Lore own and control.  *Id.* ¶ 61, Ex. B [ECF No. 4-2] ("Purchase Agreement").  (Rodriguez, Lore, and their LLC will be referred to collectively as "the Buyer.")

The terms of the Purchase Agreement are fairly complex and require some explanation.  At a closing set to occur on June 30, 2021, the Buyer will acquire twenty limited-partnership interests—*i.e.*, a 20% ownership share in the Partnership—in exchange for 20% of a "Purchase Price" that will be calculated based on a total Partnership enterprise value of $1.5 billion.  Purchase Agreement §§ 2.1(a), 2.2(a), 2.3(a)–(b).  The closing will not occur unless a number of conditions are met by both the Buyer and the Taylor parties.

*See id.* arts. XI and XII.  Most directly relevant to this case is the requirement that the NBA approve the transaction.  *Id.* §§ 11.6, 12.4.[4]

Effective as of the June 30 closing, the Taylor Group will also grant the Buyer a series of "Call Options."  *Id.* § 2.1(b).  These Call Options, if exercised, would do two things.  First, they would allow the Buyer to acquire all of the Taylor Group's remaining partnership interests, which include both general- and limited-partnership interests.  Second, they would require Taylor Sports Group, as General Partner, to exercise its Drag-Along Right so that the Buyer could acquire all remaining partnership interests of the non-Taylor Limited Partners.  *Id.*  In other words, if the Buyer exercises all of the Call Options, it will eventually end up with a 100% ownership interest in the Partnership.

The Call Options are structured to allow the Buyer to acquire partnership interests in a series of "Tranches," and the Buyer must exercise them, if at all, in a specific order. The First Tranche consists of a 20% ownership share in limited-partnership interests, to be purchased from Taylor Corporation.  *Id.* § 6.1(b)(i).  In the Second Tranche, the Buyer would acquire all general-partnership interests as well as a nearly-32% ownership share in limited-partnership interests.  *Id.* § 6.1(b)(ii).  Those limited-partnership interests would include all the interests of all the non-Taylor Limited Partners.[5]  *Id.*; *see id.* § 2.1(b)(ii).

---

[4]    It's not directly relevant to Defendants' motion to dismiss, but as of this writing, the NBA is "in the process of reviewing [the] proposed [i]nitial [t]ransfer" of Partnership Interests.  Maczko Decl. ¶ 6 [ECF No. 31].  Because the Parties are still waiting on the approval, the closing may not actually occur on June 30, but it will still be referred to as the "June 30 closing" for clarity.

[5]    A separate provision, which has not received any attention in this case, contemplates that the Buyer might separately negotiate with a non-Taylor Limited Partner so that the

Altogether, the Second Tranche would transfer an additional 40% ownership share to the Buyer, bringing its total to 80%. *Id.* § 6.1(b)(ii). Finally, in the Third Tranche, the Buyer would acquire the remaining 20% in limited-partnership interests from Taylor and Taylor Corporation. *Id.* § 6.1(b)(iii); *see* Merrill Decl., Ex. C [ECF No. 23-3].

The Purchase Agreement gives the Buyer significant discretion to decide when, if at all, to exercise the Call Options, but the whole process could take until the end of 2024. The First Tranche must be exercised after the initial closing but before December 31, 2022; the Second Tranche after the First Tranche but before December 31, 2023; and the Third Tranche after the Second Tranche but before December 31, 2024. Purchase Agreement § 6.1(b)(i)–(iii). It also need not be so drawn out. The Buyer can exercise the Call Options "at any time" after the initial closing date but before the respective deadline for each Tranche, and "so long as the order [described above] is maintained," the Buyer "may exercise the Call Option for all Tranches simultaneously or aggregate Call Options for later Tranches." *Id.* § 6.1(a), (c).

If the Buyer exercises a Call Option, it does not immediately acquire the interests associated with the respective Tranche. Instead, the Buyer must send the Taylor Group a written notice specifying which Call Option the Buyer intends to exercise, as well as a "desired closing date" which must be at least sixty days—but no more than ninety days— after the Buyer exercises the option. *Id.* § 6.3. The closing on each Call Option is "subject to prior NBA Approval" and any "other required approvals of any Governmental Entity."

---

latter could "remain as a partner in the Company and . . . not sell all or a portion of the" limited-partnership interests identified in the Second Tranche. *Id.* § 6.1(e).

*Id.* § 6.4(a).  The Buyer is also not required to exercise all of the Call Options—or any of them.  If the Buyer "fails to exercise any Call Option prior to the specified expiration date for the respective Tranche, all subsequent Call Options shall immediately terminate and thereafter be null and void."  *Id.* § 6.1(d).[6]

C

The dispute in this case is over how to apply the Partnership Agreement to the Purchase Agreement.  Orbit believes that the Purchase Agreement, as a whole, sets out a "series of related transactions" that constitutes a Control Sale under the Partnership Agreement, thereby triggering its Tag-Along Rights.  Compl. ¶¶ 79–93.  On May 13, 2021, immediately after receiving news of the Purchase Agreement, Orbit informally communicated this view to Taylor's representative, letting him know that it intended to exercise its Tag-Along Rights to participate in the June 30 closing.  Compl. ¶ 65, Ex. C [ECF No. 4-3].  Orbit reiterated this position in a series of follow-up letters to Taylor, which included a more formal "Tag-Along Notice" dated May 14, 2021.  *Id.* ¶ 66, Exs. D, E, F [ECF Nos. 4-4, 4-5, 4-6].  Taylor responded that, in his view, a Control Sale will only occur if the Buyer exercises the Call Option for the Second Tranche, since that is the only

---

[6]     Orbit includes allegations that the Purchase Agreement gives Rodriguez and Lore certain management responsibilities before they take formal control of the Partnership.  *See* Compl. ¶¶ 84–88.  The breach-of-contract claim that Orbit raises in its Complaint does not depend on these allegations, and Orbit does not argue that they are a basis to deny Defendants' motion to dismiss.  *See id.* ¶¶ 108–16; *see generally* Pl.'s Mem. in Opp'n at 6–20 [ECF No. 33].  It does, however, use these allegations to assert a different theory of breach to support its motion for a preliminary injunction.  *See* Pl.'s Mem. in Supp. at 22–24 [ECF No. 14].  The allegations and additional relevant materials will be discussed below in connection with that motion.

11

Tranche that would involve the acquisition of a majority of the general-partnership interests. *Id.*, Ex. G at 2 [ECF No. 4-7]. And because the exercise of the Second Tranche Call Option would "obligate Taylor Sports Group to exercise its drag rights," Orbit's Tag-Along Rights would never come into play. *Id.* ¶ 67, Ex. G at 2. In line with that view, the Taylor entities have not sent the Limited Partners a "Sale Notice" as contemplated in section 10.7(b) of the Partnership Agreement, nor have they "act[ed] on Orbit's Tag-Along Notices" by using commercially reasonable efforts to obtain the Buyer's consent to Orbit's participation in the June 30 closing. *Id.* ¶¶ 96–99.

After the Parties were unable to resolve this disagreement, Orbit filed a lawsuit on May 26, 2021. ECF No. 1. It alleges that Defendants have breached the Partnership Agreement by failing to honor its Tag-Along Rights and have breached an implied duty of good faith and fair dealing by structuring the Purchase Agreement "in a wrongful effort to circumvent" its Tag-Along Rights. *Id.* ¶¶ 108–23. It seeks a declaratory judgment, injunctive relief, and monetary damages "believed to total at least $300,000,000.00." *Id.* ¶¶ 124–36 and p. 32–33. Orbit then followed up with a motion for a preliminary injunction, specific performance, and an expedited briefing schedule on June 11. Specifically, Orbit seeks an order:

> (i) temporarily and preliminarily enjoining [D]efendants Glen Taylor, Taylor Corporation and Taylor Sports Group, Inc. (collectively, the "Taylor Parties") from transferring their Partnership Interests with respect to [the Partnership] pending further Order of this Court or, alternatively, directing the Taylor Parties to deposit into Court any proceeds obtained from the transaction proposed by the Taylor Parties (the "Proposed Transaction") involving Purple Buyer Holdings, LLC, Alex Rodriguez and Marc Lore (collectively, the

"Buyer"); (ii) granting specific performance of the Taylor Parties' contractual obligation not to transfer their Partnership Interests unless and until Orbit's Tag-Along Rights . . . are honored, unless all Partners (including Orbit) provide their consent to the proposed amendment of the Partnership's management and control mechanisms, and unless the Taylor Parties comply with the restrictions in the Partnership Agreement regarding Transfers . . .; and (iii) scheduling an expedited briefing schedule and hearing on a motion for summary judgment to be filed by Orbit, so that the issues in dispute can be expeditiously addressed and resolved by this Court.

Pl.'s Mot. at 1–2 [ECF No. 12]; Proposed Order [ECF No. 18].

On the same day that Orbit filed its motion, Defendants moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. Defs. Mot. [ECF No. 19]; *see* Fed. R. Civ. P. 12(b)(6).[7]  After the Parties appeared by telephone for an informal status conference, both motions were scheduled to be heard at the same expedited hearing, and an accompanying briefing order was entered. ECF No. 29.

II

The motion to dismiss will be addressed first. In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792 (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ."

---

[7]     Defendants also request a stay of discovery. *See* Defs.' Mem. in Supp. at 30–31 [ECF No. 22]. Generally, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Fed. R. Civ. P. 26(d)(1). Given that general rule and the resolution of the present motions, Defendants' request for a stay of discovery will be denied as moot.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

Start with Orbit's breach-of-contract claim.  The Parties agree that Minnesota law applies based on a Minnesota choice-of-law provision in the Partnership Agreement. Partnership Agreement, Third Am. at 11 ¶ 15; *see* Defs.' Mem. in Supp. at 18–19 [ECF No. 22]; Pl.'s Mem. in Supp. at 15 n.1 [ECF No. 14].  The elements of a breach-of-contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Defendants only contest the third element.  In its Complaint, Orbit alleges that Defendants have breached the Partnership Agreement by failing to honor its Tag-Along Rights with respect to the June 30 closing.  Compl. ¶¶ 108–16.  Defendants believe Orbit has no such rights.

The Parties' arguments require careful interpretation of both the Partnership Agreement and the Purchase Agreement.[8]  Under Minnesota law, "the primary goal of contract interpretation is to determine and enforce the intent of the parties."  *Motorsports*

---

[8]     The Purchase Agreement contains its own Minnesota choice-of-law provision. Purchase Agreement § 16.6.

*Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When contract language is unambiguous, the "language must be given its plain and ordinary meaning[.]" *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted). A contract is ambiguous only when its terms are "susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). "[C]ourts should 'construe a contract as a whole'" and "'attempt to avoid an interpretation of the contract that would render a provision meaningless.'" *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754–55 (8th Cir. 2018) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525, 526 (Minn. 1990)).

1

Orbit's claim rests on a premise: that a "Control Sale" will occur at the June 30 closing. *See* Pl.'s Mem. in Opp'n at 11 [ECF No. 33]. That premise does not reflect a reasonable reading of the Partnership Agreement. Recall that a Control Sale is a "sale, exchange, or other disposition . . . , in a single transaction or series of related transactions, . . . of Partnership Interests which includes a majority of all the General Partnership Interests[.]" Partnership Agreement § 1.9C. The Buyer will not purchase— and Defendants will not relinquish—any general-partnership interests at the June 30 closing. *See* Purchase Agreement § 2.1(a). But Defendants will grant the Buyer an option to acquire all of the general–partnership interests at a later date. *Id.* § 2.1(b). This raises the question whether the grant of an option to acquire partnership interests is a "sale,

exchange, or other disposition" of those interests.   Neither Party has cited Minnesota authority addressing this precise question.

The ordinary meaning of all three words—"sale," "exchange," and "disposition"—presupposes a transfer or conveyance of something.   A "sale" is "an exchange of goods or services for an amount of money or its equivalent[.]"   *Sale*, The American Heritage Dictionary of the English Language (5th ed.), https://www.ahdictionary.com/word/search.html?q=sale (last visited June 29, 2021); *accord Sale*, Black's Law Dictionary (11th ed. 2019) ("The transfer of property or title for a price.").   An "exchange" is "[t]he act" of "giv[ing] something in return for something received."   *Exchange*, The American Heritage Dictionary of the English Language (5th ed.), https://www.ahdictionary.com/word/search.html?q=exchange (last visited June 29, 2021); *accord Exchange*, Black's Law Dictionary (11th ed. 2019) ("The act of transferring interests, each in consideration for the other.").   And a "disposition," in this context, is "a bestowal or transfer to another."   *Disposition*, The American Heritage Dictionary of the English Language (5th ed.), https://www.ahdictionary.com/word/search.html?q=disposition (last visited June 29, 2021); *accord Disposition*, Black's Law Dictionary (11th ed. 2019).

Orbit seems to disagree and argue that "disposition" means something broader than "sale" and "exchange."   *See* Pl.'s Mem. in Opp'n at 13–15.   But if that understanding of the word works in a vacuum, it still doesn't work in this context.   When a catchall term like "other disposition" follows a series of specific words, the "[g]eneral words are construed to be restricted in their meaning by [the] preceding particular words."   *Brookdale Pontiac-*

*GMC v. Federated Ins.*, 630 N.W.2d 5, 10 (Minn. Ct. App. 2001) (quoting Minn. Stat. § 645.08, subd. 3).

At least one Minnesota court, confronted with a similar phrase appearing in a statute, has applied the same reasoning. *In Bremer Bank, Nat'l Ass'n v. Matejcek*, the Minnesota Court of Appeals addressed a provision of the Uniform Commercial Code that allows a secured party to "sell, lease, license, or otherwise dispose of any or all of the collateral" upon a debtor's default. 916 N.W.2d 688, 693 (Minn. Ct. App. 2018) (quoting Minn. Stat. § 336.9-610(a)). Relying on the *ejusdem generis* canon cited above, the court held that a secured party who "consented to [the debtor's] sale of" the collateral—a motorhome—did not "otherwise dispose of" the motorhome because it "did not enter into a transaction to transfer ownership or possession of" it. *Id.* at 695; *see also Weisbart & Co. v. First Nat'l Bank*, 568 F.2d 391, 395–96 (5th Cir. 1978) (addressing a similar provision); *Fodale v. Waste Mgmt. of Mich., Inc.*, 718 N.W.2d 827, 834–35 (Mich. Ct. App. 2006) (same); *Silverberg v. Colantuno*, 991 P.2d 280, 288–89 (Colo. Ct. App. 1998) (same).[9]

The upshot is that, under the Partnership Agreement, a Control Sale only occurs when there is an actual transfer of "Partnership Interests which includes a majority of all the General Partnership Interests." Partnership Agreement § 1.9C. And a "Partnership Interest" consists of "the *entire* ownership interest of a Partner in the Partnership at any

---

[9]    Orbit argues that *Bremer Bank* is distinguishable because the UCC specifically defines the words "sale" and "lease" to require transfers of property. Pl.'s Mem. at 17–18 (citing Minn. Stat. §§ 336.2A-103(1)(j) & (2), 336.2-106(1)). The court in *Bremer Bank* did not explicitly rely on these definitions, but either way, as explained above, the plain meaning of "sale" and "exchange"—independent of any statutory definitions in the UCC— requires a transfer.

particular time[.]" *Id.* § 1.21 (emphasis added).  With that understanding, the June 30 grant of an option to acquire general-partnership interests does not fit the bill.  An option is a "unilateral undertaking to keep an offer open for a period of time," but Minnesota courts have made clear that an option "conveys no interest in its subject matter until the optionee effectively exercises it."  *Abrahamson v. Abrahamson*, 613 N.W.2d 418, 423 (Minn. Ct. App. 2000) (citing *M.L. Gordon Sash & Door Co. v. Mormann*, 271 N.W.2d 436, 439 (Minn. 1978)); *accord* 1 Williston on Contracts § 5:16 (4th ed. May 2021 Update).  So, when Defendants extend the Buyer an option on June 30 to acquire general-partnership interests, there will be no agreement for the transfer of those interests.  No transfer—and thus no Control Sale—will occur unless and until the Buyer exercises the Second Tranche Option and a closing occurs sixty to ninety days after that.  *See* Purchase Agreement §§ 6.1(b)(2), 6.3; *see also City of Tuskegee v. Sharpe*, 288 So.2d 122, 133–34 (Ala. 1973) ("Granting to another an option to purchase land . . . is not a disposition of the property.").

Orbit's counterarguments do not change this conclusion.  First, acknowledging that a "sale, exchange, or other disposition" might require some kind of transfer, Orbit points out that the Partnership Agreement defines the word "Transfer."  Pl.'s Mem. in Opp'n at 15–18.  That definition encompasses an "encumbrance, pledge, hypothecation, . . . or any other disposition of all or any portion of a Partnership Interest or any interest therein," Purchase Agreement § 1.27, and Orbit believes it is broad enough to include options.  The problem with this argument is that the word "Transfer" does not appear anywhere in the definition of "Control Sale" or the provision defining Tag-Along Rights.  *See* Partnership Agreement §§ 1.9C, 10.7(a).  The Parties could, for example, have defined a Control Sale

18

as a "Transfer of a majority of General Partnership Interests."  That they did not do so suggests that they intended for "Control Sales" to mean a narrower set of transactions than "Transfers."[10]

Second, Orbit argues that a Control Sale will occur at the June 30 closing because the transfer of a 20% ownership share in limited-partnership interests is just "the first of a series of related transactions that includes a majority of all [General Partnership] Interests." Pl.'s Mem. in Opp'n at 11.  It is true that a Control Sale may occur "in a single transaction or a series of related transactions," but either way, it must still be a "sale, exchange, or other disposition."  Partnership Agreement § 1.9C.  The possibility that a Control Sale may play out over a "series of related" "sale[s], exchange[s], or other disposition[s]" does not overcome the primary flaw in Orbit's claim: that granting an option is not a "sale, exchange, or other disposition."

Third, Orbit asserts that there will be a transfer here because an option is itself a property right with value.  By temporarily relinquishing the right to sell their Partnership Interests to someone else, it says, Defendants will diminish the value of those interests.[11] *See* Pl.'s Mem. in Opp'n at 14.  Orbit is correct that an option may carry independent value, *see Sanderson v. City of Willmar*, 162 N.W.2d 494, 497 (Minn. 1968) ("[T]he right to sell

---

[10]    Orbit's argument that other parties in other cases have included options as a type of "disposition" in their contracts fails for the same reason.  *See* Pl.'s Mem. in Supp. at 19 n.3.  The Parties could have, but did not, do something similar in this case.

[11]    There is reason to doubt this premise.  As Defendants point out in their reply brief, a provision of the Purchase Agreement may allow them to transfer their partnership interests to a third party so long as that third party agrees to assume Defendants' obligations to the Buyer.  Purchase Agreement § 16.3; *see* Defs.' Reply Mem. at 1 [ECF No. 35].

one's property to anyone at any time for any price is a property right."), but that is beside the point for purposes of this case.  A Control Sale requires a "sale, exchange, or disposition . . . *of Partnership Interests*."  Partnership Agreement § 1.9C (emphasis added).  And a Partnership Interest is a partner's "*entire* ownership interest . . . in the Partnership."  *Id.* § 1.21 (emphasis added).  So, it may well be that, in granting an option to acquire his Partnership Interests, Defendants will be transferring something of value to the Buyer.  But that "something" is not a "Partnership Interest."

Finally, Orbit points to public and private statements that Taylor has made since he entered into the Purchase Agreement.  Taylor has allegedly portrayed the Purchase Agreement as a final sale of the team rather than an initial sale of a partial ownership interest followed by a series of options that the Buyer may or may not exercise.  *See* Compl. ¶¶ 73–78.  But when, as here, a contract's language is unambiguous, this type of extrinsic evidence has no role to play in determining the contract's meaning.  *See Staffing Specifix*, 913 N.W.2d at 692.

2

Concluding that no Control Sale will occur at the June 30 closing is not the end of the story.  That's because, under section 10.7 of the Partnership Agreement, a Limited Partner can exercise its Tag-Along Right before a Control Sale has actually occurred.  Two conditions must be met to trigger the right: (1) the Taylor Group must "propose[] to enter into a Control Sale," and (2) the Taylor Group must "not exercise the Drag-Along Right . . . with respect to such sale."  Partnership Agreement § 10.7(a).  A Drag-Along Right may come into play even earlier—*i.e.*, when the Taylor Group simply "desires to approve or

20

consummate" a Control Sale. *Id.* § 10.8(a). Reading these provisions alongside one another makes clear how they are to work together: when a Control Sale is on the horizon, the Taylor Group first gets to decide whether to exercise the Drag-Along Right. If it does not exercise the Drag-Along Right, then the non-Taylor Limited Partners have a chance to exercise their Tag-Along Rights.

Whether or not a Control Sale has been "propose[d]" in the relevant sense,[12] the second requirement poses a problem for Orbit. Recall that the Partnership Agreement says what the Taylor Group must do to exercise the Drag-Along Right. "[N]ot less than fifteen (15) days prior to the consummation date of the" Control Sale, it must "give written notice" of the Sale to the Limited Partners. *Id.* § 10.8(b).[13] Orbit argues that the consummation date of the Control Sale is June 30 and that Taylor therefore has waived the Drag-Along Right by failing to timely exercise it. *See* Pl.'s Mem. in Opp'n at 19. As explained above, however, no Control Sale will occur at the June 30 closing. The Control Sale will occur, if at all, at the closing on the Second Tranche Call Option. Even if the Buyer were to exercise the first two Call Options simultaneously and as quickly as possible, the closing

---

[12]    Under section 10.1 of the Partnership Agreement, "[n]o proposed Transfer . . . will be effective for any purpose" unless the NBA has given "any required consents" to the Transfer. Based on this provision, Defendants argue that the Control Sale here cannot be "propose[d]" within the meaning of section 10.7(a)—thereby triggering Orbit's Tag-Along Rights—until the NBA has approved the closing on the Second Tranche Call Option. Defs.' Mem. in Supp. at 23–24. It is not necessary to address this argument because, as discussed below, Defendants still have time to exercise the Drag-Along Rights.

[13]    The Parties do not explore in their briefing how the respective deadlines and procedures for exercising the Drag-Along Rights and Tag-Along Rights interact and how they might overlap with one another. There is no reason to believe those issues affect the outcome of these motions.

would occur at least sixty days after June 30, subject to NBA Approval.  *See* Purchase Agreement §§ 6.1(c), 6.3.  This means that the Taylor Group still has time to exercise the Drag-Along Right, so it is impossible to say that it has "not exercise[d]" it.  Because Defendants' non-exercise is a necessary precondition of the Tag-Along Right, Orbit's breach-of-contract claim fails.

B

Now move to Orbit's other claim: that Defendants violated their duty to act in good faith under the Partnership Agreement by structuring the Purchase Agreement to hinder Orbit's ability to exercise its Tag-Along Rights.  Compl. ¶¶ 117–23.  "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract."  *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.  1995) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)); *see also* Restatement (Second) of Contracts § 205 (Am. Law Inst. June 2021 Update).  The duty "governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract."  *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th Cir. 2006).  "[A] plaintiff alleging a claim for breach of the implied covenant of good faith and fair dealing 'need not first establish an express breach of contract claim—indeed, a claim for breach of an implied covenant of good faith and fair dealing implicitly assumes the parties did not expressly articulate the covenant allegedly breached."  *Cox v. Mortg. Elec.*

22

*Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012) (quoting *Hennepin Cnty.*, 540 N.W.2d at 503).

Whether a party has acted in bad faith is generally a question of fact reserved for the fact-finder, *see Anderson v. Medtronic, Inc.*, 382 N.W.2d 512, 515 (Minn. 1986), but that does not relieve a plaintiff of the burden to allege facts plausibly showing bad faith, *see Miles v. Simmons Univ.*, __ F. Supp. 3d __, No. 20-cv-2333 (ECT/KMM), 2021 WL 195798, at *3 (D. Minn. Jan. 20, 2021) ("A rule excluding fact questions from consideration on a Rule 12(b)(6) motion to dismiss would not faithfully reflect federal pleading standards."). Examples of the type of conduct that may constitute bad faith include:

> wrongfully repudiating a contract, avoid[ing] performance by affirmatively blocking the happening of a condition precedent, refusing to allow a party to perform unless the performing party waived other contractual rights, and using a party's rejection of an offer as a defense to contract liability when the defendant persuaded the party to reject the offer in the first place.

*Cox*, 685 F.3d at 671 (internal quotation marks and citations omitted).

Orbit's claim is based on its belief that the Tag-Along Rights serve two purposes. They "protect[] against a deal structure that might impair the value of the Limited Partnership Interests over time or subject the Limited Partners to indeterminate credit risk, whether due to the passage of time, the impact of purchase price adjustments, the incurrence of additional debt obligations by the Partnership, changes in tax law, or otherwise." *Id.* ¶ 45. And they "ensure that no [L]imited [P]artner will be forced to remain in the Partnership without having a say in the identity of the General Partner." Compl.,

Ex. E at 2.  To achieve these goals, it argues, the Tag-Along Rights allow limited partners to sell their Partnership Interests before Taylor may sell any of his own.  *See* Pl.'s Mem. in Opp'n at 22.  And Taylor allegedly "structured the [Purchase Agreement] in a wrongful effort to circumvent" these rights.  Compl. ¶ 120.

Orbit has not plausibly alleged the type of bad-faith conduct that would violate the covenant of good faith and fair dealing.  First, although it is not the end of the discussion, it is worth acknowledging that nothing in the Partnership Agreement prohibits what Defendants have done.  No provision stops them from using options to structure a potential transaction or from selling some of their limited-partnership interests before entering into a Control Sale to unload their general-partnership interests.

Second, none of the quintessential examples of bad-faith conduct are alleged here.  *See Cox*, 685 F.3d at 671.  Defendants have not wrongfully repudiated the Partnership Agreement, improperly extracted a waiver of rights from Orbit, or "fail[ed] to perform" any of their own obligations "for the purpose of thwarting" Orbit's rights.  *Team Nursing Servs.*, 433 F.3d at 641–42.  At most, Defendants have structured the deal such that a Control Sale will occur later than it may otherwise have occurred.

That ushers in the third point: the Partnership Agreement does not seem to give Orbit the per se right to sell immediately at the outset of a Control Sale.  The implication of Orbit's allegations is that the call-option arrangement is a sham and that the Buyer has already functionally agreed to purchase the entire Partnership in a series of related transactions.  But if that were true, the Partnership Agreement would not seem to require that Orbit be allowed to sell *all* of its partnership interests before Taylor sold *any* of his

own.  If a Control Sale triggers the Tag-Along Right and a Limited Partner exercises it, the Taylor Group must "use commercially reasonable efforts to obtain the agreement of the Prospective Purchaser to the participation of" the Limited Partner in the Control Sale. Partnership Agreement § 10.7(d)(i).  If the Buyer agrees, then the Partnership Agreement has nothing more to say on the matter.  In theory, the Buyer could agree to purchase the Limited Partner's interests at the end of a "series of transactions" constituting a Control Sale, and no provision would seem to prohibit that arrangement.  It is only if the Buyer "declines to allow the participation of the Limited Partner" or "elects to purchase less than all of the Partnership Interests sought to be sold" that Taylor must give priority to the Limited Partners' interests.  *Id.* § 10.7(d)(ii)–(iii).  In short, it is not clear that Orbit—even under its own theory—was deprived of the right it asserts.

Finally, Taylor's undisputed commitment to exercise the Drag-Along Right seriously undermines Orbit's allegation that he has acted in bad faith in the relevant sense. *See* Purchase Agreement §§ 2.1(b)(ii).  It means that Orbit will sell its interests if a Control Sale ever occurs, and that seems to be Orbit's primary goal in this case.  At most, Orbit has alleged that Defendants structured the transaction to favor their own interests.  It cites *Strategic Energy Concepts, LLC v. Otoka Energy, LLC*, for the proposition that a party may not "restructure" transactions to avoid triggering a condition precedent that would require it to pay another party money owed under a contract.  No. 16-cv-463 (MJD/BRT), 2016 WL 7627040, at *11 (D. Minn. Nov. 18, 2016), *report and recommendation adopted*, 2017 WL 29663 (D. Minn. Jan. 3, 2017).  The behavior at issue in *Strategic Energy* is not what we have here.  There, the defendants "deliberately" delayed completion of a power

plant so that the plant could not become "fully operational," a condition precedent to the plaintiff receiving the first in a series of installment payments. *Id.* at *4. The defendants then signed a "side agreement" that put it "in an advantaged position relative to" the plaintiff. *Id.* The side agreement eventually resulted in "all entities budgeted to be paid from the installment payments under the" original agreement being paid, except for the plaintiff. *Id.* Orbit has not alleged anything like that degree of improper conduct. Defendants' decision to structure the Purchase Agreement the way they did may delay Orbit's ability to sell, but it does not amount to bad faith.[14]

C

Orbit asks that any dismissal be without prejudice so that it can have an opportunity "to file an amended pleading pursuant to [Federal Rule of Civil Procedure] 15(a)." Pl.'s Mem. in Opp'n at 28. Rule 15(a) encourages courts to grant leave to amend "when justice so requires," and the Eighth Circuit has said that "parties should usually be given at least one chance to amend their complaint," *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999). At the same time, however, "parties should not be allowed to amend their

---

[14] In its Complaint, Orbit listed "declaratory judgment" and "injunctive relief" as separate counts. These are remedies, not separate causes of action. *See Far E. Aluminium Works Co. v. Viracon, Inc.*, __ F. Supp. 3d __, No. 20-cv-2000 (DSD/DTS), 2021 WL 663728, at *6 (D. Minn. Feb. 19, 2021); *Christensen v. PennyMac Loan Servs., LLC*, 988 F. Supp. 2d 1036, 1046 (D. Minn. 2013). In any event, both are premised on Orbit's substantive claims, and because it has not plausibly alleged those claims, it has not plausibly alleged a basis for these remedies.

complaint without showing how the complaint could be amended to save the meritless claim." *Id.*

The dismissal of Orbit's Complaint will be with prejudice. The primary weakness in its claims is a flawed interpretation of the Partnership Agreement, and to that extent, Orbit's problem "is a legal one, not a factual one." *Essentia Health v. ACE Am. Ins. Co.*, __ F. Supp. 3d __, No. 21-cv-207 (ECT/LIB), 2021 WL 2117241, at *7 (D. Minn. May 25, 2021). Orbit has never sought to formally amend its Complaint, and despite the numerous exhibits attached to the Complaint and thorough briefing on two separate motions, it has not shown what changes it would make to address the issues that Defendants have raised. Under these circumstances, the interests of justice do not require granting leave to amend.[15]

## III

Next is the motion for a preliminary injunction. A court considering a motion to dismiss and a motion for a preliminary injunction simultaneously will commonly deny the motion for a preliminary injunction as moot if it determines that dismissal is appropriate. *See, e.g.*, *Heights Apartments, LLC v. Walz*, __ F. Supp. 3d __, No. 20-cv-2051 (NEB/BRT), 2020 WL 7828818, at *17 (D. Minn. Dec. 31, 2020). Given the nature of this case—most notably its compressed timeline and the possibility of an expedited appeal—it is worth separately addressing the merits of Orbit's motion for a preliminary injunction.

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.

---

[15]    Because Orbit's claims will be dismissed with prejudice, its request for an expedited hearing and briefing schedule on a motion for summary judgment is moot.

2003).   The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citation omitted).   The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (footnote omitted).   "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp.*, *Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

## A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted).   Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807.   And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts[.]" *Id.*   "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied[.]" *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

28

As discussed above, Orbit has not shown that it is likely to succeed on the merits of the claims it raised in the Complaint.  That analysis will not be repeated here.  In its brief in support of the motion for a preliminary injunction, however, Orbit argues that Defendants have breached two other provisions of the Partnership Agreement.  The provisions in question prohibit a Limited Partner from "participat[ing] or interfer[ing] in the management or control of the Partnership business," Partnership Agreement § 9.3, and require the consent of all partners for any amendment to the Partnership Agreement that "alter[s] the allocation of Partnership management responsibilities and control," *id.* art. XVI.  To support this claim, Orbit points to two provisions of the Purchase Agreement that are apparently designed to facilitate the transition in management of the Partnership from Taylor to Rodriguez and Lore.

1

The first challenged provision sets up an "Advisory Board" after the June 30 closing that will "advise the General Partner on significant financial and operational matters[.]"  Orbach Decl., Ex. M at 3 [ECF No. 15-13].  The Board will be "selected by the limited partners," and both Taylor and the Buyer agreed to "vote their respective limited partnership interests in favor of two (2) representatives designated by" the Buyer.[16]  *Id.*  The General Partner must "present to the Advisory Board for discussion before causing the [Partnership] . . . to take any of" a list of specified actions, but the Advisory Board is

---

[16]    In a letter to Orbit, Taylor indicated that Rodriguez and Lore will have seats on the Advisory Board.  Compl., Ex. G at 2 [ECF No. 4-7].

29

"advisory only and no action by the [Partnership] . . . requires the approval, in any form, by the Advisory Board to be effective." *Id.* at 2–3.

Orbit has not shown that the presence of these provisions in the Purchase Agreement likely constitutes a breach of the Partnership Agreement. The Purchase Agreement requires only that the General Partner "present" certain proposed actions to the Advisory Board "for discussion." If there were any doubt about the nature of the Board's power (or lack thereof), the Agreement confirms that the Board's function "is advisory only." Orbach Decl., Ex. M at 3. A prohibition on "participat[ing] or interfer[ing] in the management or control of the Partnership business" cannot reasonably be understood to extend to the giving of advice. If it did, the General Partner could never even solicit and receive the input of a Limited Partner on a matter of Partnership business.

2

The second challenged provision says that Rodriguez and Lore will be designated as "Alternate Governors" to represent the teams with the NBA. Orbach Decl., Ex. M at 3. The NBA Constitution creates a Board of Governors to carry out "the general supervision of the affairs of the Association." Orbach Decl., Ex. N at 33 [ECF No. 15-14]. Each Member—*i.e.*, team—must designate a Governor who is "an Owner, or a director, officer or authorized employee of such Member." *Id.* at 33–34. The Member must also "submit to the [NBA] Commissioner . . . the names of up to three Alternate Governors . . . who shall be persons qualified to serve as Governors[.]"[17] *Id.* at 34. "For purposes of [the NBA]

---

[17]    The NBA Constitution defines "Owner" to include an "individual or Entity . . . that, directly or indirectly, . . . owns of record or beneficially *an interest in* . . . a Member[.]" *Id.*

Constitution and By-Laws, any action that may be taken by a Governor may be taken in his or her absence by an Alternate Governor . . ., and such action shall have the same force and effect as an action taken by the Governor." *Id.* at 1. According to an uncontested affidavit from an NBA representative, "appointment as an Alternate Governor does not provide the appointee with any control rights with respect to a team." Maczko Decl. ¶ 8 [ECF No. 31].

On this record, it is also not likely that Rodriguez and Lore's impending status as Alternate Governors violates the Partnership Agreement. The Partnership Agreement does not appear to say anything about who may or may not be Alternate Governors. It does say, however, that the General Partner may "take any and all actions it deems necessary or prudent to comply with NBA Regulations." Partnership Agreement § 7.1(b). In light of this broad authority and the fact that Alternate Governors lack "any control rights with respect to [the] team[s]," Maczko Decl. ¶ 8, there is no reason to believe that the Partnership Agreement prevents Taylor from designating Rodriguez and Lore—or any other Limited Partner for that matter—as an Alternate Governor.

B

The second *Dataphase* factor is irreparable harm, which "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312,

---

at 2 (emphasis added). When Rodriguez and Lore acquire a 20% ownership interest in the Partnership at the June 30 closing, it appears that they will be "Owner[s]" under this definition and therefore will be qualified to serve as Alternate Governors.

319 (8th Cir. 2009). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (internal quotation marks and citation omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Orbit argues that it will suffer two forms of irreparable harm. First, it asserts that, without judicial intervention, its "bargained-for rights as a minority investor will be erased." Pl.'s Mem. in Supp. at 24. Put differently, if it can't exercise its Tag-Along Rights, it will "be forced to remain a Limited Partner throughout a 'transition of ownership' over which it has no say and no control." *Id.* at 25. Second, Orbit asserts that it faces a threat of "unrecoverable economic loss" because, even if it succeeds in obtaining a monetary judgment, Taylor will be unable to pay it. *Id.* at 27.

Neither argument is persuasive. Some courts, it is true, have said that "the loss of [an investor's] bargained-for minority rights independently satisf[ies] the irreparable harm requirement." *Alcatel Space, S.A. v. Loral Space & Commc'ns Ltd.*, 154 F. Supp. 2d 570, 584 (S.D.N.Y. 2001). Here, Orbit has not plausibly alleged that it will be deprived of its Tag-Along Rights, much less shown a likelihood of success on that merits question.

32

Setting that aside, however, there are other problems. Orbit primarily asserts the right "to receive payment for its Partnership Interests at an enterprise value of $1.5 billion[.]" Pl.'s Mem. in Supp. at 27. A money damages award can vindicate that right. Indeed, the Purchase Agreement's pricing formula and the breakdown of each Limited Partner's percentage interest would seem to provide a straightforward way to calculate Orbit's damages. At bottom, in other words, "this case is about money." *Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016). Moreover, the record shows that that Orbit will not "be forced to remain a Limited Partner throughout a 'transition of ownership' over which it has no say and no control." Pl.'s Mem. in Supp. at 25. Notwithstanding Defendants' public and private representations that the sale is a sure thing, the Purchase Agreement makes clear that no transition of control will occur unless and until the Buyer actually exercises the Second Tranche option. Each separate Call Option transaction is subject to separate NBA approval, among other conditions, and there is no telling what unforeseen circumstances might cause the Buyer to decline the Call Options in the future. Finally, it bears repeating that, if everything in the Purchase Agreement goes according to Defendants' plan, Defendants will exercise their Drag-Along Right, ensuring that Orbit can sell its interests in their entirety and on the same terms that Taylor sells his own. Without more, the fact that Orbit doesn't yet know *when* it will sell its partnership interests does not give rise to an imminent threat of irreparable harm.

Orbit has not adequately supported its argument that Defendants will be unable to satisfy a money judgment. True, "[t]he Eighth Circuit has held that the threat of

unrecoverable economic loss due to a company's bankruptcy or insolvency can constitute irreparable harm." *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, No. 02-cv-213 (JRT), 2002 WL 649086, at *4 (D. Minn. Apr. 17, 2002) (citing *Iowa Utils. Bd.*, 109 F.3d at 425–26). In assessing whether economic loss is unrecoverable, courts consider both "the [non-movant's] resources and the potential magnitude of eventual damages." *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (citation omitted). No doubt the Parties in this case are fighting over a great deal of money; Orbit claims it is entitled to $300,000,000. Compl. at 33 ¶ 5. But Defendants also appear to have substantial resources. Taylor's net worth, for example, is estimated at $2.9 billion. Defs.' Mem. in Opp'n at 25. And if the June 30 closing goes through, Taylor will have an influx of cash. Orbit asserts that "the Taylor Parties have a consistent history of illiquidity"; that Taylor pursued the Purchase Agreement because he "needs the money"; that Taylor is a defendant in two other pending lawsuits; and that, without an injunction, Taylor "may freely transfer the proceeds" of the June 30 closing "to third parties[.]" Pl.'s Mem. in Supp. at 27–28 (citing Orbach Decl. ¶¶ 89, 95 [ECF No. 15]). Orbit does not back these statements up with any hard evidence, however, and without more, it has not met its burden to show unrecoverable economic loss.[18] *See Hollywood Healthcare Corp. v. Deltec, Inc.*, No. 04-cv-1713

---

[18]   For the first time in its reply brief, Orbit requests expedited discovery on the question of Taylor's financial liquidity. Pl.'s Reply Mem. at 5 [ECF No. 34]. That request is denied. It is true that "some courts have found that expedited discovery is appropriate . . . when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1057 (D. Minn. 2019) (internal quotation marks and citations omitted). But expedited discovery is the exception, not the rule. In this case, the requested discovery would not

(RHK/AJB), 2004 WL 1118610, at *11 (D. Minn. May 17, 2004) (denying preliminary injunction where the moving party "made no showing that" the non-moving party was "bankrupt or insolvent," even though it had shown that the non-moving party had failed to pay invoices and laid off its sales force and that its president has been "indicted in an unrelated matter"). In short, Orbit has failed to show an immediate threat of irreparable harm, and were its claims not being dismissed, this would be an "independently sufficient ground" to deny the motion for a preliminary injunction. *Watkins, Inc.*, 346 F.3d at 844.

C

Next is the balance-of-harms factor. This involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015). This factor does not favor an injunction. Accepting that Orbit may suffer some economic harm by being forced to sell its partnership interests later rather than sooner, Defendants could suffer harm on an even greater scale. The Purchase Agreement says that "time is of the essence," and it allows the Buyer to terminate the agreement without cause if it becomes impossible to close by July 31, 2021. Purchase Agreement §§ 14.1, 16.9. Given these provisions, an injunction could cause enough disruption to tank the entire deal, potentially causing Defendants to lose out on their substantial portion of the Partnership's

---

affect the outcome of the motion, and the fact that Orbit waited until the last possible minute to request it weakens the argument that it is necessary.

$1.5 billion enterprise valuation.[19]   Orbit minimizes any harm to Defendants as "self-inflicted" because of their failure to honor its Tag-Along Rights.  Pl.'s Mem. in Supp. at 29.  Given Defendants' contractual obligation to exercise their Drag-Along Rights in the event the Buyer exercises the Second Tranche option—an obligation which ensures that Orbit will be put in largely the same place as if it had exercised a Tag-Along Right—this argument carries little weight.[20]

D

The final *Dataphase* factor—the public interest—has little bearing on the outcome of this motion.  Both Parties assert that the public interest in "judicial enforcement of contracts between private parties," *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 924 (D. Minn. 2018), is on their side.  Because Defendants have the better reading of the Partnership Agreement, this factor does not weigh in favor of injunctive relief.  Either way, however, this case "implicates primarily business interests" rather than "public rights." *Prairie Field Services, Inc. v. Welsh*, 497 F. Supp. 3d 381, 405 (D. Minn. 2020) (citation omitted).  To be sure, plenty of professional basketball fans may be interested in the outcome.  Orbit's allegation that nothing in the Purchase Agreement keeps the Buyer from "mov[ing] the Timberwolves and Lynx outside of Minnesota," *id.* ¶ 91, seems especially

---

[19]   Orbit argues that this risk could be mitigated by its alternative suggestion: that the proceeds of the June 30 closing be placed in escrow pending the adjudication of its claims. Whatever the merit of this argument, it underscores that the Parties are primarily fighting about money.

[20]   Whether considered as part of the balance of the equities or the public interest, it is worth noting that the other non-Taylor Limited Partners—none of whom has joined Orbit's lawsuit—would also stand to lose money if the Purchase Agreement were to fall through.

likely to raise eyebrows.  But that allegation has nothing to do with the legal claims in this case.  Those claims—and the interests that the Parties assert—concern private economic issues.[21]

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motion to Dismiss [ECF No. 19] is **GRANTED**.

2. Plaintiff's Motions for a Temporary and Preliminary Injunction, Specific Performance, and an Expedited Briefing Schedule and Hearing on Motion for Summary Judgment [ECF No. 12] is **DENIED**.

3. This action is **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 1, 2021                              s/ Eric C. Tostrud
                                                                  Eric C. Tostrud
                                                                  United States District Court

---

[21]    Apart from its request for a preliminary injunction, Orbit seeks "specific performance" of the Partnership Agreement provisions it believes Defendants have violated.  Pl.'s Mem. in Supp. at 30–33.  These requests do not appear to differ from one another in any legally relevant way.  Because the *Dataphase* factors do not favor preliminary injunctive relief in this case, Orbit's request for specific performance will be denied.