UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---------------------------------------------------------------
                                  )
Orbit Sports, LLC,                ) CIVIL FILE
                                  ) NO. 21-CV-1289 (ECT/TNL)
                  Plaintiff,      )
                                  )
          vs.                     )
                                  )
Glen Taylor; Taylor Corporation; )
and Taylor Sports Group, Inc.,    ) Courtroom 3B
                                  ) Wednesday, June 30, 2021
                  Defendants.     ) St. Paul, Minnesota
                                  ) 1:00 P.M.
---------------------------------------------------------------

**<u>HEARING ON</u>**


**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
**- and -**
**DEFENDANTS' MOTION TO DISMISS**



BEFORE THE HONORABLE ERIC C. TOSTRUD
UNITED STATES DISTRICT JUDGE









**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S :**


**For the Plaintiff:**        **GREENBERG TRAURIG, LLP**
                       By:  MICHAEL M. KRAUSS, ESQUIRE
                            PAUL H. SCHAFHAUSER, ESQ. (NJ)
                            PETER D. KIESELBACH, ESQUIRE
                       90 South Seventh Street - Suite 3500
                       Minneapolis, Minnesota  55402



**For the Defendants:**       **SAUL EWING ARNSTEIN & LEHR, LLP**
                       By:  ALAIN M. BAUDRY, ESQUIRE
                            COURTLAND C. MERRILL, ESQUIRE
                            LAUREN F. SCHOEBERL, ESQUIRE
                       33 South Sixth Street - Suite 4750
                       Minneapolis, Minnesota  55402

```
 1        (1:00 p.m.)

 2                    P R O C E E D I N G S

 3                       IN OPEN COURT

 4           THE COURT:  Good afternoon, everyone.  Please be

 5   seated.  This is Orbit Sports, LLC, versus Glen Taylor and

 6   others, Civil File Number 21-1289.

 7           I'll invite counsel to note their appearances for

 8   the record, please, starting with Plaintiff.

 9           MR. KRAUSS:  Good afternoon, Your Honor.  This is

10   Michael Krauss with Greenberg Traurig, LLP, for the

11   Plaintiff, Orbit Sports, LLC.  With me is my colleague Paul

12   Schafhauser, who's been admitted *pro hac vice*, and our

13   colleague Peter Kieselbach.

14           THE COURT:  Wonderful.  Good afternoon.

15           MR. KIESELBACH:  Good afternoon, Your Honor.

16           THE COURT:  All right.  And how about for

17   Defendants?

18           MR. BAUDRY:  Good afternoon, Your Honor.  Alain

19   Baudry and Courtland Merrill from Saul Ewing for the Taylor

20   party defendants, and to my left is Greg Jackson, General

21   Counsel of Taylor Corporation.

22           THE COURT:  Wonderful.  Good afternoon.

23           All right.  Let me just get a few ground rules out

24   there, and I appreciate that you may have heard some of this

25   before, but I think it's good to just remind everyone how
```

1    we'll do things today.

2         Since Orbit filed its motion first -- I know you

3    filed them on the same day -- Orbit will go first here today

4    in the hearing.  Though we normally use the podium, I'll ask

5    that you remain seated today when you make your arguments.

6    Please remove your masks when you're talking if you would.

7    It makes it a lot easier to create a record.

8         I understand that it's -- one or both of you may

9    have to use the document camera.  Obviously that's fine if

10   you have to come up to the podium for that.  Make sure that

11   your microphone's on and relatively close to you.

12        It's wonderful to see everybody here in person.

13   We've been doing this by Zoom for way too long and it's a

14   wonderful substitute, but it's not a perfect substitute, so

15   it's great to see everybody here live and in person.

16        One thing we have noticed is that folks have had a

17   tendency to be talking quite quickly, so please moderate

18   your pace as best you can so we create an accurate record

19   here today.

20        Let me ask before I go any further,

21   Mr. Schafhauser, if you'll be doing the arguing on behalf of

22   plaintiff, I take it?

23        MR. SCHAFHAUSER:  Your Honor, we've actually split

24   up, Mr. Krauss and I, the argument, so I'll be doing the

25   injunction motion.  Mr. Krauss will be doing the motion to

1    dismiss.

2              THE COURT:  Okay.  Let's -- any questions about

3    the instructions or directions that I've just given?  Any

4    concerns with any of that?

5              MR. SCHAFHAUSER:  None whatsoever, Your Honor.  We

6    understand and appreciate it.

7              THE COURT:  All right.  Great.  Mr. Baudry.

8              MR. BAUDRY:  Understood.

9              THE COURT:  Great.  All right.  Then let's

10   proceed.

11             MR. SCHAFHAUSER:  Thank you, Your Honor.

12             I must confess.  Sitting in front of a federal

13   judge is a little bit out of my league, but I will comply

14   with Your Honor's request under the circumstances.

15             Could you please put on the screen our exhibits.

16             Your Honor, we have prepared some documents which

17   we'll put on the screen, but just by way of preview, of

18   course the Court is aware that we are seeking a preliminary

19   injunction and also asking for specific performance of

20   certain terms in the Partnership Agreement.  There are

21   really four terms that we'll go through today that we

22   believe warrant specific performance.

23             I need not tell Your Honor what the standard is.

24   Your Honor is well familiar with it.  Of course, just

25   cutting to the chase here, I'd like to deal at some length

1    with the probability of success, because of course the

2    courts have recognized that probability of success is the

3    most important of the four factors, although we'll go

4    through all four.

5         In this case, Your Honor, I respectfully submit on

6    behalf of our client that we not only here have a reasonable

7    probability of success, or a 50 percent probability of

8    success, or a potential probability of success, but

9    respectfully, we have an overwhelming likelihood of success

10   here.  And it's best illustrated, I would submit to Your

11   Honor, by the fact that there have been three separate

12   submissions by the defendants to this Court, and in all

13   three of those submissions -- and we'll go through them

14   momentarily, but in all three of those submissions the

15   defendants have used ellipses to essentially try to

16   eliminate a key portion of what constitutes a control sale,

17   series of related transactions.  They seem to overlook that.

18   That fact, the fact that they have really no answer for

19   series of related transactions and a series of related

20   transactions constitutes a control sale, speaks volumes, I

21   respectfully submit.

22        So with that I would like to ask my colleague to

23   go to the first slide and we'll walk through some of the

24   language.  Your Honor, this is Section 10.7 of the

25   Partnership Agreement which we've all -- both sides have

1     submitted.  And Section --

2            THE COURT:  I should note before you go any

3     further that I've read the agreement, not just the

4     provisions that you've cited, but the whole thing.

5            MR. SCHAFHAUSER:  Thank you, Your Honor.  I

6     appreciate that and I think both sides appreciate Your

7     Honor's diligence in reading everything through.

8            So I will not belabor the point of going through

9     every last line of this, but there are some aspects that I

10    did want to highlight here in Section 10.7.  Actually, to

11    highlight those provisions, why don't we go to the next

12    slide where we've highlighted certain of those provisions.

13           10.7, Your Honor, as you can see on the screen,

14    provides:  "[I]n the event that one or more members of the

15    Taylor Group" -- and I'm going to stop right there, that

16    phrase, "one or more members of the Taylor Group."

17           The Taylor parties, Your Honor, have argued to

18    this Court that the only triggering event for a control sale

19    is when general partnership interests are sold.  That's

20    their position as we understand it in their papers.  That is

21    not what this document, however, says.  The document says --

22    it doesn't say here:  In the event that the general partner

23    proposes to enter into a control sale.  It doesn't say in

24    the event that the holder of the general partnership

25    interests sells the interest.  It says:  "[I]n the event

1       that one or more members of the Taylor Group (which includes

2       one or more persons that collectively own, directly or

3       indirectly, a majority of the General Partnership

4       Interests)."  That's what it says.  So just to begin, it's

5       not limited to the holder of the general partnership

6       interests.  It's broader than that.

7              Then it says, 10.7(a), "[I]n the event that one or

8       more members [] proposes to enter a Control Sale."

9       Obviously when it references the proposal to enter into,

10      that's a future event.

11             Again, the Taylor parties take the position before

12      Your Honor that it's when the NBA has approved it, when a

13      transfer is effective under Section 10.1, which we'll get to

14      momentarily, that's when my client has a right under 10.7,

15      because it's only when a transfer is effective that my

16      client has tag-along rights.  But again, that is

17      contradicted and belied by the provisions set forth in

18      10.7(a).  It's when a proposal is made, when the Taylor

19      parties propose to prospectively enter into a control sale,

20      a future event that has not yet occurred.  That's when the

21      triggering event occurs.

22             It then goes on to say:  "[T]hen," meaning at that

23      time, immediately, "then each Limited Partner [] shall have

24      the right [] to elect to participate ...."

25             THE COURT:  I take it a future slide will get at

1     the question of whether Defendants have not exercised their

2     drag-along rights.

3                 MR. SCHAFHAUSER:  Yes.  Well, let me address that

4     now then.  I don't want to wait till a future slide.  Let me

5     address Your Honor's question.

6                 Peter, could you go to 10.7(b), please.

7                 THE COURT:  Because I've got to harmonize both

8     those provisions, correct?

9                 MR. SCHAFHAUSER:  Yes, absolutely.  And what we

10    just went through, Your Honor, in 10.7(a) was that when a

11    proposal is made, then there is an opportunity for the

12    Taylor parties -- and I want to read the words -- if the

13    selling partner does not exercise the drag-along right with

14    respect to such sale.  That's 10.7(a).

15                Now let's go to 10.7(b) which is now on the

16    screen.

17                Thank you, Peter.

18                10.7(b) is at a different point in time.  10.7(b)

19    says:  "The Selling Partner shall provide each of the

20    Tag-Along partners with written notice of the proposed

21    Tag-Along Sale" -- by the way, again, proposed, the sale

22    hasn't occurred, a future event, proposed -- "within" --

23    when does it have to happen? -- "within ten days following

24    the execution of any definitive agreement [] entered into

25    with respect to the Tag-Along Sale."

1          So now we're at a different point in time.

2      There's a proposal that's made.  I'm proposing to enter into

3      a control sale.  Now we're at a different point in time.

4      Now there has been a definitive agreement executed and ten

5      days have passed following the execution of that definitive

6      agreement.  At that moment in time, Your Honor, there's an

7      obligation that the Taylor parties have.  The Taylor parties

8      have an obligation to provide a notice that a tag-along sale

9      has occurred.  That's what 10.7(b) provides.  And the point,

10     Your Honor, is this:

11         The Taylor parties have the period of time from

12     when they first propose to enter into a control sale until

13     the period of time ten days after they've actually signed a

14     definitive agreement regarding such a control sale to decide

15     whether or not they're exercising their drag-along rights.

16     And what did the Taylor parties do here?  Because here they

17     did sign a definitive agreement.  They signed the equity

18     interest purchase agreement.  What did they do here?

19         Well, on the tenth day, Your Honor, on the tenth

20     day, the Taylor parties sent a letter -- actually, the

21     letter is dated May 17th, 2021, and in that letter,

22     Mr. Taylor says:  "The second tranche is" -- and I'm

23     quoting --

24         THE COURT:  Sorry.  This is Exhibit J to

25     Mr. Orbach's --

1          MR. SCHAFHAUSER:  Yes, Your Honor, and

2     subparagraph 7 on the second page.  Mr. Taylor says:

3          "[T]he Second Tranche is the only option including

4     any general partnership interests" -- by the way, there it

5     is again, the assertion that only general partnership

6     interests constitute a control sale -- "the only option

7     including any general partnership interests so a 'Control

8     Sale' for purposes of the MTBLP Partnership Agreement would

9     not arise unless and until the Second Tranche option is

10    exercised and consummated."

11         In other words, what Mr. Taylor is saying through

12    this letter and did say in writing five weeks ago, or maybe

13    now six weeks ago, is that there is no control sale now.

14    Not only is he saying he's not exercising his drag-along

15    rights now.  He's saying he doesn't have any drag-along

16    rights now.  He's saying he has no drag-along rights to

17    exercise because there's no control sale today.

18         So, Peter, could we go back to 10.7(a), please.

19         So that brings me back, Your Honor, to 10.7(a) --

20    thank you, Peter -- where it says:  [A]nd the Selling

21    Partner does not exercise the Drag-Along Right with respect

22    to such sale ...."  So it's not just that the selling

23    partner can sit back forever and say, "I'm not exercising my

24    Drag-Along Right and therefore you never have a tag-along

25    right, you never have it, because I'm just not exercising

1    it.  I refuse to recognize that a control sale has occurred,

2    I'm just not exercising it, and therefore I can block you."

3    That's not the way this document works, Your Honor.  There's

4    a period of time prescribed.  There's a procedure set forth.

5    10.7(b) puts an affirmative obligation on the Taylor parties

6    to provide a sale notice within ten days after the execution

7    of a definitive agreement.  That date passed on May 24th of

8    this year.  And at no time did the Taylor parties say, "By

9    the way, a control sale has occurred and I'm exercising my

10   drag-along rights."  They said the opposite.  They said a

11   control sale has not occurred.  They said it to us, they

12   said it to Your Honor, they said it in pleadings, and I

13   think they're going to say it this afternoon through their

14   capable counsel, that no control sale has occurred.  So, if

15   no control sale has occurred, the Taylor parties are taking

16   the position that there are no drag-along rights for them to

17   exercise, but we respectfully differ for the reasons that

18   we'll get into.  But again, I wanted to address Your Honor's

19   question about the interplay between the drag-along rights

20   and the tag-along rights.

21          But last point on this before we proceed.  And

22   again, I just want to address this because Your Honor

23   flagged this issue and it's an important one that the

24   parties have raised.

25          No one prevented the Taylor parties from

1    exercising their drag-along rights if they wanted to

2    exercise them.  The Taylor parties said in their papers to

3    Your Honor that we are seeking to nullify their drag-along

4    rights.  We never sought to nullify their drag-along rights.

5    If they wanted to exercise their drag-along rights within

6    ten days after the EIPA, hallelujah.  We would have been

7    delighted, because the drag-along rights would have resulted

8    pretty much in the same spot that the tag-along rights would

9    accomplish.

10         So, no one prevented Mr. Taylor or his entities

11   from exercising the drag-along rights under the agreement.

12   No one was seeking or is seeking to nullify his drag-along

13   rights.  It is that the Taylor parties refuse to admit that

14   those drag-along rights were triggered or that they refused

15   to exercise the drag-along rights.  They refused.  I can't

16   force them to do something which they've refused to do in

17   terms of their drag-along rights.  But because, Your Honor,

18   Section 10.7 says that if the selling partner does not

19   exercise drag-along rights, which is where we are here

20   today -- as we are standing here today, the Taylor parties

21   have not just not exercised them, they've refused to

22   acknowledge that they exist, so they haven't exercised them.

23         Then -- and now we go back to 10.7(a) -- "then

24   each Limited Partner shall have the right to elect to

25   participate in such Tag-Along Sale ...."  So I would

1    respectfully submit, Your Honor, that the interplay is clear

2    that if, as is the case here, the Taylor parties refused to

3    acknowledge the existence of a control sale, thereby

4    refusing to even acknowledge that they have drag-along

5    rights today and thereby refusing to exercise their

6    drag-along rights under 10.7(a) and otherwise, then at that

7    point they've simply refused to exercise their rights and

8    they cannot block us, block my client, Orbit Sports, from

9    exercising its tag-along right which flows therefrom.

10    So, I hope I've answered Your Honor's question

11    about the interplay.

12    Peter, could we now go back to the next slide.

13    Thank you.

14    This brings us to the definition, Your Honor, of

15    "control sale."  The definition as we've highlighted here of

16    control sale has a number of what we believe are critical

17    aspects.  "A sale, exchange or other disposition," so let me

18    stop there.  That of course means that it doesn't have to be

19    a sale *per se*.  It can be an exchange or another disposition

20    which we'll get to in more detail, but it doesn't have to be

21    a sale.

22    Let's stay with "other disposition."  There's a

23    parenthetical, Your Honor, on the screen.  It says:  "(For

24    cash or property with a discernible cash value)."  So the

25    other disposition does have to be for, you know, an exchange

1    of money or value.  It cannot be a gift.  So we've

2    eliminated gift.

3           Then we go on:  "By one or more members of the

4    Taylor Group."  Here's that same language that we saw, Your

5    Honor, in 10.7.  Again, it doesn't say:  "By the general

6    partner of the general partnership interests."  It says:

7    "By one or more members of the Taylor Group," which we

8    clearly have here.  We have three members of the Taylor

9    Group in fact.  Then it goes on to say:  "In a single

10   transaction or series of related transactions."  And then it

11   says:  "To any Person who is not a member of the Taylor

12   Group" -- which the buyer is not a member of the Taylor

13   Group -- "of Partnership Interests."  Not just general

14   partnership interests, "of Partnership Interests."  And then

15   it says:  "Which include a majority of all the General

16   Partnership Interests."  So it could be a sale of

17   partnership interests.  It could be an exchange or other

18   disposition of other interests.  It could be a combination,

19   as long as it is in a single transaction or a series of

20   related transactions.

21           Now, let me ask my colleague Peter if you could

22   just go to the next --

23           THE COURT:  Just one question.  I want to be

24   sure --

25           MR. SCHAFHAUSER:  Of course.

1          THE COURT:  -- I understand your position --

2          MR. SCHAFHAUSER:  Absolutely.

3          THE COURT:  -- here.  Are you suggesting that

4     control sale somehow might mean a sale of a minority of all

5     the general partnership interests?

6          MR. SCHAFHAUSER:  I am not suggesting that.  What

7     I'm suggesting, Your Honor, is that a minority of interests

8     can be transaction number one.  Another transaction that's

9     part of a series of related transactions can be transaction

10    number two.  Another transaction that's part of the series

11    of related transactions can be transaction number three.

12    Another one can be transaction number four.  And then you

13    get to the majority, as long as it includes a majority of

14    all the general partnership interests at the end of this

15    process.

16          So what I'm suggesting is that there can be

17    several -- well, let me use the word that's actually in the

18    EIPA.  There can be several tranches, there can be several

19    tranches, and that in fact is exactly what we have in this

20    instance.  There is a set of tranches.  Let me -- and again,

21    I want to respond to Your Honor's point.

22          Could you please -- and we'll come back to this,

23    Your Honor, this definition.

24          THE COURT:  One more question, just a real quick

25    one, I think.

1          MR. SCHAFHAUSER:  Of course.

2          THE COURT:  When I'm reading "general partnership

3     interests" there, I give partnership interests as it's used

4     with respect to general the same definition that partnership

5     interests is given in the definition section of the

6     Partnership Agreement, correct?

7          MR. SCHAFHAUSER:  Yes.  Both of these are defined

8     terms.  The answer is yes.  There's a partnership interest

9     which includes -- it could be limited partnership interests

10    or general partnership interests, and then general

11    partnership interest is a subset of all partnership

12    interests.  And actually to illustrate and highlight that

13    point --

14          If you could, Peter, go to the chart, which is

15    Exhibit G, and then we'll come back to this.

16          Your Honor, I wanted to show you -- and this is

17    actually something that was put into the record by the

18    Taylor parties.  You see at the top it says "Document 23-3."

19    I believe it's Mr. Merrill's second affirmation and it's

20    Exhibit G thereto.

21          And this Exhibit G, Your Honor, what we're looking

22    at here is an exhibit to the EIPA, and this is frankly a

23    wonderful illustration of what we've been talking about, the

24    interplay between partnership interests and general

25    partnership interests.

1          So what this shows is the series of

2    transactions --

3          THE COURT:  Just for clarification, not to

4    interrupt -- and I'm sorry about this --

5          MR. SCHAFHAUSER:  I appreciate the questions.

6          THE COURT:  -- I think Exhibit G is to the

7    Partnership Agreement.  I think this is Exhibit C to

8    Mr. Merrill's declaration.  Let me get a nod.  Yes, I got a

9    thumbs up over here.

10          MR. MERRILL:  Yes, that's correct.

11          THE COURT:  Okay.  Got it.

12          MR. SCHAFHAUSER:  Thank you, Your Honor.  I --

13          THE COURT:  No.

14          MR. SCHAFHAUSER:  I mangled it.

15          THE COURT:  It's all right.

16          MR. SCHAFHAUSER:  I appreciate it.  And I stand

17    corrected and it won't be the last time, I'm sure, that I

18    stand corrected, but I want to get it right, so thank you

19    for that.

20          This document, as I understand it, though, was and

21    is an exhibit to the EIPA.  And this document, Your Honor,

22    shows the transactions that are outlined in the EIPA.

23          By the way, every one of these transactions, to

24    state the obvious, is between the same sellers and the same

25    buyer, same lawyers, same documents, same conditions, same

1    reps and warranties, same closing conditions, same

2    everything.  It's all in one integrated document, but I

3    digress.

4        Looking at this schedule, Your Honor, Taylor

5    Sports Group at the very top left is shown to have an 8.24,

6    approximately, percent GP interest, a general partnership

7    interest.  Then you have Taylor Corporation with a 48

8    percent or so interest, a total interest of that amount,

9    meaning the -- essentially, as I read this, the limited

10   partnership interests are approximately 92 percent of the

11   total partnership interests, and the general partnership

12   interests are approximately eight percent of the total

13   partnership interests.

14       And what this shows, Your Honor, is the series of

15   transactions outlined between the buyer and the Taylor

16   parties.  What it shows is that at the closing -- and

17   there's a reference -- there's a column for closing units,

18   20 percent, at the closing 20 percent will be sold.

19       But by the way, as a condition of that closing,

20   options will also be conveyed, irrevocable options that the

21   buyer will have the right to exercise either simultaneously

22   or at any period of time as long as they're in the same

23   sequence up until certain option exercise dates set forth in

24   the EIPA, and those options will entitle the buyer to obtain

25   the remaining interest.  You see it here:  First tranche, 20

1    percent, so then the buyer is at 40 percent.  Second

2    tranche, if you total it up at the bottom, it's 39.999999,

3    and now we're talking about 80 percent.  And then the third

4    tranche, the final tranche, is the remaining 20 percent.  So

5    this series of related transactions that is outlined in the

6    EIPA -- again, this is a longer question than perhaps Your

7    Honor bargained for, but it results in 100 percent of the

8    partnership interests being in the control of the buyer.

9    That's the end result of this series of related

10    transactions.

11           Peter, could we now go back to the slide we are

12    at, please.  Thank you.

13           So I was at 1.9C, Your Honor.  We were talking

14    about a single transaction or a series of related

15    transactions.  What we just saw was that 8.2 percent of the

16    partnership interests are general partnership interests.

17    The Taylor parties seem to suggest, if I understand the

18    argument correctly, that it's only when that 8.2 percent is

19    sold that there's a control sale, but that's not what this

20    document provides.  It talks about a series of related

21    transactions of partnership interests, which we clearly have

22    here, which include a majority of all the general

23    partnership interests, which we also will have here, because

24    100 percent of the general partnership interests will be

25    conveyed under this EIPA as well.

1          Now, Your Honor, what we saw in the defendants'

2     submissions is -- and I alluded to this at the outset of my

3     remarks -- is an effort to frankly overlook the phrase

4     "single transaction or a series of related transactions."

5     So what this slide shows is how they've defined what a

6     control sale is in their briefs.  And we highlighted this in

7     the briefs, but this really illustrates it perfectly.

8          What the defendants argue is that a control sale

9     means a sale, exchange or other disposition of a majority of

10    all the general partnership interests.  That's their

11    position.  Their position is unless and until there is a

12    sale, exchange or other disposition of a majority of the

13    general partnership interests, there is no control sale.

14    And for that reason they argue that it's only the second

15    tranche -- that exhibit we just looked at.  It's only the

16    second tranche that triggers when a control sale occurs.

17    But again, if you look at the highlighted sections, that

18    omits the fact that a control sale includes not just a

19    majority of all general partnership interests, but

20    Partnership Interests, capital P, capital I, and those can

21    be sold, exchanged or otherwise disposed in a single

22    transaction or a series of related transactions, which is

23    exactly what we have here.

24          If Section 1.9C, Your Honor, were intended to

25    provide that a control sale only occurs upon a sale of the

1    general partnership interests, that's what it would say.  It

2    would have been so easy to say in a document a control sale

3    occurs only when general partnership interests are sold, or

4    a control sale occurs only when the general partner is

5    replaced.  That's their position, but that's not what the

6    document says.  Their position, the defendants' position, is

7    unsupported by the words -- the plain language set forth in

8    1.9C.

9           THE COURT:  You're arguing an option is a

10    disposition, correct?

11           MR. SCHAFHAUSER:  We are arguing that an option is

12    a disposition, Your Honor.

13           THE COURT:  All right.  I take it you're going to

14    get to that in a future slide here.  You don't have to now.

15           MR. SCHAFHAUSER:  Thank you.  And again, trying to

16    be responsive to Your Honor's question.

17           Let's just jump to the next slide, please.  One

18    more.

19           So, I wanted to go through some of these points in

20    response to Your Honor's question.

21           So, the initial transaction -- and by the way,

22    it's defined in the EIPA, as well as even in Mr. Maczko's

23    declaration to this Court, which is an interesting

24    declaration and we'll get to it.  But even Mr. Maczko in his

25    declaration refers to the initial transfer, thereby

1    suggesting that there are other transfers that are

2    contemplated.  And in fact, there are other transfers

3    contemplated, because the EIPA itself provides -- there's a

4    definition in the EIPA that talks about Contemplated

5    Transactions, capital C, capital T, and that definition

6    includes all of the transactions that are laid out in the

7    EIPA, not just including the sale of the initial 20 percent,

8    but the option -- the options that are conveyed at closing

9    as well.

10           And so to get back to Your Honor's question about

11   options, at the closing, not only will there be a sale of 20

12   percent -- and obviously a sale is a sale within the meaning

13   of the Partnership Agreement, so we have a sale of

14   partnership interests at closing.  We have a sale of

15   partnership interests at closing within the meaning of

16   Section 1.9C.

17           But at closing what we also have is, to Your

18   Honor's question, we have another disposition.  We have

19   another disposition of the remaining interests.  And how do

20   we have that?  The two components of this agreement go hand

21   in hand.  There would be no 20 percent purchase if the

22   options were not also conveyed, and vice versa.  They go

23   hand in hand and the document, the EIPA, clearly shows that.

24   They go hand in hand.  The options, in fact, are conveyed in

25   consideration for the payment of 20 percent of the

1    enterprise value net of debt.  So, the options are going to

2    result -- along with the sale of the initial 20 percent --

3    are going to result in the payment to the Taylor parties of

4    hundreds of millions of dollars, 20 percent of 1.5 billion

5    being 300 million, less the debt, so there's a credit for

6    that, but certainly hundreds of millions of dollars.  These

7    options are not a gimme, they're not a freebie, they're not

8    a throwaway, they're not inconsequential.  What the Taylor

9    parties are conveying at closing is the right for the buyer

10   at anytime, that day, the next day, the next day, or

11   anytime thereafter through the option exercise period to

12   acquire control of the Minnesota Timberwolves and the Lynx

13   by exercising those rights.  They are -- I mean, to state

14   that they are valuable rights would be a gross

15   understatement, Your Honor.

16            THE COURT:  So that's defining disposition by

17   reference to the facts of the case, fair enough?

18            MR. SCHAFHAUSER:  Well, we have the facts of the

19   case, but we also have, I submit, the law on our side, as

20   well as the Partnership Agreement itself which we'll get to.

21            THE COURT:  What's the one-sentence definition of

22   disposition that supports your understanding of that

23   provision?

24            MR. SCHAFHAUSER:  The one -- well, the

25   one-sentence definition of disposition, it actually relates

1    to the three words.  It says "sale, exchange or other

2    disposition."  I'm struggling to just limit it to one

3    sentence, because there are a number of definitions here

4    that go into it, and here we go.

5           So, a sale.  A sale is a transfer of property or

6    title for a price.  An exchange.  Again, an act of

7    transferring interests, so we have the common element of

8    transfer.  A transfer.  Any mode of disposing -- there's the

9    word "disposing," Your Honor -- of or parting with an asset

10   or an interest in an asset.  And what we have here is, we

11   have a transfer of interest.  We have a disposal of a bundle

12   of rights with respect to the Taylor parties' remaining

13   interests.

14          So, looking down at the next portion of this

15   slide, Your Honor, "other disposition" is, again, any other

16   mode of disposing of or parting with property or an interest

17   in property, provided there is monetary or other

18   consideration.  Here we have monetary or other

19   consideration.  There will be hundreds of millions of

20   dollars of monetary consideration.

21          And then, Your Honor --

22          Could you, Peter, just go to the transfer

23   definition in the Partnership Agreement, because I promised

24   His Honor to talk about that as well.

25          THE COURT:  So can I jump to a question before you

1    get there?

2              MR. SCHAFHAUSER:  Of course.

3              THE COURT:  Sort of jump ahead?

4              MR. SCHAFHAUSER:  Your Honor, you wear the black

5    robes.  You can ask any question.

6              THE COURT:  Well, I don't mean to -- is transfer

7    used in the definition of control sale?

8              MR. SCHAFHAUSER:  I actually welcome that question

9    because I was going to get to that point, because the

10   straight answer, which of course is the only answer to ever

11   give anyone, and certainly Your Honor, the definition of

12   transfer as set forth in 1.27 of the Partnership Agreement

13   is not a part of control sale per se.  It's not, okay?

14              And where that is relevant and where I was going

15   to get to that is that the defendants have made an

16   argument -- which we'll get to momentarily, but the

17   defendants have made an argument that Section 10.7 provides

18   that it's subject to Section 10.1, subject to 10.1.  Well,

19   10.1 of the Partnership Agreement provides that no

20   transfer -- there's the word again -- no Transfer, capital

21   T,  will be effective under certain conditions:  can't

22   violate the securities laws, can't have tax consequences for

23   the partnership, a number of conditions, including NBA

24   approval, which they focus on, but there are a number of

25   conditions in 10.1.  They only focus on one.  But again, the

1    definition of transfer is not *per se* a part of the

2    definition of control sale.

3         What I do submit to Your Honor, however, is that

4    the definition of transfer which we have on the screen now

5    is relevant, because the word "sale" involves a transfer,

6    the word "exchange" involves a transfer, and the words

7    "other disposition" involves a transfer, and the Taylor

8    parties are saying you have to have a transfer.  So then the

9    question arises, well, what is a transfer?  It just so

10   happens that we do have a definition of transfer in the

11   Partnership Agreement and that definition is very broad.

12   The definition includes -- and you see the bolded language.

13   We can read the whole thing, but the bolded language talks

14   about an encumbrance, a pledge, hypothecation, or any other

15   disposition.  So here you have -- there's the word

16   "disposition," but you have encumbrance, pledge,

17   hypothecation.

18        Now, why am I pointing out these words, Your Honor

19   might well ask me, and the answer, of course, Your Honor, is

20   that the EIPA, if nothing else, with respect to the 80

21   percent that we saw in that exhibit a few moments ago that

22   will not be, quote, transferred at closing through a sale,

23   will nonetheless be transferred within this meaning in the

24   sense that there will be an encumbrance on the Taylor

25   parties' ability to convey or otherwise dispose of those

1    interests.

2          What am I saying?  Because of the EIPA, Mr. Taylor

3    cannot tomorrow morning go out and say, "You know what?  I

4    found a buyer who wants to buy the Timberwolves for 2.5

5    million.  I'm just going to sell it to that buyer."  No,

6    because the EIPA will have bound him to give options to the

7    Rodriguez/Lore group for 1.5 million.  In other words,

8    there's a cap, there's an encumbrance, there's a limit,

9    there's a price established that will be established not

10   just on the date of closing, but through all periods of time

11   until the options are exercised.  It's an encumbrance.  It's

12   also a limitation on any other disposition by the Taylor

13   parties of their interests other than outside of the four

14   corners of the EIPA that they signed.  So there is a sale,

15   which is a transfer, at the closing, but there certainly

16   also is, Your Honor, a transfer within this meaning of an

17   encumbrance, pledge, hypothecation or other disposition.

18         And again, you are correct that the word

19   "Transfer," capital T, does not appear in Section 1.9, but

20   what does appear in Section 1.9 are three words:  sale,

21   exchange, or other disposition, which the Taylor parties are

22   arguing require transfers.  Well, if they require transfers,

23   here's the definition of transfer.  And even under that

24   definition, which is their word -- they like the word

25   "transfer" -- if it does require a transfer, we're within

1    the four corners of Section 1.27 of the Partnership

2    Agreement in terms of a transfer.

3             Your Honor, I touched on this a couple of moments

4    ago, but I wanted to highlight this again while we're on

5    this definition.

6             At the closing, the buyer will have the ability to

7    control the future of the team.  It's within the buyer's

8    option -- there's a word -- it's the buyer's option, the

9    buyer's sole discretion, the buyer's irreversible right, to

10   say at any time at the closing, or the day after the

11   closing, or the next day, or any time thereafter,

12   "Mr. Taylor, I require you to sell us the remaining interest

13   in the Timberwolves for an enterprise value of $1.5 billion.

14   We require you to do it."  And Mr. Taylor at that moment

15   cannot say, "Sorry.  I don't want to do it.  I want to see

16   if there's another buyer.  Sorry.  I don't want to do it.  I

17   don't think it's the right price."  That's a powerful right

18   that is going to be conveyed at closing.

19            Of course, the Taylor parties say, "Oh, options.

20   You know, it's" -- I think they quoted a song *Nothing Plus*

21   *Nothing Equals Nothing* (sic), or -- I think I mangled that,

22   but the Billy Preston song from the early '70s.  These

23   options are not nothing, Judge.  These options, by the way,

24   have been broadcast to the world.  We can all read what the

25   Taylor parties and what the buyer parties are saying, that

1    there is a transition of ownership that is encapsulated

2    here, and here we have a few of them:  The Taylor parties'

3    public statement on May 14th that Mr. Taylor has reached an

4    agreement regarding the sale and future ownership of the

5    Timberwolves and the Lynx.

6            THE COURT:  So I've read this.  Let me just make

7    sure I understand how it fits within your argument.

8            MR. SCHAFHAUSER:  Yes.

9            THE COURT:  If I understand it correctly, this

10   only fits in as extrinsic evidence if the Partnership

11   Agreement is ambiguous and I've got to look somewhere else

12   to try to interpret it.  Is that about the size of it?

13           MR. SCHAFHAUSER:  I think Your Honor has said it

14   perfectly.  That is correct.  So let me -- and I understand

15   Your Honor's point, so we'll move on from that.

16           THE COURT:  But you're suggesting the Partnership

17   Agreement is not ambiguous.

18           MR. SCHAFHAUSER:  I am suggesting that it is

19   unambiguously clear that the Taylor parties have proposed to

20   enter into a control sale, and because they have proposed to

21   enter into a control sale and because they have not

22   exercised their drag-along rights, we have tag-along rights

23   that have been triggered.  So yes -- I want to be clear.

24           THE COURT:  Okay.

25           MR. SCHAFHAUSER:  My position is that it's clear

1    and unambiguous that my client should prevail and will

2    prevail and that there is a likelihood at the very least of

3    success on the merits.  That is my position.

4            They've made a cross -- a motion to dismiss in

5    which case, you know, my colleague will address that, but

6    for purposes of this motion, yes, Your Honor, that is our

7    position.

8            THE COURT:  Okay.

9            MR. SCHAFHAUSER:  So let me, you know, move away

10   from extrinsic evidence in that light and go back to -- and

11   I think Mr. Krauss will be addressing it in terms of that

12   motion.  That's why we have that slide in here.  So let me

13   go back.

14           Peter, I'm sorry to keep jumping around, but let's

15   go back to where we were.  Thank you.

16           All right.  So let's go to the next one, please,

17   Peter.

18           Your Honor, I just wanted to address a couple of

19   other things on the likelihood-of-success component and then

20   we'll move on to irreparable harm and the other elements.

21           Even the word "tranches" demonstrates that the

22   transactions set forth in the EIPA are related.  By

23   definition a tranche is related to another tranche.  By

24   definition the transactions set forth are related.

25           THE COURT:  The word expresses a sequence.

1          MR. SCHAFHAUSER:  The word expresses -- exactly

2     right.  The word expresses a sequence.

3          In addition, you have Mr. Maczko's declaration

4     that I touched on a bit earlier.  In Mr. Maczko's

5     declaration he says that -- and I talked about his use of

6     the phrase "initial transfer" earlier, but let's talk about

7     his other statements.

8          In paragraph 7, Mr. Maczko says that:  "The EIPA

9     also provides for" -- and here's the phrase -- "a series of

10    call options in Article VI," a series.  There it is.  It's a

11    series of related transactions for all intents and purposes.

12         Then he says in the next sentence:  "Under NBA

13    rules, the inclusion of these Call Options is also subject

14    to NBA review and approval, which is currently ongoing."

15         Why would that be, Your Honor, the question must

16    be asked of the Taylor parties.  Why would it be that the

17    inclusion of the call options is subject to NBA review and

18    approval?  If these are not related transactions, they

19    wouldn't be subject to NBA review and approval.  If these

20    were not intended to lead to control to the buyer, the NBA

21    would have no interest in the inclusion of the call options.

22    But even Mr. Maczko in his declaration says, yes, the

23    inclusion of the call options is also subject to NBA review

24    and approval at this time, not in the future, at this time.

25         Could we go back, Peter, to 10.7(b).

1        Your Honor, there's a couple other things that we

2   should note about the language of 10.7(b).  Again, courts

3   look at the plain language, so let's look at the plain

4   language of 10.7(b) in the context of an argument by the

5   defendants, again, that there are no rights that are

6   triggered unless and until a sale is effective.  Let's look

7   at 10.7(b).

8        It says:  "The Selling Partner shall provide each

9   of the Tag-Along Partners with written notice of the

10  proposed Tag-Along Sale," meaning a Tag-Along sale that will

11  occur in the future.  It's proposed.  By definition it

12  hasn't happened yet.

13       Then it says:  "The Sale Notice shall describe in

14  reasonable detail [] the Partnership Interests to be sold."

15  Again, they haven't been sold.  Sale hasn't been effective.

16  Disposition hasn't been effective.  It's in the future.

17  It's to be sold by the selling partner.

18       Then it talks about the name of the proposed

19  buyer, not the new limited partner who just closed on a

20  deal, the proposed buyer, who then is defined in that same

21  section as the "Prospective Purchaser."  Again, not the

22  purchaser, not the newly admitted limited partner, not the

23  newly appointed general partner.  It says the "Prospective

24  Purchaser."

25       Then it talks about the "proposed date, time, and

1    location of the closing of the sale."  And then it talks

2    about "if not yet executed any form of agreement proposed to

3    be executed ...."

4            Why do I focus on these prospective words, Your

5    Honor?  Because again, the Partnership Agreement lays out a

6    process for both tag-along rights and drag-along rights.

7    It's as if, you know, we are running a race.  There's a

8    starting point to the race, there's a finish line to the

9    race.  The starting point is when a control sale is

10   proposed.  That's the starting point.  We're off to the

11   races.  The control sale has been proposed.  The finish line

12   is when there is a closing of the control sale, but in

13   between those two periods we're running the race.  We're

14   going -- the proverbial race.  We're going through the

15   tag-along right process and this is one feature of the

16   tag-along right process in 10.7(b), and this process, as we

17   talked about earlier, just happens to be within ten days

18   following the execution of any definitive agreement.  All of

19   this has to happen.

20           Can we now go to the next slide, Peter.

21           The next slide, which happens to be the next

22   provision in the sequence, 10.7(d), Your Honor, talks about

23   what needs to happen after what we just saw in 10.7(b), and

24   that is that "the Tag-Along Partner [must] give written

25   notice to the Selling Partner of such election and

1    specifying the Partnership Interests" -- again, it proposes

2    to sell, it proposes to sell.  That's what is contemplated.

3    And here again you have the bolded language "proposed

4    Tag-Along Sale," "contemplated Tag-Along Sale."

5            Again, the rights are in play, the rights are in

6    existence, the rights have been triggered, and the Tag-Along

7    Sale has not closed, because the plain language talks about

8    proposed, talks about contemplated, talks about prospective,

9    talks about to be sold, all prospective language.

10           So, what happened here?  Well, what happened here,

11   Your Honor, is that the Taylor parties --

12           Let's go back to 10.7(b).

13           Under 10.7(b) they were required to provide a

14   notice, a sale notice, within ten days following the

15   execution of the definitive agreement, and they provide a

16   notice of sale notice and they said -- as I mentioned

17   earlier, they sent a letter saying that there is no control

18   sale at this time.

19           Let's now go back to 10.7(c).  10.7(c), Your

20   Honor, just so we are not in a position where we waived any

21   rights, we actually sent a tag-along notice.  My client sent

22   a tag-along notice to the Taylor parties under 10.7(c) and

23   notified the Taylor parties of its exercise of its tag-along

24   rights.

25           And what has happened in response?  Well, let's go

1    to the next slide, because again, we're talking about a

2    continuum of rights and obligations, all of which precede

3    the closing of the tag-along sale.

4            Here's 10.7(d).  Again, we're still talking here

5    about a prospective purchaser, still talking about a

6    contemplated tag-along sale, so we're still talking about a

7    future event.  Hasn't closed, hasn't become effective.  As

8    the Taylor parties keep talking about, "Oh, it's not

9    effective."  Well, 10.7(d) doesn't require effective.  It

10   talks about rights with contemplated sales.  And 10.7(d)

11   provides an affirmative obligation on the selling partner,

12   namely the Taylor parties, to "use commercially reasonable

13   efforts to obtain the agreement of the Prospective Purchaser

14   to the participation of each Electing Partner in such

15   contemplated Tag-Along Sale."

16           So, again, what has happened here?  What has

17   happened here is that no such efforts were undertaken.  The

18   Taylor parties certainly don't say anywhere in their three

19   briefs to Your Honor that they used commercially reasonable

20   efforts under 10.7(d).  To the contrary, their efforts have

21   been devoted to trying to argue that there are no rights to

22   speak of.  That's been their effort.

23           Let's go to the next slide, please.

24           Another provision of 10.7(d), subsection (ii).

25   Here's the participation procedure.  Again:  "In the event

1   the Prospective Purchaser" -- so again, we're talking again

2   about a future event, still a prospective purchaser, still

3   not effective, still not closed, prospective purchaser --

4   "In the event that the Prospective Purchaser elects to

5   purchase less than all of the Partnership Interests to be

6   sold by the Electing Partners," then in that event, Your

7   Honor, there is a formula as to how the selling interests

8   are to be divvied up and conveyed.

9           And this is very important, because this goes to

10  this -- respectfully, this outlandish comment in the papers

11  that my client is seeking a windfall.  Nothing could be

12  further from the truth.  My client is seeking enforcement of

13  the provision that I'm about to read to Your Honor,

14  10.7(d)(ii)(A):

15          "First, each Electing Partner shall be entitled to

16  sell the full amount set forth in their respective Tag-Along

17  Notice, which for the avoidance of doubt may be all of an

18  Electing Partner's Partnership Interests."

19          That's first.  That comes first.

20          And then second, once that happens there's a

21  mechanism in which the Taylor parties get to sell the

22  remaining portion so long as each electing partner has been

23  given the ability to sell the full amount if they wish to

24  sell the full amount of their partnership interests.

25          So first comes the electing partners.  Second

1    comes the Taylor parties.  That's the sequence in the

2    Partnership Agreement.  What the Taylor parties are seeking

3    to do here is to switch that.  First comes the Taylor

4    parties and second comes everyone else.  First they get

5    $300 million net of debt and we can wait for three years.

6    They want to switch the sequence.  They want to put first

7    the selling partner and second each electing partner.  They

8    want to flip this Section 10.7(d)(ii) on its head in

9    contravention, I respectfully submit, of the plain language

10   of the Partnership Agreement.

11          But the Partnership Agreement is even more

12   striking and this really gets to why it is so clear that

13   this transaction cannot proceed unless and until the limited

14   partnership's tag-along rights are honored.

15          Could we flip, please, Peter, to the next slide.

16   Thank you.

17          10.7(d) sub-romanette (iii) says:

18          "The Selling Partner shall not (directly or

19   indirectly) Transfer any of its Partnership Interests to any

20   Prospective Purchaser pursuant to such Tag-Along Sale," and

21   you can read the rest of the words, but basically it's

22   unless the tag-along rights and unless the tag-along

23   procedure is honored.  It specifically says that the Taylor

24   parties shall not transfer any of their partnership

25   interests to any prospective purchaser unless the tag-along

1    rights are honored.  A clearer and more express prohibition

2    against what is proposed to happen here could not be

3    fathomed than what is set forth in 10.7(d)(iii).

4            Let's go to 10.1, please.

5            Your Honor, there's a second provision that

6    relates here and that's 10.1, and we've highlighted some

7    language which I'll get to momentarily, but for the moment I

8    want to actually focus on the first sentence, which says:

9            "A Partner may not Transfer" -- again there's the

10    capital T word -- "Transfer or assign all or any part of

11    such Partner's Partnership Interest except in accordance

12    with this Agreement."

13            It's our position, Your Honor, for the reasons

14    that I've outlined, that the proposed transaction here is

15    not in accordance with the agreement.  It seeks to turn the

16    agreement on its head.  It seeks to vitiate my client's

17    rights.  It seeks to erase the words "series of related

18    transactions" from Section 1.9.  It seeks to change the

19    "First" and "Second" in Section 10.7(d) upside down.  So, as

20    a result, for that additional reason, 10.1 prohibits any

21    transfer except in accordance with the agreement.

22            Now, Your Honor is going to hear the argument

23    which we saw in the submissions by the Taylor parties that

24    10.1 is relevant for a different reason, and that is, you

25    know, what we were talking about a moment ago, and it's the

1    highlighted language that no proposed transfer -- by the

2    way, let's stop right there.  It says "No proposed

3    Transfer," so it's a proposed Transfer, capital T, and then

4    it lays out a number of things that are essentially

5    preconditions to the effectiveness of the transfer.  So 10.1

6    doesn't say that there can be no proposed transfer at all.

7    It says the proposed transfer will not be effective unless

8    certain things are undertaken, so let's talk about what

9    those certain things are:

10            "[F]ails to comply with all applicable state and

11    federal securities laws."  An unremarkable provision.

12    Hasn't been mentioned in the Taylor parties' papers.  They

13    haven't argued:  "Oh, this transaction will not be effective

14    because we don't have opinion of counsel as to whether it

15    complies with state and federal securities laws."  Why not?

16    Why are they not focused on that?  Well, maybe the Taylor

17    parties will answer why they're not focused on that.

18            Next one:  "[W]ill have an adverse impact on the

19    ability of the Partnership to be taxed as a partnership for

20    income tax purposes."  No mention of that in the papers.

21            Next one:  "[W]ill result in a Limited Partner

22    being exposed to liability as a general partner."  No

23    mention of that.

24            The point is there is only one and only one

25    provision here that the Taylor parties mention, and that is

1    that no proposed transfer will be effective unless and until

2    NBA approval is obtained, but that's fine.  That's

3    unremarkable.  That's consistent with any transaction that

4    has contingencies.  Section 1.9C doesn't say that you cannot

5    have a control sale unless all transactions have zero

6    contingencies.  It doesn't say that a control sale cannot

7    have a financing contingency.  It doesn't say that a control

8    sale cannot have a contingency to comply with federal and

9    state securities laws.  It doesn't say that you can't have a

10   contingency for compliance with tax law.  It doesn't say

11   that a transaction must be noncontingent to qualify as a

12   series of related transactions that triggers a right.

13          So respectfully, Your Honor, the idea that one

14   contingency out of a whole realm of contingencies -- which,

15   by the way, exists not only in 10.1, but also exists in the

16   EIPA.  There are contingencies in the EIPA as well which any

17   buyer would put in a document, which again is unremarkable.

18   You purchase a house.  There are contingencies.  That

19   doesn't mean that the agreement to purchase a house is void.

20   It doesn't mean that the agreement is not worth the paper

21   that it's written on.  It means that there is a title

22   contingency.  There's -- Your Honor gets the point.

23          10.1 --

24          THE COURT:  Let me suggest that because we've been

25   at this for over an hour now talking about the merits, which

1     is good because it's sort of the focus of the inquiry here,

2     but let's shift to irreparable harm if that's something you

3     intend to cover and perhaps cover a bit more quickly.

4              MR. SCHAFHAUSER:  Thank you, Your Honor.

5     Appreciate it.

6              Your Honor, there are two different forms of

7     irreparable harm that we face here.

8              The first form of irreparable harm is that there

9     are bargained-for rights that will be nullified, they will

10    be undone, they will be vitiated, they will not exist for

11    all intents and purposes if this transaction proceeds

12    without my client's tag-along rights being honored.  And the

13    bargained-for rights, to be very specific, include four

14    separate provisions, Your Honor, some of which we touched on

15    already, but I'll just highlight them briefly.

16             We already talked about 10.7(d)(iii), which

17    provides that the Taylor parties shall not transfer any

18    partnership interest to any prospective purchaser unless and

19    until my client's tag-along rights are first honored, so

20    that's an express prohibition against a transfer by the

21    Taylor parties.  It's a bargained-for right.

22             Second bargained-for right, Section 10.1 that we

23    also touched on a few moments ago.  "Partner may not

24    Transfer ... all or any part of such Partner's Partnership

25    Interest except in accordance with this Agreement."  May not

1    do it.  Can't do it.  That right goes away if this

2    transaction closes without my client's rights being honored.

3         Article XVI of the Partnership Agreement talks

4    about the consent of -- and now I'm quoting -- "All

5    Partners" -- "Without the consent of all Partners, no

6    amendment shall alter the allocation of partnership

7    management responsibilities or control."  I'm going to get

8    to that in more detail momentarily.

9         But what goes along with that is Section 9.3,

10   which provides that:  "[N]o Limited Partner shall have the

11   right to participate or interfere with the management or

12   control of the Partnership business."

13        Well, in fact, the minute that this EIPA closes,

14   absent this Court's intervention, those two provisions will

15   be violated as well, because at the closing the buyer will

16   be designated as the alternate governor.  Now, the

17   defendants say that the alternate governor can be terminated

18   by Mr. Taylor at will.  That may be so, but unless and until

19   the alternate governor is terminated, he's the alternate

20   governor, and if Mr. Taylor is not available, he acts under

21   the Constitution of the NBA that Mr. Maczko put forth, a

22   detailed constitution.

23        THE COURT:  That's the more persuasive argument,

24   right, that being an alternate governor gives one no control

25   over the franchise -- over the partnership, I should say.

1    What's the response to that?

2            MR. SCHAFHAUSER:  The whole point of being a

3    partner in a partnership that controls the Minnesota

4    Timberwolves and owns the Minnesota Timberwolves, Your

5    Honor, is to be empowered to act on behalf of an NBA team.

6    That's the whole point.  I respectfully submit -- and maybe

7    I'm overstating.  I shouldn't say no one, but virtually no

8    one that I can imagine would buy the partnership interest of

9    the Minnesota Timberwolves Limited Partnership without

10   aspiring to be the governor empowered to act on behalf of

11   the Minnesota Timberwolves.  The whole point is to be the

12   governor, or the alternate governor in this instance, in

13   which event Mr. Taylor cannot act.

14           But you have something else as well.  You have an

15   exhibit to the EIPA which provides for an advisory board.

16   And again, the Taylor parties now scoff that, oh, it's

17   meaningless and, you know, there's no real control.  Well,

18   then if that's so, if the appointment as alternate governor

19   is so meaningless, and if the appointment to the advisory

20   board and the creation of an advisory board that has never

21   existed in the history of the Timberwolves until now, if

22   that's so meaningless, then why did the parties see fit to

23   spend what undoubtedly were countless hours and countless

24   thousands of dollars negotiating those provisions?  They

25   were negotiated, Your Honor, because when one looks at the

1    provisions in detail with a nod and a wink, with a nod and a

2    wink, what Mr. Taylor is telling the buyer is that he will

3    not take actions without their consent with a nod and a

4    wink.

5              THE COURT:  When you say "a nod and a wink," I

6    assume you're referring to the fact that there's an advisory

7    board, but that the advisory board has no veto or consent

8    power.

9              MR. SCHAFHAUSER:  That's right.  I admit to Your

10   Honor, as I must, that there are words in the document which

11   profess to say that the advisory board is merely a

12   consultative body and in and of itself does not divest

13   Mr. Taylor of his authority -- or rather Taylor Sports Group

14   of its authority as general partner.  I readily concede that

15   that's what the words on the page seem to indicate.

16             But, but, Your Honor, again, never before in the

17   history of the Timberwolves has Mr. Taylor seen fit to

18   propose an advisory board nor has -- he bargained for it as

19   part of the series of related transactions, Your Honor,

20   that are in place here.  What he has done and what he is

21   doing and what is abundantly clear is that he is providing a

22   measure of control to others and that he himself is no

23   longer going to have unfettered, unfettered, prerogative to

24   act.  That's what is manifestly clear.

25             So, I know I've gone on for a while and you asked

1    me to be more prompt in going through these points, so I

2    just wanted to go back to the main point.

3          The main point, Your Honor, is that the first of

4    the two forms of injunctive relief that are in play here is

5    that there are express prohibitions in the document that

6    would be violated, express prohibitions against a transfer,

7    express prohibitions against sharing management authority,

8    that we submit would be violated.  Where there are such

9    prohibitions and where there is a potential transaction that

10    would jeopardize those prohibitions, courts do act.  Courts

11    have seen fit to act.

12          So we have cited, Your Honor, a number of cases.

13    I would highlight only a couple for the moment given the

14    interest of time.

15          In the **EIG Global Energy Partners** case that we

16    cited, the court in that case, Your Honor, was dealing with

17    a prohibition in the operating agreement there against

18    transactions -- and I'm quoting page 7 of the court's

19    decision, and I quote:

20          "The Court finds that Plaintiff is likely to

21    suffer irreparable harm if the acquisition goes forward in

22    apparent violation of the LLC Agreement.  Because complex

23    business transactions cannot be simply unwound,

24    bargained for rights to prevent changes in business

25    structure and ownership are irreversibly lost after a

1    transaction breaching those rights occurs."

2           The court goes on to say:

3           "Here, Plaintiff is asserting a right to prevent a

4    transfer in the control of TAMCO, its partner [], without

5    supermajority approval.  If this right is not given interim

6    protection, it will be lost once the announced acquisition

7    [] is consummated.  Consequently, the Court finds that

8    Plaintiff is likely to face irreparable harm if it is not

9    granted preliminary relief."

10          Your Honor understands the analogy we seek to

11   draw, so let me move on to the next case very quickly, the

12   **Alcatel** case.  The same kind of issue.  In that case, on

13   page 38, the court says, and I quote:

14          "The loss of Alcatel's bargained-for minority

15   rights independently satisfy the irreparable harm

16   requirement.  Alcatel negotiated for particular contractual

17   rights [...] which, if breached, would constitute

18   irreparable harm," and then it cites other cases.

19          We also, Orbit Sports, bargained for contractual

20   rights which, if breached, would constitute irreparable

21   harm.

22          That brings me, Your Honor, to the second

23   component of our irreparable harm showing, and that is, Your

24   Honor, that there is no adequate remedy at law here, because

25   we are talking about such enormous, frankly, sums of money

1    in dispute that it is highly unlikely that absent relief

2    from this Court that there will be a full recovery.

3           Your Honor is familiar with the cases, of course,

4    that we've cited, but I do want to note one case in

5    particular, and that is the -- forgive me.  That is the

6    case, Your Honor, in which -- the **UnitedHealthcare** case, a

7    case decided by Judge Rosenbaum of this court.  There was a

8    dispute involving the then chairman, or I should say the

9    former chairman, of UnitedHealthcare Group.  He asserted

10   that he was the holder of rights and interest north of a

11   billion dollars, and Judge Rosenbaum in that case refers to

12   that assertion that he had north of a billion dollars.  It's

13   on page 17 and page 18 of Judge Rosenbaum's decision, but

14   this is what Judge Rosenbaum said in that case.  What he

15   said was that:

16          "Under appropriate circumstances, an injunction is

17   proper even where only money damages are sought" -- which by

18   the way, we're not only seeking money damages, but -- "even

19   where only money damages are sought.  In such cases, a court

20   must consider two factors:  the non-movant's resources and

21   the potential magnitude of eventual damages."  And then this

22   is what he says, Your Honor.

23          Of great resonance in this case where we are

24   talking about Glen Taylor, I admit we all see what the press

25   says about his resources, but this is what the court said

1   with respect to an alleged billionaire in the

2   *UnitedHealthcare* case:

3          "The Court" -- and I'm quoting at page 14 now.

4   "The Court finds that while Dr. McGuire's resources are

5   great, the potential damages may be even greater."

6          And on that basis, Your Honor, Judge Rosenbaum

7   determined that there was irreparable harm shown because

8   there was not an adequate remedy at law, and he therefore --

9   interestingly enough, he therefore enjoined the release of

10  certain property held by Dr. McGuire so that the plaintiffs

11  in that case would have an adequate remedy at law if they

12  prevailed at the end of the case.

13         Here, Your Honor, we have a situation where --

14  and noted in the papers, this actually is not the only

15  lawsuit that Mr. Taylor is involved with.  There are other

16  lawsuits of record and, you know, we've cited them in the

17  papers.  He's being sued for what appears to be more than a

18  billion dollars in another lawsuit.  He admitted to my

19  client -- and this is undisputed.  He hasn't denied it,

20  hasn't submitted an affidavit in response.  He admitted to

21  my client he needed the money in 2016.  He admitted to my

22  client that he needed the money when he structured the

23  transaction the way he structured it now.

24         And beyond what Mr. Taylor might have said, moving

25  beyond what he said, just looking at the structure of the

1    transaction, why would the owner, Your Honor, I respectfully

2    ask, why would the owner of an NBA team, if he didn't have

3    liquidity issues, if he didn't have, you know, issues, why

4    would he structure a transaction in this way whereby he's

5    selling a piece now, he's selling options now, he's tying

6    his hands, he is tying his hands and giving irrevocable

7    rights to someone else and they can exercise them, he's

8    capping the amount at which he can sell his team?  Why would

9    he do that if he doesn't need the money immediately?

10           I respectfully submit that even the sheer

11   structure of this transaction, which is a curious structure,

12   demonstrates that Mr. Taylor, although he claims to be a

13   billionaire in the -- I saw a *Forbes* reference -- the *Forbes*

14   reference is not probative.  The *Forbes* reference is

15   hearsay.  The *Forbes* reference is not dispositive of

16   anything.  What is dispositive is the admissions he made to

17   my client, the fact that Mr. Taylor is in the public record

18   as being sued by others for what appears to be more than a

19   billion dollars, and the fact that if and when my client

20   prevails in this case, the amount to which my client is

21   entitled will potentially dwarf what Mr. Taylor will

22   recover.

23           So for all of those reasons, Your Honor, just like

24   in the ***UnitedHealthcare*** case that Judge Rosenbaum dealt

25   with, Mr. Taylor -- and let me go back and quote it, just to

1    paraphrase it, but it has equal resonance here.

2    Mr. Taylor's resources may be great, but the damages may be

3    greater.  That's exactly what was found with respect to

4    Dr. McGuire, and that's exactly the situation that exists

5    with Mr. Taylor.  Interestingly enough, we presented these

6    facts, we put in the record, we put in Mr. Orbach's

7    declaration.  Not a word in response by Mr. Taylor in a

8    declaration, not a word saying, "Oh, I'm good for the money.

9    No problem.  No issue."  Not a word in response,

10    interestingly enough.

11        But there is another aspect of this, Your Honor,

12    and the other aspect of it is that if Your Honor were to

13    find -- for all the reasons I've submitted, we believe that

14    the proposed transaction should be stayed and enjoined, but

15    if Your Honor were to find that perhaps that form of relief

16    is too draconian, there's another solution here.  There's

17    another aspect.

18        Your Honor sits, you know, and has equitable and

19    broad powers.  Your Honor could as an alternative direct

20    that the sale does go forward and that the money is simply

21    paid into court.  If there is a dispute, although they

22    haven't provided any evidence, Your Honor could simply

23    direct that the money be paid into court.  There would then

24    be a recovery available if, as I believe will be the case,

25    Orbit prevails.

1          I did not see -- and maybe I missed it, but I did

2     not see any real response to that point, but there certainly

3     is -- there certainly is precedent for that.  In fact,

4     again, Judge Rosenbaum in the case that I just referenced

5     enjoined monies from being dissipated.  The same could be

6     done here.

7          Injunctive relief is in the public interest.  We

8     noted the cases.  There certainly is a public policy and

9     public interest in enforcing the sanctity of contracts and

10    that's what we're talking about here.

11         If there is any issue, Your Honor, as to whether

12    my client has an adequate legal remedy, courts also have

13    found in some instances that expedited discovery is

14    appropriate.  We could have narrowly tailored expedited

15    discovery.  For the reasons that I've already submitted, I

16    believe we've already carried the day.  We've borne our

17    burden.  The Taylor parties have submitted nothing in

18    response.  But even if, even if there were an issue, Your

19    Honor could and should in that instance direct expedited

20    discovery as to the adequacy of Orbit's legal remedy.

21         So for those reasons, Your Honor, we respectfully

22    submit that Orbit is likely to prevail on the merits, Orbit

23    will suffer irreparable harm in the absence of relief from

24    this Court, the balancing of the equities weighs in favor of

25    Orbit, injunctive relief is in fact in the public interest

1    because we're talking about the sanctity of contracts.

2              Couple of brief points just to finish up, Your

3    Honor.  And by the way, I appreciate the opportunity you've

4    given me.  A couple brief points.

5              We have an entire section of our submission

6    talking about an alternate remedy that's available, specific

7    performance.  Your Honor could -- and we respectfully submit

8    should -- grant specific performance in the alternative.

9    Specific performance is an equitable remedy, it is a remedy

10   that the Court has available to it, and specifically, no pun

11   intended, but specifically the performance that we are

12   seeking is the no-transfer provisions that are baked into

13   the contract.  They are clearly set forth in the contract.

14   Absent specific performance, it's as if those provisions

15   didn't exist.  So the Court can and should grant specific

16   performance.  We've cited the cases and I know that Your

17   Honor has read the papers.

18             Last but not least -- and I'm sure my esteemed

19   colleague will address this -- but we do not believe that a

20   bond is necessary or warranted.  Again, the Taylor parties

21   have demonstrated zero prospect that they will be damaged.

22   There has been no affidavit saying that anyone will walk

23   away from this deal.  Mr. Rodriguez has not said that he's

24   going to walk away, Mr. Lore has not submitted an affidavit,

25   Mr. Taylor has not submitted an affidavit saying, oh,

1    they're going to walk away.  There's no competent evidence

2    in the record that anyone is going to damage the Taylor

3    parties in the least.  And by the way --

4         THE COURT:  I'm familiar with all of that.  I

5    think I have to -- and I'm making this as a statement more

6    than a question -- I think I have to read the

7    time-is-of-the-essence provisions and give them credit.

8         MR. SCHAFHAUSER:  Very well.  Very well.

9         Let me then say in response to that, Your Honor,

10   that if -- if the time-is-of-the-essence provision were

11   exercised and enforced, again, you've heard what I said, but

12   if Your Honor is going to give credit, what will be the

13   damage if it were enforced?  At the end of the day the

14   Taylor parties would be left with partnership interests

15   valued at $1.5 billion.  Doesn't sound like much damage.

16   They bought those interests for far less.  There's no

17   damage.  Even if this buyer were to walk away absent proof,

18   absent competent proof by the Taylor parties that this is

19   the only buyer in the universe that wants to buy an NBA team

20   for that price, they still haven't sustained a showing of

21   damage, because at the end of the day at very worst they

22   would be left with partnership interests worth, according to

23   the documents, $1.5 billion.

24        But again, there's another solution, and that is,

25   if the Taylor parties say that they would be damaged, that

1    they're worried about this buyer walking away, the

2    alternative is just put the money into court and let this

3    dispute be adjudicated on its merits by this Court without

4    my client facing the jeopardy that at the end of this

5    process, if and when it prevails, it will be left holding

6    the bag.

7            Because under the Partnership Agreement, to

8    reiterate one more time, 10.7(d), my client is to get paid

9    first, not second, first.  That's what the document says.

10   It says first.  The electing partner gets paid first.  The

11   electing partner is my client, not the Taylor parties.  So

12   that provision, Your Honor, should be enforced.

13           Last point on the bond.  Interestingly enough,

14   after spending page after page after page saying there's no

15   control sale, there's no drag-along rights, there's no

16   tag-along rights, no rights have been triggered of any kind,

17   these are not a series of related transactions.  When it

18   comes to talking about a bond, the defendants say that they

19   should be awarded a bond that would prevent -- protect them

20   against the loss of a $1.5 billion transaction, because a

21   bond in that amount could result in losses -- and I'm

22   quoting -- could result in losses to the Taylor parties

23   exceeding $1 billion.

24           THE COURT:  I get the point.

25           MR. SCHAFHAUSER:  You get the point.

1          THE COURT:  I get the point.

2          MR. SCHAFHAUSER:  Thank you, Your Honor.  I

3    appreciate the time you've given.  Thank you.

4          THE COURT:  All right.  We've been at this for a

5    bit over an hour and a half now, and so here's what we're

6    going to do.  We're going to take a ten-minute break.  We'll

7    come back at a little after a quarter to and resume,

8    Mr. Baudry, with your argument.

9          MR. BAUDRY:  Thank you, Your Honor.

10          THE COURT:  All right.  We're adjourned for just a

11    moment.

12          (Recess taken at 2:37 p.m.)

13                              *      *      *      *

14          (2:50 p.m.)

15                          IN OPEN COURT

16          THE COURT:  All right, everyone.  Please be

17    seated.

18          Mr. Baudry?

19          MR. BAUDRY:  Thank you, Your Honor.  May it please

20    the Court and counsel.  Alain Baudry and Courtland Merrill

21    from Saul Ewing representing the Taylor party defendants.

22          First, I want to extend my appreciation to the

23    Court and to opposing counsel for rescheduling the hearing

24    at my request.  I very much appreciate it.

25          What I'd like to do with my time this afternoon is

1    spend virtually all of it on -- either consider it our

2    motion to dismiss or likelihood of success on the merits.

3            THE COURT:  Check to see if your microphone is on

4    there, Mr. Baudry, and if it's --

5            MR. BAUDRY:  It wasn't.  Thank you.

6            THE COURT:  Okay, great.  Thank you.

7            MR. BAUDRY:  I'm going to essentially spend the

8    vast majority of my time on likelihood of success or our

9    motion to dismiss, because I think the Court has substantial

10   expertise on irreparable injury and doesn't really need the

11   parties' assistance in that regard.

12           I think what's unique in this case is the

13   Partnership Agreement and how it interrelates with the NBA

14   Constitution and the Equity Purchase Agreement pursuant to

15   which my clients agreed in principle to sell all partnership

16   interests in the Minnesota Timberwolves Limited Partnership

17   to a company controlled by Marc Lore and Alex Rodriguez for

18   $1.5 billion over a period of years through some grants of

19   options that I'll talk about.

20           My clients own approximately 73 percent of the

21   outstanding partnership units, including all of the general

22   partner units, and it's the general partner units, as Your

23   Honor is aware, which convey sole and absolute control over

24   managing the affairs of the partnership.

25           The plaintiff is a limited partner, owns

1    approximately 17.3 percent of the limited partnership

2    interests, and, as we pointed out in our agreement, if the

3    second tranche is exercised, stands to realize a gain of

4    about -- he's going to get about $237 million and a huge,

5    huge return on investment.

6             Under the Purchase Agreement with the buyer,

7    there's only one thing that the buyer is committed to do.

8    The only thing that the buyer has contractually committed to

9    do is to purchase an initial 20 percent limited partnership

10   interest from the Taylor parties.  There is no other

11   contractually enforceable agreement by the buyer to buy any

12   additional units.  It's in its sole discretion.  It has

13   options.  It's in its sole and absolute discretion whether

14   to exercise the options.  If it decides not to exercise the

15   options, then the options essentially self-destruct and the

16   rest of the options self-destruct, but if it decides not to,

17   there's no claim that my clients would have against the

18   buyer for breach of contract.

19            That decision, the first 20 percent, is subject to

20   NBA approval and we are told now that that approval will not

21   happen sooner than July 13th of next month.  The remainder

22   of the purchases may or may not happen depending on whether

23   the buyer decides to exercise the options in its sole

24   discretion and whether the NBA approves of those sales if it

25   does happen.  Each -- and I think this is clear -- each and

1     every option transaction, just like the initial sale, if it

2     is exercised, has to be approved by the League or the

3     transaction can't proceed.  While that is an explicit

4     condition in the Purchase Agreement, the Equity Purchase

5     Agreement, it's also a requirement in the NBA Constitution.

6     The League has to approve every single transfer before it

7     can become effective.  And it turns out that the NBA is a

8     very exclusive club and it's very particular about who gets

9     to join it, and we'll see the NBA Constitution lays out a

10    very detailed process, vetting process, when someone applies

11    to either purchase a limited partnership interest or a

12    general partnership interest.

13            The Partnership Agreement provides when there's a

14    control sale -- and we'll get into the definition, but that

15    of necessity includes that a majority of the general

16    partnership interests are sold, transferred, or otherwise

17    disposed of to a new general partner, then the old general

18    partner can force the remaining limited partners to exit at

19    the same time.  It's called the drag-along right.

20            And the theory of the drag-along right is pretty

21    simple.  If someone wants to buy an NBA franchise, a lot of

22    times they want to bring in their own investment group and

23    they don't want residual partners from the old regime, and

24    without drag-along rights, then basically all partners would

25    be able to hold the general partner hostage by saying, "We

1    won't sell," so that's a very important provision.

2          The Partnership Agreement also says if the general

3    partner decides not to exercise the drag-along right, then

4    in that case the limited partners still gets to decide

5    whether they want to get bought out or not or remain in the

6    partnership with a new general partner they didn't select,

7    and those are called tag-along rights.

8          And the crux of this dispute, as is apparent, is

9    that the plaintiff claims that the agreement pursuant to

10   which the buyer buys a 20 percent limited partnership

11   interest now with an option to buy remaining interests later

12   constitutes a control sale, entitling it to an immediate

13   buyout.  And then it has an alternative theory, which is,

14   okay, well, even if the agreement isn't a control sale, it's

15   a proposal to enter into a control sale, and that's enough

16   to trigger our rights to be bought out regardless of whether

17   there ever actually is a sale of the majority interests of

18   the general partnership units and regardless of whether the

19   League approves it.  So their position is the mere proposal

20   to anyone of a proposal to sell a majority of general

21   partnership units, they get cashed out now, and that's the

22   crux of the dispute.

23          And to understand why neither of those theories

24   make any sense and is in fact dead wrong, what I want to do

25   is delve into the Partnership Agreement, the Purchase

1    Agreement, and even the NBA Constitution so the Court can

2    understand the interrelationship between those documents.

3        With the Court's permission, I've given the Court

4    a hard copy of this PowerPoint deck.  It's called "Final

5    Deck."  And I also gave the Court what's called a "Build Up

6    Deck."  And the reason is, the slides we're going to look at

7    have excerpted language from the partnership provisions that

8    I want to focus on and you can look at the build up deck to

9    see what language we left out or the totality of the

10   language, and that's for everyone's convenience.

11       THE COURT:  I've got the agreement in front of me.

12       MR. BAUDRY:  Okay.  So let's look at the first

13   definition, "control sale."  And "control sale" -- this is

14   part of what's the third amendment to the Partnership

15   Agreement, which was -- the third amendment was negotiated

16   at the time the plaintiff entered into the partnership.  So

17   you have the original Partnership Agreement with a variety

18   of provisions and then the provisions that we're talking

19   about in large part today:  drag-along rights, tag-along

20   rights, control sale, were all contained in the third

21   amendment.

22       And:  "'Control Sale' means a sale, exchange or

23   other disposition ... by ... the Taylor Group, in a single

24   transaction or series of related transactions ... which

25   includes a majority of all the General Partnership

1    Interests ...."

2          So, the first thing we have to do is unpack what

3    is "sale, exchange or other disposition."  And it is

4    interesting, because as we heard during my colleague's

5    opposing argument, the Partnership Agreement has a defined

6    term, "transfer."

7          Courtland, can we see that?

8      (Pause)

9          MR. BAUDRY:  No, that's from Section -- we want

10    the other document.

11          MR. MERRILL:  Excuse me.

12          MR. BAUDRY:  We need to go down a little bit.

13    There it is, 1.27, transfer.

14          So "transfer" is in the original Partnership

15    Agreement, broadly defined.  I'm not going to read it, but

16    it's clearly broader than the four words that appear in

17    "control sale," "sale," exchange or other disposition," and

18    nowhere does the word "transfer" -- the answer to your

19    question does the word "transfer" appear in the definition

20    of "control sale" is very simple:   No.

21          What's interesting is that in the third amendment

22    there is use of the word Transfer, capital T, so that --

23          Could we see the next provision?

24          So in the very same third amendment where they

25    were defining "control sale," they had a Section 10.9 about

1    transfer of interests of limited partners, and there you see

2    the capitalized word "Transfer" appear several times:  "The

3    purported Transfer," capital T, "shall be null and void,"

4    and then there's the word "Transferred," all capital T.

5          And obviously the significance of that is that the

6    parties negotiated this and clearly they intended that the

7    definition of "control sale" was narrower than "Transfer,"

8    or they would obviously have just -- they could easily have

9    just said a control sale means a transfer.  They intended

10    something, obviously, much narrower.

11          And, you know, one of the key questions is

12    obviously what does "sale, transfer or otherwise disposed"

13    mean.  We cited the Court to the *Bremer Bank* case, Minnesota

14    Court of Appeals case from 2018 which follows an early Fifth

15    Circuit case construing the terms "sale, lease, license, or

16    otherwise dispose" out of the UCC.  And what the Fifth

17    Circuit did and what -- the *Bremer Bank* case endorsed that

18    approach -- is that using the doctrine of *ejusdem generis*,

19    it said that when you have a series of words and the last

20    word is and "including X," that "X" has to be defined

21    similarly to the words that precede it.

22          And in the *Bremer Bank* case, what the Court of

23    Appeals said is "sell, lease, license, or otherwise

24    dispose," "otherwise dispose" has to involve essentially a

25    transfer of title, and because the bank in that case did not

1    enter into a transaction to transfer ownership or possession

2    of the motor home, there was no other disposition.

3            And that's consistent with actually the dictionary

4    definition of disposition, the act or power of disposing,

5    such as transfer to the care or possession of another, and

6    obviously there's a key difference in the parties'

7    interpretation of how this partnership provision applies to

8    the Equity Purchase Agreement.

9            It is clear under Minnesota law that the grant of

10   an option to someone to buy property does not convey any

11   interest or title in that property.  And so here we have

12   parties who intended a narrow definition --

13           THE COURT:  Until it's exercised.

14           MR. BAUDRY:  Until it's exercised.  And even then,

15   if it's exercised, it still may not come into fruition

16   because the NBA still has to approve it.

17           So let me just go back.  They say we're running

18   away from "series of related transactions."

19           THE COURT:  Just so I'm clear on something.

20           MR. BAUDRY:  Yes.

21           THE COURT:  When you talk about control sale and

22   you will loop in the NBA's approval --

23           MR. BAUDRY:  Yes.

24           THE COURT:  -- you're doing that by tying the

25   definition of control sale to 10.1.

1          MR. BAUDRY:  Yes.

2          THE COURT:  Okay.

3          MR. BAUDRY:  Yes.

4          THE COURT:  I get it.

5          MR. BAUDRY:  The purpose of the related

6    transactions is pretty simple.  Let me give you an obvious

7    example.

8          The Taylor parties sell their general partner

9    interest to a buyer in three different transactions:

10    one-third, one-third, one third.  And the series of related

11    transactions is there to prevent them from saying, "We never

12    sold the majority of partnership units.  We only sold a

13    third."  But obviously if it's to the same buyer, you'd have

14    to aggregate those, and if the aggregate transactions

15    included a majority of the general partnership interests,

16    then clearly you would have a control sale even though no

17    individual sale was a majority of the general partnership

18    interests.

19          And the last word is -- opposing counsel talked a

20    great deal about this, but the acid test, you can't have a

21    control sale unless you have two things:  sale, exchange or

22    other disposition, and, two, it includes a majority of all

23    the general partnership interests.

24          And Your Honor correctly noted that "general

25    partnership interest" is a defined term under the

1    Partnership Agreement and it means the general partnership

2    interest held by the general partner in its capacity as

3    general partner.  So unless you have those two things, sale,

4    exchange or other disposition, which includes a majority of

5    all the general partnership interests, you can't have a

6    control sale.

7         THE COURT:  Let's pull that microphone just a

8    little closer if you could, Mr. Baudry.

9         MR. BAUDRY:  Yes.

10        THE COURT:  Thank you.

11        MR. BAUDRY:  We talked about drag-along rights.

12   What Section 10.8 does is to define the tag-along (sic)

13   right, and I start with the tag-along -- the drag-along

14   right first because it has priority under the Partnership

15   Agreement, and the general partner gets first dibs on

16   whether or not to exercise a drag-along right.

17        So what this section tells us is:  "Subject to

18   Section 10.1, if ... the Taylor Group ... desires to approve

19   or consummate a Change in Control," which is a defined term

20   that includes a control sale, then "the Taylor Group shall

21   have the right ... to require each of the other Partners ...

22   to approve and participate in the Drag-Along Sale ...."

23        If you look at the words in 10.8, they're a little

24   different than the words in 10.7.  So the words are:

25   "if ... the Taylor Group ... desires to approve or

1    consummate," not propose, approve or consummate.  So you

2    have to have an initial proposal, that proposal has to be

3    accepted, and then the general partner has -- if he wants to

4    approve or consummate -- will have the right to drag along

5    the other partners, limited partners.

6              THE COURT:  Define "consummate."  Close?

7              MR. BAUDRY:  Yes.

8              THE COURT:  Okay.

9              MR. BAUDRY:  And as we'll see, a close assumes

10   prior NBA approval.

11             So then let's talk about how the drag-along right

12   is exercised.  So, the drag-along right is exercised if the

13   general partner, not less than 15 days prior to the

14   consummation of the drag-along sale, not less than 15 days

15   prior to closing, gives written notice to the dragged

16   partners, to the limited partners, setting forth purchase

17   price, anticipated closing date.

18             And then it says if the drag-along sale involves a

19   control sale, which if the second tranche option was

20   exercised, for example, and approved, then the dragged

21   partner shall drag along on the date of the drag-along sale,

22   sell all of their partnership interests.

23             THE COURT:  Can I ask a question about that?

24             MR. BAUDRY:  Yes.

25             THE COURT:  How could a drag-along sale not

1    involve a control sale?

2            MR. BAUDRY:  I don't know the answer to that

3    question, because logically a control sale requires a

4    disposition of a majority of the general partnership units,

5    and that's what triggers drag-along rights.

6            THE COURT:  I understood drag-along sale to be a

7    subset of a control sale, right?

8            MR. BAUDRY:  Yes.  A drag-along sale is a sale in

9    which the general partner has exercised its drag-along

10    right.

11            THE COURT:  Right.  Okay.  I guess what I'm

12    required -- to have that confusion, I'm required to read

13    "change in control" to mean a "control sale"?  Is that

14    always true?

15            MR. BAUDRY:  If we go back one slide, a change in

16    control, one of the definitions is control sale, but it also

17    could include --

18            THE COURT:  Asset purchase.

19            MR. BAUDRY:  Asset purchase.

20            THE COURT:  Yes.  Okay.  Got it.

21            MR. BAUDRY:  Right.  So, one of the arguments that

22    was made in the reply brief of the plaintiff was, oh, this

23    is so terribly unfair.  Our position is that tag-along

24    rights under 10.7 can never come into existence before the

25    transaction closes, and therefore you're essentially writing

1    tag-along rights out of the agreement, and that's just

2    absolutely not the case.

3         And 10.8(b) shows us why that's not the case,

4    because if the general partner wants to exercise the

5    drag-along right, there is a cutoff date by which it must do

6    it, and that cutoff date is not less than 15 days prior to

7    the consummation date.  So, if you have a closing date and

8    the general partner has not issued a drag-along notice 15

9    days earlier, then they can't thereafter exercise

10   drag-along.  And that means that there will be at a minimum,

11   at a minimum a 14-day period, a two-week period, in which

12   limited partners get to decide whether they want to exercise

13   their tag-along rights, and we're going to look at 10.7.

14        So it's just not right, it's just wrong to say

15   that tag-along rights don't come into existence except after

16   closing.  No, there was a minimum two-week period, because

17   that's the cutoff date after which the general partner can

18   no longer elect the drag-along right.  And everyone -- I

19   mean, it's really the buyer, right, who tells the general

20   partner whether they want to keep the -- or whether they're

21   amenable to keeping the existing partners in or whether they

22   want to bring in their own group and they want everyone out.

23        So this section presupposes that the general

24   partner might wait until the 15th day before closing.  In

25   reality, as this transaction demonstrates, they know long

1    before.  And in this case, in this transaction, the general

2    partner has advised the limited partners that if the second

3    tranche option gets exercised and the majority of the

4    general partnership units transfers to the buyers, then in

5    that event the Taylor parties intend to exercise the

6    drag-along rights and all the limited partners get bought

7    out on the same terms and conditions as the Taylor parties.

8            So, let's then talk about 10.1, because 10.8(b) --

9    or 10.8(a) has a very important little preamble:  "Subject

10   to Section 10.1."

11           In 10.1, which is part of the old Partnership

12   Agreement, it says:

13           "A Partner may not Transfer or assign all or any

14   part of such Partner's Partnership Interest except in

15   accordance with this Agreement."  And that:  "No proposed

16   Transfer" -- and "proposed" is the wording used in Section

17   10.7 -- "which [] fails to comply in all respects with all

18   applicable provisions of NBA Regulations, including the

19   obtaining of any required consents, will be effective for

20   any purpose."

21           And that's very important, and the reason it's

22   very important is because owners face very harsh penalties

23   from the NBA if they attempt to transfer partnership

24   interests without the League's prior approval.  And this is

25   from Article V of the NBA Constitution regarding transfer of

1    memberships:

2              "No membership ... may be sold, pledged,

3    hypothecated, assigned, or otherwise transferred or

4    encumbered (each a 'transfer') in whole or in part, directly

5    or indirectly, except in accordance with the subject to the

6    following provisions of this Article 5."

7              And, you know, what's interesting is, this is

8    another example, this is another definition of the word

9    "transfer" that the parties could have selected in the

10   definition of "control sale."  It's similar to the

11   definition of "transfer" in the partnership, but the point

12   is that there's very broad definitions of "transfer" when

13   it's appropriate to do so, and what the NBA is saying is,

14   you do anything with your partnership interests that fits

15   into any of these boxes, then you trigger the provisions of

16   this Article 5.

17             "Upon receipt of an application requesting

18   approval ... the Commissioner" of the NBA conducts an

19   investigation.

20             "A transfer shall only become effective if

21   approved by the affirmative vote of not less than

22   three-quarters of all Governors at a meeting called for such

23   Purpose ...."

24             And "Any violation of the provisions of this

25   Article 5 shall constitute a violation of Article 13(b)."

1    And Article 13(b) says:  "The Membership of a

2    Member or the interest of any Owner may be terminated" if

3    the owner does or allows "any of the following:  [] Transfer

4    or attempt to transfer a Membership or an interest in a

5    Member without complying with the provisions of Article 5."

6            THE COURT:  What's the definition of membership in

7    Section 13?  If there's an easy answer, great.

8            MR. BAUDRY:  It's in the NBA Constitution, and if

9    you just give me a moment --

10           THE COURT:  Certainly.

11           MR. BAUDRY:  -- I will find it for you.

12       (Pause)

13           MR. BAUDRY:  It's not immediately apparent to me

14   where in the -- let's see.  There's a definition section.

15   Yes.

16            This is on page 2 of the NBA Constitution:

17            "Membership shall mean the rights, privileges, and

18   benefits granted to a Member by the Association, including

19   without limitation the right to organize and operate a

20   professional basketball team to play in the League."

21            So you try to do a transfer and not get League

22   approval, you potentially can face a very, very harsh

23   sanction, and that's why you have the Section 10.1 in the

24   Partnership Agreement to make clear that no proposal, no

25   contemplated agreement, is effective for any purpose without

1    NBA approval.

2            So, I've done this summary slide of what the

3    elements of a drag-along right are.

4            First, it "Requires 'Control Sale,' transfer of

5    title to a majority of the GP interest," and we say that's

6    our interpretation of **Bremer Bank**, that title to a majority

7    of the general partnership interests actually has to

8    transfer to a buyer, or third party, to even give rise to a

9    drag-along right.

10           Second, "Proposed Transfer not effective for any

11   purpose unless NBA approves [it]."

12           Third, there's a required notice, which

13   "include[s], among other things, [the] purchase price and

14   the anticipated closing date."

15           And the point there is that Section 10.8 is

16   contemplating an actual control sale with an actual closing

17   and a purchase price and a definitive agreement, not a

18   hypothetical transaction in the future, an actual closing of

19   a control sale.

20           And lastly, in terms of timing, a "Drag-Along

21   Right is effective if notice is provided at any point up to

22   15 days before closing."  After that, no more ability by the

23   general partner to exercise the drag-along right.

24           THE COURT:  If League approval is part of that,

25   does that last "Effectiveness" block, is that accurate?

1    Should it really say 15 days before closing or League

2    approval, whichever comes later?

3              MR. BAUDRY:  Well, as a practical matter, because

4    of the prohibition in Article 5 of the NBA Constitution,

5    you're not going to hold the closing unless the NBA approves

6    it.

7              THE COURT:  Got it.

8              MR. BAUDRY:  All right.  Then I want to talk now

9    about 10.7, the rights that the plaintiff believes have been

10   violated here.  We see the exact same preamble, "Subject to

11   Section 10.1," but the trigger language is a little

12   different:  "in the event ... the Taylor Group ... proposes

13   to enter into a Control Sale ... and the Selling Partner

14   does not exercise the Drag-Along Right ...."

15             Now, there's at first blush a little bit of an

16   inconsistency between 10.7 and 10.8, because on the one hand

17   it's saying you don't get to tag along unless the selling

18   partner elects not to exercise the drag-along, but the

19   trigger appears to be the word "proposes" as opposed to

20   trigger language in 10.8, which is "desires to consummate or

21   approve."

22             And at first glance you say -- it's how do you

23   harmonize these, and the harmonization is the language

24   "Subject to Section 10.1," because in order to be effective,

25   a proposal has to be accepted and approved by the League and

1   the general partner has to elect not to exercise its

2   drag-along right.

3          And the interpretation that the plaintiff offers

4   of Section 10.7(a) is -- what they're telling you is the

5   words "Subject to Section 10.1" mean nothing.  The only

6   relevance of the different conditions in Section 10.1, sales

7   of securities laws or threatening to make a limited partner

8   liable for a general partner, this is the one, the League

9   approval, that is directly relevant to tag-along rights and

10  drag-along rights.

11          THE COURT:  You'll grant that it's a little bit

12  unnatural to call a League-approved transaction a

13  quote-unquote proposal?

14          MR. BAUDRY:  Yes.

15          THE COURT:  Okay.

16          MR. BAUDRY:  But it cannot be the case that the

17  words "Subject to Section 10.1" don't mean anything, and the

18  Court has to harmonize 10.7 and 10.8, and really the only

19  way to do it is to look at those words, "Subject to 10.1."

20  And then it makes sense, because if it requires League

21  approval to be effective for any purpose, then the general

22  partner has the decision to make once League-approved:  Do I

23  exercise my drag-along rights or not?  They have until 15

24  days before the closing to decide that, and then the limited

25  partners at that point, from day 14 before closing to

1    closing, have the option to elect their tag-along rights at

2    that point.

3            But -- and it has to be right, because the

4    condition in Section 10.7(a) that tag-along rights -- you

5    never get to tag-along rights unless the selling partner has

6    decided not to exercise the drag-along right, and the

7    decision under 10.8 of the seller to exercise or not a

8    drag-along right does not happen at proposal.  It happens at

9    consummate.  And they are expressly acknowledging in Section

10   10.7(a) that the tag-along right is subordinate to the

11   drag-along right, so if the general partner elects to do a

12   drag-along, there is no tag-along.  And really in some sense

13   it doesn't matter, because the limited partners are getting

14   bought out one way or the other.

15           But the point is, by giving priority, by

16   recognizing the priority of drag-along rights, the whole --

17   at the very instant you utter the words, "I'd like to offer

18   to sell my general partnership interest to you," that that

19   triggers tag-along rights, that does not work with the

20   Agreement.  As you work through it, it doesn't work.

21           It's also consistent with what the plaintiff in

22   its correspondence to my client said was the purpose of

23   tag-along rights.  These tag-along rights were and remain

24   intended to ensure that no limited partner will be forced to

25   remain in the partnership without having a say in the

1    identity of the general partner, and that is the purpose of

2    a tag-along, obviously.

3            But the point is, if that's the purpose and you

4    have a transaction which may or may not happen in the future

5    or may or may not be approved by the League, then there's no

6    need to have a tag-along if there's no change in the general

7    partner.  So if the control sale either doesn't get

8    exercised or even if it's exercised the League says, "We're

9    not letting this buyer become the general partner, we veto

10   this," there's no change in the general partner.

11           And so the very purpose of tag-along rights is

12   unnecessary at that point, and what they're trying to do is

13   take what are essentially "me too" provisions that say if a

14   majority of the general partnership interests get bought

15   out, then the limited partners either can be dragged out or

16   can elect to tag out, and they're trying to say that it's

17   not a "me too," it's a "me first," and that just isn't

18   consistent with this Agreement.

19           Again, 10.7 says:  "Subject to 10.1."  I'm not

20   going to reiterate what I said, but it's clear that NBA

21   approval is a condition of 10.7.  And when it says a

22   proposal isn't effective for any reason, it can't trigger

23   tag-along rights if it's not effective, and they just --

24   their argument is, well, it can be an ineffective proposal,

25   but, you know, we still get to tag along.  That doesn't make

1    any sense.

2        The sale notice in Section 10.7 also requires

3    within ten days of the execution of any definitive agreement

4    by all the parties thereto a sale notice which describes a

5    proposed date, time and location and a copy of the

6    definitive agreement.

7        Is there a definitive agreement between the Taylor

8    parties and the buyer for the sale of any partnership

9    interests beyond the first 20 percent?  Absolutely not.  The

10    Equity Purchase Agreement is unenforceable against the buyer

11    with respect to any partnership interests other than the

12    first 20 percent.  So, if they're going to elect to purchase

13    any of the interests subject either to the second tranche,

14    the third tranche, or the fourth tranche, then there needs

15    to be a contract between the buyer and the Taylor parties --

16    and potentially the limited partners -- that makes that

17    obligation enforceable, and right now it isn't.

18        So, let me now summarize the elements of tag-along

19    rights under Section 10.7.  Requires a control sale.

20        THE COURT:  Let me just -- sorry.  Before you get

21    to that --

22        MR. BAUDRY:  Yes.

23        THE COURT:  I'm up here thinking and trying to

24    listen at the same time --

25        MR. BAUDRY:  Sure.

1          THE COURT:  -- and I do a lousy job of that

2     sometimes, so let me make sure I understand this.  You're

3     defining "definitive" as it's used in 10.7(b) --

4          MR. BAUDRY:  Yes.

5          THE COURT:  -- as only being met if the rights to

6     a controlling general partnership interest, the sale of a

7     controlling general partnership interest, are enforceable.

8          MR. BAUDRY:  Right.  I wasn't -- I'm not even

9     tying it to general partnership interests.  It could be even

10    any of the limited partnership interests.  Right now there

11    is no enforceable agreement which obligates the buyer to

12    close on any of the tranches:  first tranche, second

13    tranche, or third tranche, just has an option.

14         THE COURT:  All right.  So "definitive" means

15    "legally enforceable."

16         MR. BAUDRY:  Yes.

17         THE COURT:  All right.  I get it.  Thank you.

18         MR. BAUDRY:  So what are the elements of a

19    tag-along right?  First one is "Control Sale, transfer of

20    title to a majority of the GP interest."

21         Two requirements here, the "proposed transfer not

22    effective for any purpose unless NBA approves transaction,"

23    and second, "tag-along rights cannot exist if the general

24    partner has exercised the drag-along right."

25         And that's the other reason why their definition

1    of proposed -- their argument that, well, if you propose to

2    sell your partnership interests regardless of whether that

3    offer is accepted, even if it's accepted, regardless of

4    whether the League approves and regardless of whether there

5    ever becomes a new general partner, we get to cash out.

6    That's just commercially unreasonable and absurd.

7         The "notice must include, among other things, the

8    purchase price and the anticipated closing date."  Again,

9    10.7 contemplates an actual control sale with an actual

10   closing date, purchase price, et cetera.  It contemplates a

11   real transaction, not a hypothetical, not a maybe.  You

12   don't get to tag-along on a maybe.  You have to tag-along on

13   an actual control sale.

14        And "Effectiveness.  Tag-along rights are

15   effective if a limited partner provides written notice to

16   the general partner within 15 days of receiving sale notice

17   from the general partner," but the general partner doesn't

18   have to provide a sale notice up to 15 days before closing,

19   because they can still up to that point decide to exercise

20   tag-along rights.

21        I want to address the subject of control -- the

22   argument that, well, the evidence that the Equity Purchase

23   Agreement is a control sale is the fact that the Taylor

24   parties have ceded control of the partnership to the buyer,

25   and nothing could be further from the truth.

1          So the first thing is that under the Partnership

2     Agreement -- this is not unique to this partnership -- this

3     is just basically, as the Court is aware, a function of

4     partnership law.  You have a general partner who gets to

5     exercise exclusive management and control, and then limited

6     partners, who are essentially passive investors.  And the

7     benefits of being a limited partner are that you don't face

8     liability for partnership obligations, whereas the general

9     partner does, so there's a trade-off.

10         But here, the Partnership Agreement makes clear

11    that only "The General Partner shall have the exclusive

12    management and control of the business ..., and all

13    decisions regarding the management ... shall be made by the

14    General Partner," and "[t]he General Partner is hereby

15    granted the right, power, and authority to do ... all things

16    which, in its sole judgment, are necessary, proper, or

17    desirable to carry out" the management of the business of

18    the partnership.

19         And it goes on to say, just to be clear:

20         "Without limiting the [prior grant of authority]

21    ... it shall have the power and authority of the General

22    Partner, it shall have the power and authority ... to take

23    any and all actions it deems necessary or prudent to comply

24    with NBA Regulations.  NBA Regulations is a defined term

25    that includes the NBA Constitution under the partnership

1    plan.

2              There's another provision saying:  "Limitations on

3    Control.  Except as explicitly provided in this Agreement,

4    no Limited Partner shall have the right to participate or

5    interfere in the management or control of the Partnership

6    business."  And this is a standard provision in most

7    partnership agreements and it's consistent, where the

8    general partner has all the power and authority and limited

9    partners have none.

10             And what they're trying to do is, they're reading

11   this as if the limited partner would have standing to bring

12   suit if the general partner decided that he wanted to enter

13   into a contract with a limited partner to provide consulting

14   or advice about the business.

15             What 9.3 is saying is that the bundle of rights

16   that comes with being a limited partner does not include the

17   right to participate or interfere in the management or

18   control of the business, but that doesn't stop the general

19   partner, who has sole discretion, to enter into a separate

20   contract, not the Partnership Agreement, but a separate

21   contract with someone who happens to be a limited partner to

22   provide some kind of services to the partnership.

23             The best example of that that I could give you is

24   Flip Saunders.  He was -- he's a limited partner, or now his

25   estate is a limited partner, but at the time that he was the

1    general manager and coach of the team, he was also a limited

2    partner.  And that was pursuant to a separate contract and

3    that doesn't violate 9.3.  And really what 9.3 is saying is

4    limited partners like the plaintiff don't have the ability

5    to participate or interfere with how the general partner

6    decides they want to manage the organization.

7         And this (indicating) is what was very surprising.

8    This is their reply brief that the plaintiff served I think

9    last Friday, I think, Thursday.  They say:  "Orbit invested

10   in a Partnership with an established management structure,

11   which may not be changed without its consent."

12        Wow.  I don't know where that is in the

13   Partnership Agreement.  What I read was a limited partner

14   shall have no right to participate or interfere in the

15   management or control of the partnership business and the

16   general partner has exclusive management and control of the

17   business.  So if the general partner decides that he wants

18   to have an advisory board, he can do it in his sole and

19   absolute discretion and they can't object or interfere.  If

20   the general partner wants to nominate someone to be an

21   alternate governor on the board, it's actually his

22   obligation to do that.

23        THE COURT:  I get this argument.  Can I ask:  My

24   understanding of one of the arguments that was in the brief

25   is that the actual agreement with the buyers and the

```
1    creation of this advisory board doesn't give them management

2    or control in any sense.

3              MR. BAUDRY:  Right.

4              THE COURT:  As a matter of contract law.

5              MR. BAUDRY:  Yes.

6              THE COURT:  Not a fact of contract law.

7              MR. BAUDRY:  As a matter of contract law.

8              THE COURT:  Right.  So resolvable as a matter of

9    law.

10             MR. BAUDRY:  Yes.

11             THE COURT:  And then we've got the affidavit from

12   the NBA official --

13             MR. BAUDRY:  Yes.

14             THE COURT:  -- who says being a governor doesn't

15   give you control, management or operational control over a

16   team.

17             MR. BAUDRY:  Right.  The NBA does not get involved

18   in how -- I mean, obviously not every franchise is a

19   partnership, right, some may be corporations, but what the

20   role of the governors are, the League is run by the NBA

21   Commissioner and the NBA Commissioner reports to the Board

22   of Governors.  And under Article XVIII of the NBA

23   Constitution, every member has to be on the board and each

24   member has to submit to the Commissioner in writing the name

25   of such governor and the names of up to three alternates.
```

1    You have to submit the name of at least one alternate, but

2    up to three.

3              And the point is that what the governors do is,

4    they oversee how the Commissioner regulates the League, but

5    the Commissioner does not get involved in partnership

6    affairs.  He doesn't say, you know, "I think you should

7    change your tax status."  The Commissioner is basically

8    focused on the professional game and that does not involve

9    the business of the partnership, the internal affairs of the

10   partnership.

11             THE COURT:  Today you're sort of doing those

12   arguments one better and maybe it was in the brief and I

13   missed it -- that's totally possible -- which is, I think

14   you're suggesting that even if any buyer had some kind of

15   operational control as a limited partner did at one time,

16   right?

17             MR. BAUDRY:  Right.

18             THE COURT:  As GM.

19             MR. BAUDRY:  Right.

20             THE COURT:  That would not violate --

21             MR. BAUDRY:  It would not, because the general

22   partner has the ability and sole discretion to decide that

23   they're going to enter into a separate contract.  In other

24   words, in that case it's not the limited partnership status

25   that is giving the limited partner that right.  It's a

1    separate contract negotiated.

2            THE COURT:  I get it.

3            MR. BAUDRY:  This is the Maczko declaration, NBA

4    Head of Investor Transactions.  His precise statement is:

5    "[A]ppointment as an Alternate Governor does not provide the

6    appointee with any control rights with respect to a team."

7    And he didn't use the word "partnership," because as I said,

8    not every team is a partnership, but the NBA does not get

9    involved in the internal management of the franchises.

10            So, I want to then talk about the Equity Interest

11    Purchase Agreement with the company controlled by Lore and

12    Rodriguez.

13            And so this is -- 2.1 is what I've referred to as

14    the only enforceable obligation against the buyer, and that

15    is that they'll acquire 20 percent of the limited

16    partnership interest at the closing, and then effective as

17    of the closing the seller partners, parties, grant a series

18    of call options to acquire all of the remaining Taylor

19    units, and they also -- the seller also commits -- as

20    general partner, Taylor Sports Group, Inc. will grant a call

21    option to acquire all the other limited partnerships'

22    interest pursuant to a drag-along right.

23            The grant of options -- and this is consistent

24    with Minnesota law.  And we didn't cite to other states'

25    laws because I didn't think it was relevant, but this is

1    not -- Minnesota is not an outlier.  This is just sort of

2    hornbook law, that what an option is is an outstanding offer

3    that can be accepted at any time by the buyer until the end

4    of the option period, but it doesn't transfer any interest

5    in the underlying property.  And so that's obviously

6    directly relevant to whether the grant of an option to

7    acquire a majority of the general partnership units is a

8    control sale, and it just isn't under Minnesota law, just

9    isn't.

10             Then this is the -- Section 6.1(b) talks about the

11    different tranches and the Court's already heard about it

12    and I'm sure read it, and what I've highlighted here is the

13    second tranche, which consists of the outstanding general

14    partnership units, hundred percent, and 31 percent of the LP

15    units to be purchased from the seller parties and the

16    non-Taylor partners, so this is -- this is the drag-along.

17             The second tranche, the Taylor parties sell their

18    general partner units, a hundred percent of them, and they

19    sell some of their limited partnership units and all of the

20    limited partners who are non-Taylor parties get bought out.

21    And the period of time that this option can be exercised is

22    after the first tranche option, which is -- first tranche

23    has to be exercised between the day of closing of the first

24    20 percent and December 31st, 2022.

25             And then what this is saying is only if the buyer

1    exercises the first tranche and closes on it, then the

2    second tranche can only be exercised after the exercise of

3    the option and before December 31st, 2023.

4              And the way the Equity Purchase Interest Agreement

5    reads is if at any point along the sequence the buyer elects

6    not to close.  And they're sort of suggesting, though, this

7    is a nod-nod, wink-wink, and of course the buyer is going to

8    exercise the options.  Well, there are a lot of reasons why

9    that might not happen.

10             I mean, for example, the valuation of the team

11   assumes that the NBA will be able to resume a normal season

12   starting next October and that COVID will -- and the

13   restrictions on COVID and on attendance and so forth will

14   not be there.  You know, God willing that that is the case,

15   but, you know, who knows with this pandemic.  Or there may

16   be a downturn in the economy, an unexpected downturn in the

17   economy or a crash in the stock market.  I mean, there are a

18   lot of reasons outside the control of these parties and the

19   buyer may decide that it doesn't want to exercise any

20   particular options, and that's why these are all maybe and

21   hypothetical.

22             I wasn't quite sure what point my colleague on the

23   other side was making, but what the Maczko declaration is

24   saying is that what the NBA does is they actually look at

25   not just the initial sale of the 20 percent partnership

1    interest, but they look at the entire structure of this

2    Equity Purchase Interest Agreement, including the option

3    tranches.  And they don't initially approve any of the

4    option tranches.  They look at the entire structure of this

5    agreement and they say are we comfortable approving this

6    agreement in this form.  That's one of the issues that the

7    NBA has to decide.  So they have to approve the actual form

8    of agreement and who knows.  They could require changes.  I

9    mean, no one knows at this point.  But that's what the

10   initial review of the options is, is this transaction

11   structured in a way that is acceptable to the League.

12            And then he says that the point is that the NBA

13   will not review any individual option to decide whether to

14   approve it until and unless the option is exercised.  So the

15   NBA, like this Court, is not in the business of giving

16   advisory opinions and they're not going to undergo all the

17   vetting and so forth unless they are actually informed that

18   the buyer has exercised the option and that the parties want

19   to move forward.  And can anyone tell us what the League is

20   going to say about, you know, in 2023 if the buyer decided

21   to elect the -- exercise the second tranche option?  We

22   don't know anything about what the financial package is, who

23   the group of investors are.  I mean, that's one of the

24   reasons, obviously, the buyer wanted to structure the

25   Agreement in this way, to give it time to put together a

1      package, but it's impossible to say whether the League will

2      grant approval.

3               So there are two fundamental conditions that make

4      each of the tranches a hypothetical and speculative.  The

5      first is will the buyer actually exercise the tranche, and

6      the second is will the League approve it, and sitting where

7      we are today in 2021, no one knows the answers to those

8      questions or can know them.

9               We've talked about this.  Taylor hasn't exercised

10     its drag-along rights yet because they haven't come into

11     being, but it has contractually committed to do so upon

12     buyer's exercise of the call option with respect to the

13     second tranche.

14               And this is the timing.  This is the contemplated

15     timing under the Equity Purchase Agreement.  "The

16     consummation of the exercise of each Call Option" -- so

17     option has been exercised and now we're at a closing --

18     "must occur, subject to prior NBA approval, no earlier than

19     60 days following the Call Exercise Notice and no later than

20     90 days following the delivery of the Call Exercise Notice."

21     So there's a two- to three-month period that presumes that

22     NBA approval will be obtained in that window, but if it's

23     not, then that 90-day period gets automatically extended by

24     another 90 days.

25               I want to go back to Exhibit I, the portion of the

1    Equity Purchase Agreement that is called "Governance

2    Matters" that they claim is evidence that control has been

3    transferred.  And the Court may have seen this and I don't

4    want to belabor it, but I just did want to go over it, and I

5    provided a hard copy to the Court because the layout is a

6    little bit funky.

7        So this is an excerpt from the first page of

8    Exhibit I, but it just reinforces that:  "Any change in the

9    Controlling Owner or the General Partner ... shall be

10    subject to the prior approval of the NBA."

11        "The Controlling Owner," which for our purposes I

12    think we can read as General Partner, "will have exclusive

13    power and authority to act for and bind the company,

14    including the Minority Owner, with respect to all matters

15    relating to the NBA and the basketball and business

16    operations ...."

17        Then it says:  "On all matters which are not Core

18    NBA Matters, the Controlling Owner, the General Partner and

19    the Minority Partner shall have those rights and obligations

20    provided in the Partnership Agreement ...."

21        And I misspoke.  I apologize.  Controlling Owner

22    is not the same thing as General Partner.  The Controlling

23    Owner with respect to the Taylor parties is Glen Taylor,

24    who's been on the NBA Board of Governors since he purchased

25    the team, and then it's either Marc Lore or Alex Rodriguez

1    if they acquire a majority of the general partnership

2    interests.

3              But in any event, then on non-core NBA matters, it

4    says that the minority partner -- and right now, if the

5    first 20 percent tranche -- not the first tranche.  If the

6    first 20 percent limited partnership interest closes and is

7    approved, then the Lore and Rodriguez group is a minority

8    partner.  And then conversely, if they exercise the first

9    tranche and it's approved and they exercise the second

10   tranche and it's approved, then at that point the Taylor

11   parties become the minority partner, because all they have

12   left is a 20 percent limited partnership interest and the

13   buyer group has everything else, and then they get the last

14   tranche, that last 20 percent, and either they will take out

15   the Taylor Group or the Taylor Group will remain a limited

16   partner.

17             And, you know, one of the reasons that general

18   partnership interests weren't included in the first tranche

19   or the second tranche is -- and certainly not the first

20   tranche -- is that it's in the interests of the general

21   partner until the buyer actually decides to buy the general

22   partnership interest to maintain control, and so that's why

23   it was structured in that way.

24             So, yes, the minority owner, the buyer, has some

25   consultation rights and those rights are on -- they're

1    listed on the first and second pages, important matters that

2    affect the future prospects of the team, such as relocating

3    the team, or entering into new lines of business, or

4    incurring or guaranteeing indebtedness.

5           And it's not remarkable at all that if you have a

6    party who is potentially investing up to $1.5 billion to

7    acquire all of the rights of the entire franchise, that they

8    would want to be consulted with to express their opinions

9    about any of these major changes.

10          But it's very clear that it is just the right to

11   consult and that:  "Failure to engage in presentation and

12   discussion with the Advisory Board as contemplated herein

13   with respect to any matter shall not constitute a breach or

14   invalidate any action taken without presentation and

15   discussion," meaning the limited partner, the buyer, has no

16   right to enforce this section and say, "You made a decision

17   without consulting with us."

18          Now, it would be imprudent, I would agree, for a

19   general partner to make a major decision that the buyer

20   expected to be consulted with about and not consult with the

21   limited partner, but they don't have the legal obligation to

22   do that, and that's why the general partner retains all

23   power and control and this is just an advisory board.

24          Then there's a provision actually relating to the

25   Advisory Board, and the language I've highlighted is:  "For

1    clarity, the Advisory Board is advisory only and no action

2    by the company, including those specified in the prior

3    section ... requires the approval, in any form, by the

4    Advisory Board.

5            So all this list of things that they're supposed

6    to be consulted with, they don't have a say.  They can give

7    their opinion, but that's it.  They don't have the right to

8    control the general partner, to direct the general partner.

9    The general partner remains at all times in sole and

10   absolute control of all decisions that are made with respect

11   to the partnership.

12           We cited the Court to a case from Delaware, **Werner**

13   **v. Miller Technology**, which addressed this very issue, and

14   there the Delaware court said:

15           "The Advisory Board's role in [Defendant's]

16   management structure is to offer opinions regarding

17   decisions that the general partner, as manager, will

18   ultimately make.  Nowhere in the Partnership Agreement or

19   the PPM is there language that gives the Advisory Board the

20   power to direct the actions of the general partner.  The

21   ability to offer ideas cannot be construed as an ability to

22   manage the affairs of [the defendant].  The suggestion that

23   the Advisory Board participates in management simply because

24   it contributes information to the decisionmaking process is

25   untenable."

1          And the Court is I'm sure aware that Delaware is

2     one of the most respective jurisdictions on matters of

3     corporate law and that Minnesota courts, when Minnesota law

4     is not developed on a particular point, look to Delaware law

5     for guidance.  And we cited to two cases.  One was this

6     Delaware case and the second was a Ninth Circuit case which

7     said the same thing, that unless you could demonstrate that

8     the person on the advisory board -- even if they were

9     influential because they were a big bank -- unless you could

10    demonstrate that they could actually control the general

11    partner, they were not exercising control or management.

12              THE COURT:  Through legal authority.

13              MR. BAUDRY:  What's that?

14              THE COURT:  Unless they had the power to control

15    through legal authority.

16              MR. BAUDRY:  Yes, and that's why you can resolve

17    this issue --

18              THE COURT:  Not the power of persuasion.

19              MR. BAUDRY:  Yes.  You can as a matter of law look

20    at these documents and say the advisory board does not cede

21    any management control or authority to the buyers because

22    they are in an advisory role only, and it's crystal clear

23    from Exhibit I that that's the case.

24              And then the funny thing is that Mr. Orbach was

25    invited to join the Advisory Board.  This is a May 17th

1    letter from Glen Taylor to Meyer Orbach, and he says:

2        "I will be establishing an Advisory Board on which

3    Lore and Rodriguez would have seats.  If you are willing, I

4    would also like to have you join the Advisory Board.  This

5    would provide a further opportunity for you to assess

6    whether you enjoy working with them and if you would like to

7    retain your limited partnership interest with additional

8    opportunity for additional appreciation in value."

9        I mean, Mr. Taylor is offering him a seat at the

10   table.  There's nothing secret or underhanded about the

11   Advisory Board.  How is Mr. Orbach irreparably injured by

12   the creation of an advisory board that he was invited to sit

13   on?  Obviously he isn't.  And this whole idea that the

14   creation of an advisory board which hasn't happened yet,

15   which hasn't done anything, irreparably injures him when

16   nothing has happened?  He can't point to anything that has

17   harmed him.  It's entirely speculative, as is the whole deal

18   with the alternate governor.  There's no irreparable injury.

19   It's all speculative.

20       All right.  What I'm going to do now is summarize

21   the two theories, the flaws with the two separate theories

22   offered by the plaintiff.

23       The first theory is, oh, the Equity Purchase

24   Interest Agreement is a control sale, and the reason why

25   that doesn't work, as I've said, it doesn't transfer a

1    majority of the GP interest, grant of an option as a matter

2    of law, not even subject to factual, not a matter of fact,

3    but as a matter of law is not an other disposition, and the

4    language from the Minnesota Court of Appeals case is

5    virtually on point.

6            And that case didn't turn on the fact that it was

7    a UCC case.  That had nothing to do with it.  I mean, it was

8    interpreting a statute and it said this is how you interpret

9    these words, which are virtually the identical words before

10   this Court, except the differences in that case, license was

11   an additional term and in this case license is not -- it's

12   three words in our case.

13           Second, the first closing on the 20 percent

14   limited partnership interest does not convey any right to

15   control or manage the partnership.  It's just a conveyance

16   of a limited partnership interest with no rights of control.

17   And the Taylor parties obviously retain all authority to act

18   as general partner until and unless the second tranche

19   option is exercised.

20           And an option to acquire the GP interest doesn't

21   convey any right, title, or interest in the GP units?  Is it

22   something of value?  Is an option potentially valuable?

23   Sure, but that's very different than saying that it's

24   conveying an interest in the underlying partnership

25   interests.

1          There was a mistaken comment made by opposing

2     counsel.  He said, well, the Taylor parties have given up

3     the right to sell their units to anyone else, and actually

4     this is not true.  So it's -- 16.3 of the Equity Purchase

5     Agreement says that the Taylor parties are free to sell all

6     of their units to any third party subject to the third party

7     agreeing to the options, recognizing the options, but we

8     don't know if those options will be exercised and nothing

9     prohibits the Taylor parties from if they find a buyer

10    willing to pay $2 billion to sell their interest for two

11    billion to this buyer, the only condition being the buyer

12    would have to recognize the existence of these prior

13    options, but we are not prohibited, absolutely not

14    prohibited, from selling these units during the option

15    period.

16          No one -- and then as I pointed out, the language

17    in both 10.7(b) and 10.8(b) contemplates a real closing on a

18    real control sale where a majority of title to the general

19    partnership interest passes.  And it's not a maybe, perhaps

20    sale in the future, and that's the point.  No one gets to

21    tag along on a maybe.  There may or not be a control sale.

22    We won't know until the buyer elects or not to exercise the

23    second tranche option.

24          And then this argument that, well, the first 20

25    percent, it's in the same contract as the agreement to grant

1    options and therefore it's a series of related transactions.

2    That's analytically incorrect.  So the transfer of the first

3    20 percent doesn't give those 20 percent limited partnership

4    units any particular rights than if it was in a stand-alone

5    agreement.  And it's related transactions that otherwise

6    dispose of the majority of the general partnership

7    agreements.  And I'm repeating myself, but the grant of

8    options just doesn't do that.

9            And then finally, the obvious purpose of the

10    related transactions limitation, as I indicated, to prevent

11    the GP from selling its interest in separate transactions

12    and saying, you know, "I never sold a majority of them."

13            Now, the second reason, their second alternative

14    theory, why a control sale proposal does not trigger

15    tag-along rights.  Again, Section 10.1 incorporated by

16    reference as 10.7 requires legal approval, and that language

17    has to mean something.  You can't interpret 10.7 to say it

18    doesn't matter, those words don't mean anything.  All you

19    need is a proposal.  Then that would --

20            THE COURT:  I get that.  I get your position on

21    that.

22            MR. BAUDRY:  Yes.  So if it's an ineffective

23    proposal because the League hasn't approved it, it can't

24    trigger any rights, right, and that would render 10.8 null

25    and void -- I think it's 10.8(a) -- null and void since

1    they're saying tag-along rights would vest now before

2    drag-along rights, and that's exactly contrary to 10.7(a),

3    would convert a "me too" to a "me first" and would allow

4    limited partners to cash out even though there may never be

5    a control sale and no change in the general partner.

6          And if the purpose, according to them, of

7    tag-along rights is to prevent them from finding themselves

8    in the general partnership where they didn't get to pick the

9    general partner, why would it make sense to have their

10   tag-along rights triggered before you knew whether there was

11   going to be a new general partner?  If there isn't going to

12   be a new general partner, there's no need to protect the

13   limited partners from a potential sale, and if there is,

14   they automatically get bought out and the plaintiff makes a

15   very substantial return on its investment.

16          So those are all the reasons, Your Honor, why we

17   believe that not only can't they show a likelihood of

18   success on the merits, but they can't even state a claim for

19   breach of the Partnership Agreement and why we believe that

20   this complaint is susceptible to Rule 12 dismissal.

21          THE COURT:  Thank you, Mr. Baudry.  All right.

22          MR. BAUDRY:  I --

23          THE COURT:  Sorry.

24          MR. BAUDRY:  I see it's 4:00 o'clock.  I was just

25   going to address a couple of points on irreparable injury.

1           THE COURT:  Certainly.

2           MR. BAUDRY:  The first is, you read the complaint

3      and what this plaintiff wants is a buyout, money damages,

4      and that just isn't the kind of claim that gives rise to

5      irreparable injury.  And if the plaintiff is really

6      concerned about the liquidity of the Taylor Group, then why

7      would they object to a transaction where the Taylor Group is

8      getting liquidity.

9           Second, their point is, well, we wouldn't be

10     harmed if the Court entered an injunction.  And you're right

11     that the agreement says time is of the essence, but I wanted

12     to make sure that the Court was aware of the provision in

13     the Equity Purchase Agreement that says if the first 20 --

14     sale of the 20 percent interest doesn't close by July 31st,

15     then the buyer can walk away at its option.

16          THE COURT:  And I apologize.  When I said that, I

17     intended to refer to that provision.

18          MR. BAUDRY:  Yes.  And so the consequences of an

19     injunction potentially would be very significant.  It would

20     be potentially the loss of a very significant potential

21     agreement, and their response is, "Well, you haven't been

22     harmed.  You still have your partnership interests."  But

23     that agreement can be just as easily applied to them.  They

24     still have their limited partnership interests.  They can

25     wait two years and see if this buyer exercises the second

1      tranche option, and if they don't want to wait two years,

2      nothing is preventing the plaintiff from selling its limited

3      partnership interests.  So there's no -- I mean, just apply

4      the same logic to them.  That eviscerates their irreparable

5      injury argument.

6              And then with respect to the alleged management

7      control and advisory board and alternate governor, I mean,

8      it doesn't -- they don't even allege a breach of the

9      agreement and they don't articulate how either of those will

10     cause them specific immediate irreparable injury.  I mean,

11     all he tries to say is, "I bought into this deal with a

12     particular structure and you've changed the structure," but

13     they bought into this partnership understanding that they

14     had no control over that structure and they were

15     specifically committed all control over what the management

16     structure was going to be to the general partner.  So

17     ironically, they're doing what Section -- I think it was

18     9.1 or 9.3 -- says they can't do.  They're interfering.

19     They're trying to interfere with a general partner deciding

20     how he wants to run his business.  So not only do they not

21     state a claim.  They're actually violating the Partnership

22     Agreement by trying to interfere with the operation of the

23     partnership.

24              That's all the comments I had unless Your Honor

25     has any questions.

1          THE COURT:  No, I don't have any further questions

2     at this time.  Here's how we're going to wrap up today.

3          Orbit by my count had a little over an hour and a

4     half time to argue.  The defendants have had about an hour

5     and 20 minutes or so, give or take.  I think that's plenty

6     of time along with the briefs I've had or I've received that

7     have been filed by the parties to understand what's going on

8     here today, but I want to give the parties an opportunity to

9     provide some rebuttal.  I don't want to shut you out of that

10    completely, but I'm going to shorten it.  So I'm going to

11    give each of you ten minutes of rebuttal time to respond to

12    the arguments that the other side's made.

13         I appreciate that there was additional argument

14    that was potentially going to be given on the motion to

15    dismiss here, but since it relates solely to the merits, I

16    can't imagine how it would be different than the extensive

17    merits sort of focused argument that was given before.  So

18    let's keep our rebuttal under ten minutes if we could,

19    please.

20         And, Mr. Schafhauser, let me start with you.

21         MR. SCHAFHAUSER:  Thank you.  I'm going to take

22    less than two minutes and then I'm going to hand it to

23    Mr. Krauss to finish up.

24         THE COURT:  If you could turn on your microphone,

25    that would be great.  Thanks.

1      MR. SCHAFHAUSER:  I apologize.  I'll be very

2  brief.  I just wanted to focus on a couple of points that my

3  colleague made at the end.

4      In their brief to the Court on June 21st, docket

5  number 30 on page 15, the Taylor parties say that the

6  information needed regarding the purchase, regarding the

7  amounts -- and this is what it says, and I quote:  "The

8  information is currently unknown and unknowable."

9      In their brief to the Court on June 11th,

10  similarly, the Taylor parties say, and I quote:  "Until the

11  date of the call option closing is known, it is not possible

12  to determine the purchase price," and then they go on and

13  talk about how they can't calculate numbers.  It sounds to

14  me like the Taylor parties are asserting that the damages

15  are not readily calculable, that the price is not readily

16  calculable, that the numbers are not readily calculable, the

17  classic irreparable injury case.

18      Briefly moving to one other topic quickly, Your

19  Honor asked both sides for citations and authority that an

20  option is -- you know, another disposition is a valuable

21  right.  Well, I would cite and quote two cases,

22  respectfully, to Your Honor.  We cited these in the briefs

23  as well.  The *Sanderson* case, which is a Minnesota case, in

24  *Sanderson* the court said, and I quote:  "It is well-settled

25  that the right to sell one's property to anyone at anytime

1    for any price is a property right."  It's a property right.

2         My esteemed colleague says that the EIPA as to the

3    options is not binding as to the buyer, but that misses the

4    point.  It's binding as to the Taylor parties.  The option

5    is in favor of the buyer.  It's binding as to the Taylor

6    parties.  They have sold within the words of the Minnesota

7    Supreme Court a property right.  They have conveyed it.  "It

8    is well-settled that the right to sell one's property to

9    anyone at anytime for any price is a property right."

10   Whether or not the buyer is bound misses the point that the

11   seller, that the option conveyor is bound.

12         The second case, Your Honor, very succinctly, the

13   *Crowell v. Delafield* case, a 1990 Minnesota case as well.

14   The Supreme Court of Minnesota in that case again -- and I

15   quote -- says that:  "An option to purchase property

16   together with the permissive use of the property is a

17   property right of some significance," is a property right

18   and it's of some significance.  So it's a significant

19   property right that we're talking about.  It's not

20   immaterial.  And frankly, if hypothetically Mr. Taylor were

21   to go to the buyer and say, "I'll tell you what.  We'll sell

22   you 20 percent.  Forget the options.  The options are

23   immaterial.  They're not worth much.  You know, I don't want

24   to sell the options."  We all know, everybody in this room

25   knows what would happen, because the options are of

1    paramount importance and value.

2              So I just wanted to cite those two cases, Your

3    Honor, both Minnesota Supreme Court cases, that go directly

4    to this issue.

5              And with that I hand it over to my colleague.

6              THE COURT:  Mr. Krauss, I've got you at about six

7    or seven minutes here.

8              MR. KRAUSS:  Thank you, Your Honor.  Let me go

9    directly then to Section 10.1 of the Partnership Agreement.

10             They put a lot of weight on the reference in

11   10.7(a) to "Subject to 10.1," so what does 10.1 mean there?

12   Well, part of the context is Section 10.7(a) is part of the

13   amendment that Mr. Orbach insisted upon when he joined the

14   partnership, so Section 10.1 is already pre-existing.  And

15   what they want to do there is make clear Section 10.7(a)

16   does not displace Section 10.1.  So to the extent that

17   Section 10.1 is still putting restrictions on the

18   effectiveness of transfers, nothing in 10.7 changes that.

19   It doesn't supersede that.  If you have a control sale and

20   that control sale would lead to a transfer over time once

21   it's effective that would violate 10.1, that transfer,

22   subject to a tag-along sale or drag-along sale or other type

23   of control sale, wouldn't be effective.  That's all it does.

24   It doesn't carry the weight that Defendants are putting on

25   it with respect to NBA approval and so forth.

1          And the proof of that, where's the proof of that?

2     The proof of that is in, for example, Section 10.7(b), as in

3     boy, the sale notice provision, because the sale notice

4     provision, as Your Honor will recall, is triggered within

5     ten days of a definitive agreement.  Within ten days of a

6     definitive agreement, if there are tag-along rights to be

7     exercised, there must be a sale notice given.

8          And the response from the plaintiff is to say,

9     well, you cannot have any sort of exercise of tag-along

10    rights until the NBA already has approved.  Well, NBA

11    approval is going to come after a definitive agreement, so

12    they have it very much backwards.  The definitive agreement

13    comes first, within ten days there must be the sale notice

14    with respect to allow the exercise of the tag-along rights,

15    and then somewhere down the line, only then do you get to

16    NBA approval.

17          THE COURT:  Then I'll ask you the same question I

18    asked Mr. Baudry.  How do you define "definitive"?

19          MR. KRAUSS:  I define "definitive" in this case,

20    Your Honor, as the EIPA.  And I will say that I was very

21    surprised and I would imagine that any representative of the

22    buyer would probably be very surprised to hear that the EIPA

23    is not the definitive agreement with respect to their

24    acquisition of all the partnership interests as part of a

25    series of related transactions.  There is no other contract

1    that's contemplated by the EIPA.  There is nothing further

2    to bind the Taylor parties.  Yes, the buyer has discretion

3    in terms of exercising the options, but as Mr. Schafhauser

4    just noted, the Taylor parties are bound.  There is no other

5    agreement.

6         So, it was frankly somewhat shocking to hear that

7    there's going to be some other contract when the call

8    options are exercised.  There's nothing in the EIPA that

9    contemplates that.  To the contrary, as Your Honor has gone

10   through the EIPA, the EIPA is comprehensive and it addresses

11   just about everything having to do with the exercise of the

12   call options and the closing on those call options.  There's

13   nothing left to be agreed upon.

14        So that is the definitive agreement.  That

15   definitive agreement precedes by a long shot any NBA

16   approval.  And in fact, as we have shown in our briefs and

17   Mr. Schafhauser walked through, the entirety of the

18   structure of the tag-along rights and the exercise of the

19   tag-along rights is such that all of it precedes the

20   closing, all of it precedes any of that transfer by the

21   selling partner, including Transfer with a capital T when

22   Your Honor looks at Section 10.7(d)(iii).  And there's

23   nothing there about NBA approval being required before those

24   tag-along rights are exercised.  To the contrary.  You

25   propose to enter into a control sale and that triggers the

1    tag-along rights as long as there's no exercise of

2    drag-along rights, which there isn't here, because the

3    control sale is what occurs starting -- at first it was

4    early as June 30th, now it's as early as July 13th.

5              In ways the drag-along rights are a bit of a side

6    show, because there's no dispute.  For whatever reason, the

7    defendants are not exercising their drag-along rights with

8    respect to what we say on the plaintiff's side is the

9    control sale.  And given that, the tag-along rights are

10   triggered immediately once it was proposed, which is the

11   EIPA, and then at that point we see that -- the breach of

12   the agreement by the failure to honor any of those tag-along

13   rights, much less the opportunity to fulfill them entirely.

14             THE COURT:  All right.  Thank you, Mr. Krauss.

15             Mr. Baudry?

16             MR. BAUDRY:  I've just got a couple of points,

17   Your Honor.  I think he referenced the *M.L. Gordon Sash &*

18   *Door v. Mormann* case where the court said the holder of an

19   option has an equitable right.  As we point out in our reply

20   brief in that case, the Minnesota Supreme Court said, well,

21   we're not actually dealing with a true option agreement

22   here.  The plaintiff had been in possession of the land and

23   there were circumstances that showed that it wasn't a true

24   option.

25             More to the point, sure, the grant of an option

1    may create a valuable property right in the holder of the

2    option, but that property right is the right to enforce the

3    option.  It isn't -- it isn't part of the corpus of the

4    partnership interest itself.  The buyer doesn't have an

5    interest in any of the partnership interests.  All it has is

6    the right to enforce the option if and when it chooses to

7    exercise it.  That's very different.  It's a bundle of

8    rights outside of the partnership unit.

9            I think that's -- I think we've talked long enough

10   and the Court has been provided plenty of material to chew

11   on, so I appreciate the Court's patience in hearing us out.

12           THE COURT:  And I appreciate that.

13           All right.  Let me just make some comments here at

14   the end so that everybody knows sort of how this is going to

15   go or how I expect this to go.

16           Obviously this is a complicated set of documents

17   to someone who's never seen them before, but the parties

18   here have done just an excellent job of jumping on this and

19   briefing it in an expedited fashion.  Ordinarily it would

20   take us about 45 days at least just to go through the

21   briefing process before we get to an oral argument.  Here,

22   if I remember correctly, everything was filed on about,

23   what, the 14th of June, and here we are just, gosh, two

24   weeks later or even a little less, or at least not quite

25   three weeks later, and we've really covered everything, and

1    I am grateful for that.

2         I appreciate the need for expeditious treatment

3    here.  As you might imagine, we've been working on this, so

4    I expect that we will be able to issue a decision, as I say,

5    expeditiously.

6         Oral argument's been very helpful today as it

7    always is when you have good lawyers presenting it.  It

8    gives me another chance to understand the arguments, a

9    chance to ask questions, a chance to clarify.  And I would

10   say that I don't think I heard anything today that is

11   different from what I read in the briefs or radically

12   different from what I understood the briefs to be arguing,

13   so I think we're still in a position here to move along

14   relatively quickly.

15        I was sensitive originally to the June 30th date

16   as a closing date.  I understand we've got a bit more time

17   than that now, but I also want to give the party who thinks

18   they're on the adverse end of this thing an opportunity to

19   appeal, so we're going to try to move quickly and give that

20   party that opportunity however that may shake out here.

21   Obviously, you know, preliminary injunctions are

22   interlocutory, but they are also immediately appealable,

23   whether you win or lose, so that itself, regardless of how

24   the motion to dismiss is decided, presents that opportunity

25   and I want to be sensitive to that.

1          All right.  With that, as I say, I really

2     appreciate the presentation of the motion both in the briefs

3     and here today, the motions, I should say.  It's been

4     well-briefed and well-argued.  The matter is under

5     advisement and we will issue a decision as quickly as we

6     can, and we're adjourned.

7          Thank you.

8          MR. SCHAFHAUSER:  Thank you very much, Your Honor.

9     (Proceedings concluded at 4:22 p.m.)

10          *    *    *    *

11          **C E R T I F I C A T E**

12

13

          I, **TIMOTHY J. WILLETTE,** Official Court Reporter

14          for the United States District Court, do hereby

15          certify that the foregoing pages are a true and

16          accurate transcription of my shorthand notes,

17          taken in the aforementioned matter, to the best

18          of my skill and ability.

19

20

21          ***/s/ Timothy J. Willette***

22

          **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
23          Official Court Reporter - U.S. District Court
          Warren E. Burger Federal Building & U.S. Courthouse
24          316 North Robert Street - Suite 146
          St. Paul, Minnesota  55101
25          651.848.1224